1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| NORTHSHORE SCHOOL DISTRICT, | No. |
| | |
| Plaintiff, | COMPLAINT AND PETITION FOR JUDICIAL REVIEW |
| v. | |
| A.J. and N.J. on behalf of their minor child, P.J., | |
| Defendants. | |

Plaintiff Northshore School District (the "District") brings this action to appeal the Findings of Fact, Conclusions of Law, and Final Order ("ALJ Decision") entered by Administrative Law Judge Paul Alig on August 14, 2022. This appeal is made pursuant to 20 U.S.C. § 1415(i)(2) and Wash. Admin. Code § 392-172A-05115.

## I.  PARTIES

1.      Plaintiff is the Northshore School District, a municipal corporation organized under the laws of Washington and located at 3330 Monte Villa Parkway, Bothell, Washington 98021.

2.      Defendants A.J. and N.J. are the parents of minor child P.J. and are residents of Snohomish County, Washington (collectively, "Defendants"). At all times relevant to this

COMPLAINT AND PETITION FOR JUDICIAL
REVIEW - 1

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

action, Defendants resided within the boundaries of the District and P.J. attended a District elementary school.  To protect the privacy of the minor child at issue, only Defendants initials are used.  The true identities of Defendants are known to all parties.

## II.  JURISDICTION AND VENUE

3.    The District's claims arise under the Individuals with Disabilities Education Act ("IDEA") 20 U.S.C. §1400 et. seq.; 28 U.S.C. §§ 2201 and 2202; and the state Education for All Act ("State Act") Chapter 28A.13 RCW; and the regulations promulgated thereunder.

4.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1342 and 20 U.S.C. § 1415(i)(2).

5.    Venue in the Western District of Washington at Seattle is appropriate as Defendants are residents of Snohomish County, Washington and the District is a municipal corporation located in Snohomish County, Washington.

## III.   FACTUAL ALLEGATIONS

6.    The time period relevant to this action is P.J.'s fourth grade (2019-2020 school year) and fifth grade (2020-2021 school year) years.  In second grade, P.J. was evaluated and found eligible for special education services under the IDEA disability category of Specific Learning Disability.  During both school years at issue, P.J. attended school at Kokanee Elementary School within the District.

7.    Defendants initiated an administrative due process hearing regarding the provision of special education services to P.J., which was assigned Office of the Superintendent of Public Instruction Cause No. 2021-SE-0155 and Office of Administrative Hearings Cause No. 11-2021-OSPI-01463.  An administrative hearing was held before Administrative Law Judge Paul Alig on May 17-20 and May 25, 2022.  The primary issues in the hearing were whether the

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

District violated the IDEA by failing to provide P.J. a free appropriate public education

("FAPE") under the IDEA and whether Defendants were entitled to their requested relief, which

included reimbursement for private services obtained for P.J. through Brock's Academy, located

in Washington State.

8.      On Sunday, August 14, 2022, the ALJ issued the ALJ Decision, a copy of which

is attached as **Exhibit A**.  Among other errors, the ALJ Decision included findings and

conclusions that were outside the issues identified for resolution in the administrative due

process proceeding.

9.      The IDEA provides an appeal of the ALJ Decision as a matter of right.

Specifically, 20 U.S.C. § 1415(i)(2)(A) states:

> Any party aggrieved by the findings and decision made under subsection (f) or (k)
> who does not have the right to an appeal under subsection (g), and any party
> aggrieved by the findings and decision made under this subsection, shall have the
> right to bring a civil action with respect to the complaint presented pursuant to this
> section, which action may be brought in any State  court of competent jurisdiction
> or in a district court of the United States, without regard to the amount in
> controversy.

10.     This right to appeal also is set forth in the Washington Administrative Code at

Wash. Admin. Code § 392-172A-05115(1), which states:

> Any party aggrieved by the findings and decision made under WAC 392-172A-
> 05105 through 392-172A-05110 or 392-172A-05165 has the right to bring a civil
> action with respect to the due process hearing request. The action may be brought
> in any state court of competent jurisdiction or in a district court of the United States
> without regard to the amount in controversy.

11.     The District brings this appeal pursuant to the above-stated provisions.

## IV.  CAUSE OF ACTION: APPEAL OF
## ADMINISTRATIVE ORDER UNDER THE IDEA

12.     The allegations in Paragraphs 1 to 11 are realleged and incorporated here by

reference.

COMPLAINT AND PETITION FOR JUDICIAL
REVIEW - 3

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

13.     Pursuant to the IDEA and Washington State's special education laws, the District offered P.J. a FAPE for the 2019-2020 and 2020-2021 school years, the two school years at issue in the administrative proceeding and this resulting appeal.

14.     The ALJ Decision found that the District had failed to provide a FAPE and violated the IDEA during the time period at issue.  The ALJ erroneously concluded that the District failed to provide individualized education programs ("IEPs") that were reasonably calculated to offer P.J. a FAPE in the areas of reading and written language.  The ALJ further erroneously concluded that the District failed to implement P.J.'s IEP in a manner that denied P.J. a FAPE.  Finally, the ALJ erroneously concluded that Defendants' selected private placement was appropriate and that Defendants were entitled to recover the cost of this placement at public expense.  As a result of these erroneous conclusions, the ALJ ordered the District to reimburse Defendants for the cost of their private placement during the 2021-2022 school year and awarded Defendants 21 weeks of compensatory education services to be delivered at Defendant's selected private placement during the 2022-2023 school year.

15.     The District is aggrieved by the ALJ's Decision and is entitled to appeal that decision.

## V.  RELIEF REQUESTED

The District requests that the Court enter an order:

1.     Reversing the erroneous findings and conclusions in the ALJ Decision.

2.     Entering declaratory judgment that the District provided P.J. a free appropriate public education under the IDEA and state law.

3.     Denying Defendants' request for compensatory education services and for reimbursement for Defendants' private placement at Brock's Academy at public expense.

COMPLAINT AND PETITION FOR JUDICIAL
REVIEW - 4

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

1    4.    Any and all other relief as the Court may deem just and equitable.

2    DATED this 14th day of November, 2022.

3                                PACIFICA LAW GROUP LLP

4

5                                /s/ Sarah C. Johnson
                                 _____
6                                Carlos A. Chavez, WSBA #34076
                                 Sarah C. Johnson, WSBA #34529
7                                *Attorneys for Plaintiff*
                                 *Northshore School District*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

COMPLAINT AND PETITION FOR JUDICIAL
REVIEW - 5

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

1

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of November, 2022, I electronically filed the foregoing document with the Clerk of the United States District Court using the CM/ECF system which will send notification of such filing to all parties who are registered with the CM/ECF system.

_____

Dawn Taylor

COMPLAINT AND PETITION FOR JUDICIAL
REVIEW - 6

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

EXHIBIT A

STATE OF WASHINGTON
OFFICE OF ADMINISTRATIVE HEARINGS
FOR THE SUPERINTENDENT OF PUBLIC INSTRUCTION

| IN THE MATTER OF | OSPI CAUSE NO. 2021-SE-0155 |
|---|---|
| | OAH DOCKET NO. 11-2021-OSPI-01463 |
| NORTHSHORE SCHOOL DISTRICT | FINDINGS OF FACT, CONCLUSIONS OF LAW, AND FINAL ORDER |

A due process hearing in this matter was held by videoconference before Administrative Law Judge (ALJ) Paul Alig on May 16 to 20, and May 25, 2022. The Parents of the Student whose education is at issue[1] appeared and were represented by Ryan Ford, attorney at law. The Northshore School District (District) was represented by Carlos Chavez, attorney at law. Also present for the District was Adra Davy, Director of Special Education, North Region Learning Community.

## PROCEDURAL HISTORY

The Parents filed a due process hearing request on November 24, 2021, and the matter was assigned to ALJ Jacqueline Becker. The District filed a response on December 7, 2021. ALJ Becker issued a prehearing order on December 21, 2021. The Parents filed an amended hearing request on January 14, 2022. ALJ Becker issued a prehearing order on January 26, 2022. The matter was reassigned to ALJ Paul Alig on April 11, 2022. On May 11, 2022, both parties filed Motions in Limine which were decided during the hearing.

The deadline for a written decision in this case was extended at the parties' request to thirty (30) days after the record of the hearing closes. *See* Prehearing Order dated December 21, 2021. The hearing ended on May 25, 2022, and the record closed on July 15, 2022, when the parties timely filed post-hearing briefs. The due date for a written decision is August 14, 2022.

---

[1]To ensure confidentiality, names of parents and students are not used.

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 1

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

EVIDENCE RELIED UPON

The following exhibits were admitted into evidence:

Parent Exhibits: PA1-PA12; PB1-PB26; PB28-PB32; PB34; PB35, pgs. 5, 6; PB36; PB37 pgs. 28, 29, 31; PB 38-PB41; PC1-PC7; PC8 pgs. 12-28; PC9-PC14; PC16; PC20; PC21; PC23-PC30; PC31 pgs. 4-13; PC32-PC33; PC35; PC37-PC53; PC55-PC58; PC60-PC65; PC67-PC71; PC72 pgs. 1, 2, 8; PC76 pgs. 1, 3-17; PC77; PC78; PC80; PC81; PC83; PC84; PC86-PC88; PD1-PD13; PD14 pgs. 1, 2, 4; PD15-PD19.[2]

District Exhibits: D1-D19; D21-D24.

**The following witnesses testified under oath. They are listed in order of initial appearance:**

Jenn Haynes, School Psychologist, Northshore School District
Janet Prendergast, Occupational Therapist, Northshore School District
Caitlin Fellows, Elementary School Teacher, NorthShore School District
Jessica Cottrill, Elementary School Special Education Teacher, Northshore School District
Dr. Christine Clancy, Neurologist, The Center for Child Development
Dr. David Breiger, Clinical Psychologist, Breiger and Breiger Psychological and Neuropsychological Services, PLLC
Katherine Sparks, Elementary School Teacher, Northshore School District
Rachel Kier, Director of Education, Brock's Academy
Ragen Huck, Special Education Teacher, Northshore School District
Rachel Williamson, Private School Teacher, Brock's Academy
The Parent[3]
Heather Fletcher, School Psychologist, Northshore School District
Daniel Myers, Middle School Special Education Teacher, Northshore School District
Jeffery Keller, Middle School Special Education Teacher, Northshore School District
Linda Nelson, Middle School Social Studies Teacher, Northshore School District
Jenna Richins, Former Extended School Year (ESY) Teacher
Tracy LeBel, Elementary School Paraeducator, Northshore School District
Megan Stringfellow, Elementary School Paraeducator, Northshore School District
Adra Davy, Director of Special Education, Northshore School District

---

[2] The Parents' exhibits were identified in volumes A-D and are noted as "P" with the corresponding volume.

[3] References to the Parent are to the Student's Mother.

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 2

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

## ISSUES

The issues for the due process hearing and the Parents' requested remedies are:[4]

a.  Whether the Parents are entitled to declaratory relief finding that the District violated the Individuals with Disabilities Education Act (IDEA) and denied the Student a Free Appropriate Public Education (FAPE) dating back two years from the filing of the original complaint in the area of Reading.

b.  Whether the Parents are entitled to declaratory relief finding that the District violated the IDEA and denied the Student a FAPE dating back two years from the filing of the original complaint in the area of Writing.

c.  ~~Whether the Parents are entitled to a finding that the District's reevaluation of the Student from December 2020 included material errors, mistakes, inaccuracies, falsehoods, and/or omissions.~~

d.  ~~Whether the Parents are entitled to a finding that the District denied the Parents meaningful participation in the Student's special education by including material factual errors, mistakes, inaccuracies, falsehoods, and/or omissions in the District's reevaluation of the Student from December 2020.~~

e.  ~~Whether the Parents are entitled to a finding that the District denied the Parents meaningful participation in the Student's special education by failing to adequately maintain educational records related to the Student's Individualized Education Program (IEP) goals and failing to make those records timely available to the Parents.~~

f.  ~~Whether the totality of the District's failures to allow the Parents to meaningfully participate in the Student's special education rose to the level of denying the Student a FAPE.~~

g.  Whether the Parents are entitled to a finding that the special education programming offered by the District for the 2021-22 school year was not reasonably calculated to provide the Student a FAPE, thus resulting in a denial of FAPE.

---

[4] The Second Prehearing Order dated January 26, 2022, set out 9 issues(a)-(i) for hearing. On May 11, 2022, the Parents moved to strike issues (c)-(f) as listed in the Second Prehearing Order. The District did not object to this motion. Therefore, issues (c)-(f) as stated in the Second Prehearing Order were STRICKEN.

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 3

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

h.  Whether the Parents are entitled to a finding that the instruction provided by Brock's Academy was and continues to be appropriate for the Student given her unique needs in the areas of Reading and Writing; and

i.  Whether the Parents are entitled to the relief requested in their Amended Complaint, which includes:

1.  Compensatory education delivered by Brock's Academy in the area of Reading for the District's denial of FAPE in Reading dating back two years from the date the original complaint was filed.

2.  Compensatory education delivered by Brock's Academy in the area of Writing for the District's denial of FAPE in Writing dating back two years from the date the original complaint was filed.

3.  Reimbursement by the District for all Brock's Academy tuition and other related expenses paid by the Parents.

4.  A prospective Individualized Education Program (IEP) placement at the District's expense at Brock's Academy for the Student's specially designed instruction in English Language Arts.

5.  A prospective IEP placement at the District's expense at Brock's Academy for the Student's specially designed instruction in the area of Reading.

6.  A prospective IEP placement at the District's expense at Brock's Academy for the Student's specially designed instruction in the area of Writing.

7.  Reimbursement for the private evaluation completed by Dr. Clancy and other related costs.

8.  An IEP and educational placement moving forward that is reasonably calculated to enable the Student to receive educational benefits, considering her unique needs; and

9.  An Order that includes whatever additional relief the Court may find just and equitable.

*See,* Second Prehearing Order dated January 26, 2022.

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 4

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

FINDINGS OF FACT

In making these findings of fact, the logical consistency, persuasiveness, and plausibility of the evidence has been considered and weighed. To the extent a finding of fact adopts one version of a matter on which the evidence is in conflict, the evidence adopted has been determined more credible than the conflicting evidence. A more detailed analysis of credibility and weight of the evidence may be discussed regarding specific facts at issue.

Some of the evidence presented was hearsay, which is a statement made outside of the hearing used to prove the truth of what is in the statement. In administrative hearings, hearsay evidence is admissible if, in the judgment of the presiding officer, "it is the kind of evidence on which reasonably prudent persons are accustomed to rely in the conduct of their affairs." RCW 34.05.452(1). An ALJ may not base a finding of fact exclusively on hearsay evidence unless the ALJ determines that doing so "would not unduly abridge the parties' opportunities to confront witnesses and rebut evidence." RCW 34.05.461(4). To the extent any findings of fact are based on hearsay, it is determined that such findings did not unduly abridge the parties' opportunity to confront witnesses and rebut evidence.

### The Student

1.    At the time of the hearing in May 2022, the Student was eleven years old. PC22p6.[5]

2.    It was undisputed that throughout the relevant time period in this case the Student lived in the Northshore School District (District). Test. of Parent, 1075:2.[6]

3.    The Student began raising concerns about her ability to read and write with her Parent when she was in preschool. Test. Of Parent, 670:13. The Student was being held back in preschool recess to finish her schoolwork. Test. of Parent, 670:14.

4.    In 2017, the Parent obtained a private reading tutor for the Student to provide extra reading instruction through the Wired for Reading program. Test. of Parent, 1076:12. Wired for Reading is a structured learning program that builds on a student's development of basic reading skills. Test. of Parent 1048:22. The Student continued working with her Wired for Reading tutor for approximately two years. Test. of Parent, 1076:12.

---

[5] Citations to the exhibits of record are by the party ("P" for Parent; "D" for District) and exhibit and page numbers. For example, a citation to PC22p6 is to the Parents' Exhibit C22 at page 6.

[6] Citations to the hearing transcript indicate who provided the testimony followed by the page number(s) and line(s) on which the testimony appears. For example, a citation to Test. Of Parent, 661:1 is a citation to the Parent's testimony at page 661 line 1 of the transcript.

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 5

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

5.      The Student is inquisitive, creative, incredibly perseverant, and a hard worker. Test. of Ms. Cottrill, 739:4.

## Science of Reading

6.      In 2000, the National Reading Panel identified five components or pillars at the core of effective reading programs:[7] phonological awareness, phonics, fluency, vocabulary, and reading comprehension. PC39pp9, 30; Test of Clancy, 369:2. These are the areas that a structured literacy program provides to a student so that they may make systemic advances in reading. *Id*.

7.      Phonemic awareness or phonological awareness is the ability to identify and manipulate individual sounds that are the phonemes within spoken words. Test. of Clancy, 369:11. This skill allows a student to understand and be able to break words down into their individual sounds. PC8p21; Test. of Clancy, 369:14. Understanding of phonology is related to the development of decoding skills. PC8p21.

8.      Phonics, or phonologic processing, is how letters and groups of letters link together to make sound, letter correspondence, and it helps with spelling. Test. of Clancy, 369:20.

9.      Fluency is a student's reading rate and accuracy. Test. of Clancy, 369:24.

10.      Vocabulary is word knowledge. Test. of Clancy, 370:2. It can be broken into knowledge of words seen in print and words heard verbally or auditorily. Test. of Clancy 370:4.

11.      Reading comprehension is the understanding and interpretation of what is read. Test. of Clancy, 370:6. For students to be able to read accurately and understand written material, they need to be able to decode what they read, make connections between what they read and know, and then synthesize and hold that information so it can be understood. *Id*.

## Read Naturally

12.      Jessica Cottrill,[8] a special education teacher in the District, taught reading to the Student during the 2020-2021 school year (4th grade) using Read Naturally passages. Test. of Cottrill, 310:3,

---

[7] The elements of a structured literacy program developed consistent with the science of reading are called, interchangeably, components or pillars. For consistency, the term component is used in this decision.

[8] In 2000, Ms. Cottrill obtained a bachelor's degree in special education with a certificate in preschool through twelfth grade special education and kindergarten through 6th grade endorsement from Western Washington University. Test. of Cottrill, 266:18. She obtained a master's degree from the University of Washington in curriculum and instruction. Test. of Cottrill 266; 754. Before joining the District, Ms. Cottrill was employed for nine years as an elementary school special education teacher for kindergarten through 6th grade in the Puyallup School District. She taught two years as a special education teacher in the Lake Washington School District. Test. of Cottrill, 267. At the time of the hearing, she was in her sixth year as a special

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

759:11. Read Naturally is a program that uses the five components of reading. Test. of Cottrill, 369:11. Ms. Cottrill chose to use the Read Naturally program with the Student because it had various grade level passages that she could use as a teaching tool and to help monitor the Student's reading progress in areas such as fluency. Test. of Cottrill, 759:11. Reading passages are based on grade level. For example, a beginning 4th grade passage would be labeled level 4. 0.[9] Test. of Cottrill 313:4. Read Naturally scoring is done by timing unpracticed or "cold" readings. PC72p1, 2, 8; Test. of Cottrill, 310:3. A cold read differs from a "hot" read, which is a passage that a student has had practice reading. Test. of Cottrill, 309:17.[10] Cold reading scores are compared to determine a student's reading ability and progress over time. Test. of Cottrill, 318:3. Comparison of cold reads is more accurate in measuring student's ability because hot read scores may vary depending upon how many times a child reads a passage. Id. When a student grows in reading skills their cold reading scores improve. Test. of Cottrill, 312:7. This growth can be seen through an increased trajectory in words per minutes scores, in reading accuracy scores, and in reading comprehension scores. Test. of Cottrill, 312:22.

## Fountas and Pinnell

13.     Fountas and Pinnell publishes text gradients and instructional level expectations used for progress monitoring in reading. PC74p3; Test. of Cottrill, 759:21. The District used the Fountas and Pinnell gradient for the Student to measure her instructional level, meaning the level at which the Student can decode the text without making so many errors that it is beyond their frustration threshold. PC74p6; Test. of Cottrill, 296:8, 298:14.

14.     On the Fountas and Pinnell gradient an accuracy percentage of 98 percent is independent for the Student Test. of Cottrill, 297:25. Accuracy of 95 to 98 percent was instructional level for the Student. Test. of Cottrill, 298:5. The hard level (frustration level) is when a student makes so many errors that it is frustrating. Test. of Cottrill, 298:22. The Student's frustration level was 90 percent accuracy and below or 12 or more errors. Test. of Cottrill, 298:25.

## Phono-Graphix

15.     The District used the Phono-Graphix curriculum as supplemental reading materials for students in kindergarten through high school that qualified for special education in basic reading.

education teacher in the kindergarten through 5th grade level at Kokanee Elementary School in the District. Test. of Cottrill, 268.

[9] For clarity, passages are referred to by grade level in this decision.

[10] Exhibits refer to cold reads and hot reads as well cold timing and hot timing. The terms read and timing mean the same in these contexts. Unless otherwise indicated reading and writing assessments referenced in this decision are based on cold reads.

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 7

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

PA10p1; Test. of Cottrill, 738:25; Adra Davy[11] led the District team that adopted Phono-Graphix. Test. of Ms. Davy. 1158:10. Phono-Graphix targets the area of reading of phonemic awareness and phonics. PA10pp1, 2; Test. of Ms. Cottrill, 760:5. It teaches students to sound out, segment, and blend sounds to make words. D18p4; Test of Ms. Cottrill 760:11. Phono-Graphix incorporates writing with reading. Test. of Cottrill, 761:2. When Phono-Graphix is taught, writing in an integral part of reading instruction, and can be applied into writing instruction. Test. of Cottrill, 761:4. Beginning in 2018, Phono-Graphix was the primary literacy program the District used with the Student throughout elementary school. Test. of Cottrill, 738:25, Test of Parent, 1109:5.

## IRR and iReady

16.    The Individual Running Record (IRR) was a District assessment in which a student's teacher would ask specific questions, tally miscues, comment regarding decoding, and listen as students responded to questions about the text. Test. of Sparks, 510:3. The IRR assessment used the Fountas and Pinnell reading gradient. Test. of Cottrill, 296:8.

17.    The iReady is an on-line diagnostic assessment and instruction tool implemented by the District. Test. of Sparks, 218:22, 225:4. The iReady provides a numerical raw score and a grade range of where a student's scores fall. 519:23. A student's overall score and specific domains in reading are given a placement range within a corresponding grade level that appear on a placement table. Test. of Fellows, 219:5, Test. of Fellows, 220:18.

## Initial Evaluation

18.    During the 2017-2018 school year the Student was in 2nd grade. Test. of Parent, 1075:5. The Student was struggling at school even after receiving extra assistance, therefore, the Parents referred her for a special education evaluation. *Id*.

19.    On March 7, 2018, the District completed an initial evaluation of the Student to determine if she required specially designed instruction (SDI). PA4p6. The Student's initial

---

[11] In 1993, Ms. Davy graduate from Western Washington University with a dual certification in elementary education and special education. Test. of Davy, 1146:8. In 1996, she received a master's degree in educational leadership from the University of Portland. *Id*. In 2014, she completed the University of Washington Stamford's Educational Leadership Program and received her program administrator certificate. *Id*. Ms. Davy taught special education at the elementary school level in other districts. Test. of Davy, 1147:7. Beginning in 1997, she began working as an elementary school teacher for the District and taught general education and special education classes. Id. Ms. Davy became a teacher on special assignment (TOSA) coaching and providing professional development to teachers. Test of Davy, 1148:5. She is currently the Director of Special Education for the North Region Learning Community of the District. *Id*. In this role she provides support for five elementary schools, two middle schools and a high school. *Id*. Her duties include professional development, supporting teachers and building administrators, supervising educational therapists, TOSAs and board-certified behavior analysists (BCBAs). Test. of Davy, 1148:19. Ms. Davy also teaches at the University of Washington, Danforth Program special education module called Leading for Inclusion. *Id*.

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 8

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

evaluation was conducted by Jennifer Haynes[12] a District School Psychologist. PA4p4; Test. of Haynes, 88:7. During the Student's initial evaluation, Ms. Haynes administered the Wechsler Intelligence Scale for Children — 5th Edition (WISC-V) to obtain an estimate of her intellectual abilities. PA2p3; Test. of Haynes, 123:16. The Student's Full-Scale Intelligence Quotient (FSIQ) score of 99 placed her in the average range and 47th percentile. PA2p1, 3; Test. of Haynes, 96:21.

20.    The Student's verbal comprehension index score was 113, which was the 81st percentile. PA2p4. Her visual spatial index score was 111 and in the 77th percentile. *Id.* Both scores were given a classification of high average. *Id.* The Student's fluid reasoning index and working memory index scores were the same and in the average classification (103 standard scores, 58 percentiles).

21.    The Student's processing speed index was in the very low range at a standard score of 77, which was the 6th percentile. PA2p4. Students with below average processing speeds can take longer to retain and build skills at times. Test. of Haynes, 98:6. Processing speed is how quickly a student can complete tasks. Test. of Clancy, 351:6. The Student's slower processing speed impacts her ability to get information from her head onto paper. Test. of Clancy, 351:24. Slow processing speeds can require classroom accommodations such as smaller-sized working groups. *Id.* A smaller-sized group allows for focus on a student's area of need and to support the student in maintaining focus. Test. of Haynes, 98:16. Ms. Haynes opined that in cases where a student with slower processing speed who has not made growth towards the goal of specific skill being taught over a time frame of six to twelve weeks, a more intensive approach may be considered. Test. of Haynes, 101:9

22.    The Student was found to exhibit severe discrepancies between her ability and achievement and, therefore, was approved for special education and related services under the category of Specific Learning Disability (SLD) in the areas of reading, written language, and math. PA2p4. Ms. Cottrill was assigned as the Student's special education case manager and remained in that role through the 2020-2021 school year. Test. of Cottrill, 268:18.

### 3rd Grade

23.    The Student was in the 3rd grade during the 2018-2019 school year. PA3p4. She attended Kokanee Elementary School in the District. *Id.* The Student received SDI in reading, written language, and math for 140 minutes per week in each area. PA2p3. The Student received Occupational Therapy (OT) as a related service for 30 minutes per week. PA3p9, 16.

---

[12] In 2002, Ms. Haynes graduated from University of Puget Sound with a bachelor's degree in psychology. Test of Haynes, 87. She obtained master's in education from Central Washington University in 2006. *Id.* She has been employed as a school psychologist for the District since the 2006-2007 school year. *Id.*

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

The Student received her SDI and related services in a special education classroom separate from non-disabled peers. PA3p17.

**Dr. Jenkins Evaluation**

24.    In November 2018, the Parents had the Student evaluated by Whitney Jenkins Ph. D. of the Center for Child Development. PA2p1; 1075. Dr. Jenkins completed a psychological evaluation report of the Student. PA2. Dr. Jenkins conducted a Wechsler Individual Achievement Test-3rd Edition (WIAT-III). PA2p5. The Student's total reading score of 74 ranked in the very low range. Her basic reading skills score of 74 and her reading comprehension and fluency scores of 75 were similarly within the very low range. PA2p6. Her early reading skills score of 91 was at the low end of the average range. PA2p5. Her word reading score of 71 and phonetic decoding skills of 77 placed her within the very low range. PA2p6. Her reading comprehension score of 54 was very low. *Id.* The Student's overall reading fluency score of 80 was low average. *Id.* The Student exhibited reading skills well below age and grade level expectations. *Id.* In addition, these skills were highly discrepant from her aptitude as they were nearly 2 standard deviations below her FSIQ. *Id.*

25.    The Student's overall performance score in written expression of 83 ranked in the low average range. PA2p6. On the spelling subtest, the Student's score of 80 was in the low average range and 9th percentile. PA2p5, 6. The Student's Sentence Composition score of 81 was in the low average range. *Id.* The Student's Essay Composition score of 87 ranked within the low average range. *Id.* Dr. Jenkins concluded that taken together the Student's scores demonstrated writing skills that were below age expectations and her level of aptitude. *Id.* Overall, the Students reading, and written expression skills were below average. *Id.*

26.    Dr. Jenkins administered the Comprehensive Test of Phonological Processing—2nd Edition (CTOPP-2). PA2p7. The Student's overall phonological awareness skills (i.e., her understanding of the individual sounds that make up words) placed at the lowest tier of the average range at the 25th percentile. PA2p8. Understanding of phonology is related to the development of decoding skills, a requisite for reading. *Id.*

27.    Dr. Jenkins assessed the Student using the Wide Range Assessment of Memory and Learning-Second Edition (WRAML-2). PA2p9. The Student's verbal learning recall and verbal learning recognition subsets were each a score of 7 and in the 16th percentile, receiving a low average classification. *Id.* The Student scored in the average range on the other subsets of the WRAML-2 *Id.*

28.    Dr. Jenkins concluded the Student's reading and writing abilities were well below age expectations as well as below the Student's aptitude. PA2p16. She noted the Student demonstrated collective difficulties consistent with Attention-Deficit/Hyperactivity Disorder (ADHD),

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 10

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

Predominantly Hyperactive-Impulsive Presentation. *Id.* She also demonstrated inattentive symptoms to a lesser degree. *Id.*

29.     Dr. Jenkins recommended the Student receive SDI in reading and written expression, with focus on further developing her foundational skills in reading (i.e., phonemic awareness and word study —sound/symbol relationships, syllable types, and morphology) to improve her accuracy. PA2p17. She also recommended the Student receive one-to-one educational therapy with a learning specialist to assist with her weaknesses in reading and written expression. *Id.*

### June 2019 Assessment Revision

30.     On June 13, 2019, a meeting was held regarding an assessment revision of the Student's March 7, 2018, initial evaluation. PA4p6; Test. of Haynes, 88:9. The assessment revision was conducted by Ms. Haynes to review and consider Dr. Jenkins' evaluation. PA4pp3, 4; Test. of Haynes, 88:19. Ms. Haynes reviewed the scores from the assessments conducted by Dr. Jenkins and included them in the assessment revision report. PA4pp9, 10; Test. of Haynes, 90:20. The assessment revision also considered information regarding private tutoring the Student received through Wired for Reading as well as handwriting and typewriting instruction the Student received outside of school. PA4p6. The Student continued to qualify for special education services under the eligibility category of SLD with SDI in the areas of reading, math, and written language. PA4p12.

### Beginning 4th Grade School Year

31.     The Student attended 4th grade at Kokanee Elementary School within the District during the 2019-2020 school year. PB2p3; Test. of Sparks, 483:13. Her general education teacher was Katherine Sparks.[13] PB2p7; Test. of Sparks, 483:13. The Student received her special education services in reading and written language in the learning center, a separate special education classroom at Kokanee Elementary school. Test. of Cottrill, 334:1.

---

[13] Ms. Sparks obtained her bachelor's degree in communications and elementary education in 2008 from Seattle Pacific University. Test. of Sparks, 480:12 She received her master's degree in literacy from Seattle Pacific University in 2012. Test. of Sparks, 481:2. While attending school, Ms. Sparks worked as a substitute teacher for the District and another district. Test. of Sparks, 482:7. She was employed as an elementary school paraprofessional from November 2011 through June 2012. Test. of Sparks, 482:11. She became an overload elementary school teacher during the 2012-2013 school year. Test. of Sparks, 482:14. From 2013 through 2016, she was a sixth-grade science teacher at Kokanee Elementary School. Test. of Sparks, 482:16. Ms. Sparks began working as a 4th grade teacher at Kokanee in 2016. *Id.* In 2020, she transferred to another District elementary school and at the time of hearing, she was on leave. She is a certificated elementary school teacher with an endorsement in reading. Test. of Sparks, 482:21.

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 11

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

32.     In September 2019, the Student obtained an IRR score that placed her at 3rd grade level. PB6p5, Test. of Sparks, 491.

33.     In October 2019, when the Student's reading fluency was tested using cold reads, the Student was reading middle 2nd grade passages with 62 correct words per minute and with 94 percent accuracy. PB2p3. She was reading 3rd grade passages with 69 correct words per minute, with 89 percent accuracy, and answering comprehension questions with 100 percent accuracy. *Id.* When given 4th grade level passages, the Student was reading 81 correct words per minute, with 94 percent accuracy, and answering comprehension questions with 60 percent accuracy. *Id.* When given 4th grade Dolch[14] high frequency words the Student was reading the words with 53 percent accuracy. *Id.*

34.     In October 2019, the Student was spelling one syllable words with long vowel spellings (a_e, ey, oe, ai, ee, ea, oa, ie, ay, ow) with 20 percent accuracy. PB2p14. She was spelling one syllable words, including variant vowels (ew, ow, aw, oi, ue, ou, oo, au, oy) with 10 percent accuracy. *Id.*

### October 2019 IEP Amendment

35.     On October 24, 2019, the Student's IEP team met to amend her IEP. PB2p3; Test. of Sparks, 506:12. The Student's October 2019 IEP amendment included the following goals:

- Her basic reading goal was that by March 22, 2020, when given a 4th grade passage, she would read the passage improving basic reading from 94 percent accuracy to 98 percent accuracy as measured by teacher observations and data. PB2p12; Test. of Cottrill, 276:8.
- Her reading fluency goal was that by March 22, 2020, when given a 4th grade passage, she would read the passage improving reading accuracy from 81 correct words per minute to 95 correct words per minute as measured by teacher observations and data. PB2p12.
- Her reading high frequency words goal was that by March 22, 2020, when given 4th grade Dolch high frequency words, she would read the words improving accuracy from 53 percent to 95 percent as measured by teacher observations and data. PB2p13.
- Her reading comprehension goal was that by March 22, 2020, when given a 4th grade passage, she would read the passage and answer a comprehension question

---

[14] Dolch words, or sight words, are short frequently used words. Test. of Cottrill, 720:7. The purpose of practicing these words was to create more automaticity in the Student's reading of words so that she did not have to take time to sound out words allowing her to focus on the comprehension of text. Test. of Cottrill, 719:9. Use of Dolch words also improved the Student's reading accuracy. Test. of Cottrill, 720:7.

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 12

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

improving comprehension from 60 percent accuracy to 90 percent accuracy as measured by teacher observations and data. PB2p13.

- Her written language goal in completed sentences was that by March 22, 2020, when given a writing task, she would write complete sentences (capital at the beginning, subject verb agreement, and ending punctuation) improving written language skills from 53 percent complete sentences to 80 percent complete sentences as measured by teacher observations and data. BP2p14.

- Her written language goal in spelling was that by March 22, 2020, when given a one syllable word including long vowel spellings (a_e, ey, oe, ai, ee, ea, oa, ie, ay, ow) she would sound out and write words improving spelling from 20 percent accuracy to 90 percent accuracy as measured by teacher observations and data. BP2p14. The purpose of a goal targeting the spelling long vowels and variant vowels was to increase the Student's spelling accuracy. Test. of Cottrill, 720:24. Teaching the Student writing skills also helped increase her reading skills. Test. of Cottrill, 721:6.

36.    The Student's October 2019 IEP amendment stated the Student would receive 140 minutes per week of SDI in reading in a special education classroom, and 140 minutes per week in written language special education instruction in a special education classroom. PB2p19. The Student's October 2019 IEP amendment stated the Student was placed in general education classes 40-79 percent of the day. *Id.*

### January-March 2020 Progress Assessment and Reporting

37.    In January 2020, the Student again obtained an IRR score that placed her at a 3rd grade level. PB6p5, PC74p3; Test. of Sparks, 490:20. This score remained unchanged from her September 2019 testing. Test. of Sparks, 518:2.

38.    On January 23, 2020, the Student received an iReady score of 481 which is a 2nd grade level placement. Test. of Sparks, 519:23.

39.    On January 31, 2020, the Student read a 4th grade passage with 94 percent accuracy. D2p1; PB3p1. She read 83 correct words per minute at 4th grade level. D2p2; PB3p2. The Student read 4th grade high frequency words with 70 percent accuracy. *Id.* The Student spelled one syllable long vowel words with 30 percent accuracy independently. D2p4; PB3p4. When she was provided with the Phono-Graphix sound picture resource sheet, the Student was able to use the scratch sheet spelling strategy to increase to 80 percent accuracy. *Id.* At the time of the progress report the Student performed poorly on her written language long vowel goal without the Phono-Graphix resource sheet. Test. of Cottrill, 745:17.

40.    On February 29, 2020, Ms. Sparks, after speaking with the Parent, requested that the Student receive one-on-one counseling from the school counselor to address anxiety issues the

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

Student was experiencing at school. PB4p1; Test. of Sparks, 484.18. The anxiety at school was based on the Student's transition from the learning center to the general education classroom. *Id.*

41.    In March 2020, the Student read a 4th grade passage with 96 percent accuracy. D2p8. The Student read 73 correct words per minute at 4th grade level. *Id.*

## COVID-19 Closure

42.    In the beginning of March 2020, District schools including Kokanee Elementary School closed due to the COVID-19 pandemic. PB24p1; Test. of Sparks, 508.5, 511:4. By March 31, 2020, the Student began attending school remotely. PB14p1; PB24p1; Test. of Sparks, 508.5, 511:4. The Student had learning center reading from 9:00-9:30 a.m. on Tuesdays and Thursdays, small group learning center check-ins from 9:30-9:45 a.m. on Tuesdays, learning center math from 10:00-10:30 on Tuesdays, and learning center writing from 10:00-10:30 on Thursdays. *Id.* This schedule continued through the ended of the school year. *Id.* Based on the District calendar March 31, 2020, through the end of the 2019-2020 school year was 11 weeks. D22p1.

43.    At the beginning of remote learning, the Student participated. Test of Sparks, 513:13. However, at a certain point the Student began to have difficulty attending the group classes and attempted to keep up by watching recorded lessons with her mother or tutor. Test of Sparks, 513:19. The Parent believed the remote learning program implemented from March 2020-June 2020 negatively impacted the Student because of reduced teacher involvement. Test. of Parent, 1139:17.

## April 2020 Annual IEP

44.    On April 13, 2020, the Student's IEP team conducted an annual review of the Student's IEP and developed the following annual goals:
- Her basic reading goal was by April 17, 2021, when given a 5th grade passage, the Student would read the passage improving basic reading from reading a 5th grade passage with 0 percent accuracy to reading a 5th grade passage with 98 percent accuracy as measured by teacher observations and data. D3p9.
- Her reading fluency goal was by April 17, 2021, when given a 5th grade passage, the Student would read the passage improving reading accuracy from 0 correct words per minute to 109 correct words per minute as measured by teacher observations and data. D3p9.
- Her reading high frequency words goal was by April 17, 2021, when given 5th grade Dolch high frequency words, the Student would read the words improving accuracy from 24 percent to 95 percent as measured by teacher observations and data. D3p9.

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 14

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

- Her reading comprehension goal was by April 17, 2021, when given a 5th grade passage, the Student would read the passage and answer comprehension questions improving comprehension from 0 percent accuracy to 90 percent accuracy as measured by teacher observations and data. D3p10.
- Her written language goal in paragraph writing was by April 17, 2021, when given a writing prompt, the Student would write legibly or keyboard at least 3 developed paragraphs (including topic sentence, transition words, examples, conclusion) improving writing skills from needing teacher support to plan and organize three paragraphs to independently planning and organizing her writing into three developed paragraphs as measured by teacher observations and data. D3p11.
- Her written language goal in spelling – long vowels was by April 17, 2021, when given one syllable words including long vowel spellings (a_e, ey, oe, ai, ee, ea, oa, ie, ay, ow) the Student will sound out and write words improving spelling from 80 percent accuracy using a spelling resource sheet to 90 percent accuracy independently without a spelling resource sheet as measured by teacher observations and data. D3p11.
- Her written language spelling – variant vowels goal was by April 17, 2021, when given one syllable words including variant vowel spellings (ew, ow, oo, aw, oi, ue, ou, co, au, oy) the Student will sound out and write words improving spelling from 0 percent accuracy using a spelling resource sheet to 80 percent accuracy independently without using a spelling resource sheet as measured by teacher observations and data. D3pp2,11.

45.    The purpose of a goal targeting the spelling long vowels and variant vowels was to increase the Student's spelling accuracy. Test. of Cottrill, 720:24. Teaching the Student writing skills also helped increase her reading skills. Test. of Cottrill, 721:6.

46.    The Student's April 2020 IEP stated that due to being out of school, specific data was not currently available regarding her skills to independently write paragraphs, and that the goal identified would be an appropriate next goal to target in her instruction. D3p10.

47.    The April 2020 IEP was written during the COVID-19 pandemic and the IEP team was unable to get a sample of the Student's work at the 5th grade level. Test. of Cottrill, 327:15. Ms. Cottrill testified she would normally never use a baseline of zero percent. *Id.*

48.    The Student's April 2020 IEP team did not change the amount or placement of the Student's special education services in reading and written language. D3pp16-17.

49.    The Student's April 2020 IEP team considered and rejected increasing service minutes for reading. D3p19. The team determined there were too many factors to increase services minutes. D3pp19-20.

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 15

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

## June 2020 IEP Progress Reporting

50.    On June 16, 2020, the District reported on the Student's fluency goal that the Student read from a 5th grade level text with 70 correct words per minute. PB9p2; Test. of Cottrill, 775:19. Ms. Cottrill identified this text as "Crossing the Finish Line." PB37p31; PC67p4; Test. of Cottrill, 774:18. During the hearing Ms. Cottrill clarified that "Crossing the Finish Line" was a 3rd grade level text. Test. of Cottrill, 778:8.

51.    On June 18, 2020, the District reported on the Student's basic reading goal that when reading later 3rd grade passages, the Student's reading accuracy ranged from 78-85 percent. *Id.* However, it also stated she read from a 5th grade text with 99 percent accuracy. PB9p1; Test. of Cottrill, 775:11. Staff indicated the Student appeared to be particularly focused on the day she read this more challenging passage. PB9p1.

52.    On June 19, 2020, the District reported on the Student's written language spelling-long vowel goal stated she recently spelled long vowel one syllable words with 40 percent accuracy (with a spelling resource sheet). PB9p3. The District reported progress on the Student's written language spelling-variant vowels goal that she recently spelled variant vowel one syllable words with 50 percent accuracy (without spelling resource sheet). *Id.*

## ESY Summer 2020

53.    Ragen Huck[15] was the Student's ESY teacher during the summer of 2020. Test of Huck, 684:20. The ESY plan provided 360 minutes weekly of SDI in reading and written language beginning July 6, 2020, through July 23, 2020. D2p20; PB17p3.

54.    Prior to beginning her ESY services with the Student, Ms. Huck met with Ms. Cottrill. Test. of Huck, 654:21. Ms. Cottrill went over the Student's present level of performance and IEP goals and some of the materials she used with the Student. *Id.* Ms. Huck did not meet with anyone else in the District regarding the Student's ESY program and reported the Student's progress to the District using the IEP Online program. Test. of Huck, 655:70. Ms. Huck used reading material provided by Ms. Cottrill with the Student. Test. of Huck, 664:24.

---

[15] Ms. Huck graduated from Central Washington University and received her bachelor's degree in special education preschool through twelfth grade. Test. of Huck, 647:12. She received her master's degree from American College of Education in special education with a minor in differentiated instruction in 2021. Test. of Huck, 647:21. Ms. Huck taught for the District for two and a half years while pursuing her master's degree. Test. of Huck, 684:20. She currently teaches special education for another District. *Id.*

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

55.     On July 24, 2020, the District reported progress on the Student's ESY basic reading goal that she was able to read 3rd grade passages consistently with 92 percent accuracy. PB9p1; Test. of Huck, 662:8.

56.     On July 24, 2020, the District reported progress on the Student's ESY reading fluency goal that she could read from a 5th grade level text with an average of 83 correct words per minute and was very good at sounding words out when she got stuck PB9p2, PC11p2. During the hearing, Ms. Huck testified that she was, in fact, using 3rd grade level texts with the Student, and the notation that the Student was reading 5th grade level text when timed for her reading fluency goal might have been a typo. Test. of Huck, 665:2. Ms. Huck is the best source of information as to the materials she used for ESY services with the Student. It is more likely than not that Ms. Huck used the same grade level materials to assess the Student's basic reading goal as her reading fluency goal. I, therefore, find the report misidentified the grade level that the Student was reading when timed for her fluency goal and the true level was 3rd grade. *Id.*

## Beginning of Student's 5th Grade Year

57.     The Student was in the 5th grade during the 2020-2021 school year. Her general education teacher for 5th grade was Caitlin Fellows.[16] PC2p2; Test. of Fellows, 172:7. When the Student's 5th grade school year began, there were 21 or 22 students in the Student's class and instruction was still being delivered through remote learning due to the COVID-19 pandemic. Test. of Fellows, 543:16.

58.     The Student indicated in a survey that one thing that worried her most about her 5th grade year was keeping up with her peers and dealing her anxiety. PC3p2. The Parent indicated in a 5th grade survey that the Student was embarrassed about her learning challenges as she wanted to be like her peers. PC1p4.

59.     At the start of the 2020-2021 school year, the Student received 150 minutes per week of one-on-one special education services from Ms. Cottrill (30 minutes per day, 5 days per week). Test. of Cottrill. 716:9. Divided evenly among reading, written language, and math, this amounted to 50 minutes of one-on-one special education services in each

---

[16] Ms. Fellows graduated from Northwestern University with a Bachelor of Arts degree in Asian and Middle East Studies in June 2010. Test. of Fellows, 167:4. She attended Hamline Law School from 2012-2015. Test. of Fellows, 167:12. She obtained a master's degree in elementary education from the University of Minnesota, Twin Cities, in the Spring of 2017. Test. of Fellows, 167:18. Ms. Fellows worked as a full-time master's student with Minneapolis Public Schools for the 2016-2017 school year. Test. of Fellows, 169:5 She began working for the District in 2017 and taught third grade for her first two years before transitioning to 5th grade beginning with the 2019-2020 school year. Test. of Fellows, 170:24.

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 17

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

of the areas for which the Student qualified. The Student also attended general education Zoom classes in reading and written language 4 days per week. PC57p1. During these classes, staff from the learning center team provided online assistance for the Student. PC57p1; Test. of Fellows, 211:2. This was called "push-in" support. *Id.* The amount of push-in support in her general education classes varied depending on the Student's request and assignments. Test. of Fellows, 212:4.

60.    On September 17, 2020, using a Phono-Graphix sound picture resource chart, the Student completed long vowel spellings with 50 percent accuracy. D10p15.

61.    On September 23, 2020, the Student obtained a score of 541 on the iReady reading assessment, which was in the upper range for the 3rd grade. Test. of Fellows, 220:18. The Student scored 527, in vocabulary which was a little higher than the middle of the 3rd grade range. D9p10; PC44p10, Test. of Fellows, 222:7, 230:5.

62.    On October 8, 2020, the Student scored 60 percent accuracy on her written language spelling variant vowel goals using the Phono-Graphix sound picture chart. D10p15.

### Dr. Battin Evaluation

63.    On October 6, 2020, Michelle Battin, Ph.D. completed a private evaluation at the Parents' request and expense. PC8p12; Test. of Parent, 1081:11. Dr. Battin is a clinical psychologist and was employed through the Center for Child Development Neurological and Therapeutic Services. PC8p12. The Parents requested Dr. Battin's evaluation to obtain a better understanding of the Student's functioning and abilities as well as to obtain diagnostic clarification and gather recommendations for specific treatment interventions. PC8p12; Test. of Parent, 1081:11

64.    Dr. Battin completed an evaluation report. PC8p12. She administered the WISC-V to observe the Student's problem-solving skills and estimate her cognitive ability. PC8p17. The Student's FSIQ highlighted functioning in the lower limits of the average range, ranking her at the 32nd percentile with a Standard Score of 93. *Id.* PC8pp17-18.

65.    In contrast to her cognitive abilities in other areas, the Student performed in the deficient range on tasks assessing her speed of information processing. PC8p19.

66.    Dr. Battin administered selected subtest to measure the Student's spelling, writing, and reading abilities on the WIAT-III. PC8p19. The Student's overall score in written expression of 80 was in the 9th percentile and her basic reading score of 73 was in the 4th percentile. PC8p19.

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 18

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

67.    In writing skills, the Student's aggregate performance clustered in the low average range overall on the WIAT-III. PC8p20. The Student demonstrated functioning in the borderline range when required to spell single words to dictation (Spelling). *Id.* As part of this assessment, the Student was asked to write a brief writing sample regarding a preferred activity. *Id.* She knew what she wanted to write about and was able to integrate a simple introduction and several examples into her writing. *Id.* However, her sample tended to be overly simplistic, as she struggled to integrate different supporting statements and a conclusion into her writing. *Id.* As such, the Student's performance on this writing sample ranked in the lower tier of the average range when compared to her same-aged peers (Essay Composition). *Id.*

68.    Within the reading domain, the Student's overall performance on the WIAT-III was in the borderline range for age. PC8p20. On a measure of sight word identification, the Student performed in the deficient range (Word Reading). *Id.* Her capacity to accurately decode nonsense words, which was reliant on her underlying phonetic decoding skills, measured in the low average range (Pseudoword Decoding). *Id.* The Student's reading comprehension skills ranked in the lower limits of the average range. *Id.*

69.    As part of her evaluation, Dr. Battin administered the Test of Word Reading Efficiency – 2nd Edition (TOWRE-2), which measures an individual's ability to pronounce printed words accurately and fluently. PC8p20. The TOWRE-2 measures both the ability to sound out words quickly and accurately (Phonemic Decoding Efficiency) and the ability to recognize familiar words as whole units or sight words (Sight Word Efficiency). *Id.* In aggregate, the Student's Total Reading Efficiency skills measured in the borderline range, at the 5th percentile when compared to age-matched peers. *Id.*

70.    On the CTOPP-2 subtests, the Student's phonological awareness skills were assessed in the low average range when compared to her same-aged peers. PC8p21. Her abilities in this domain were assessed, in part, via the Elison subtest, a task that required her to break words down into their individual phonemes, which ranked in the borderline range and the 2nd percentile. *Id.* The Student's phonological memory aggregate score on the CTOPP-2 subtests ranked in the borderline range for her age. PC8p21.

71.    Dr. Battin assessed the Student using the WRAML-2. PC8p22. The Student ranked in the low average range at the 9th percentile on the verbal learning scaled score obtaining a score of 6. PC8p21. The Student's ability to retain rote verbal material after a short delay also measured in the low average range at the 16th percentile as indicated by a score of 7 on the verbal learning delayed subtest. *Id.*

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 19

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

72.    Dr. Battin additionally assessed the Student's reading skills via the Gray Oral Reading Test – 5th Edition (GORT-5). PC8p22. Her performance measured in the borderline range with respect to reading rate, accuracy, fluency, and comprehension skills. *Id.* In aggregate, the Student's Oral Reading Index was estimated below expectations, at the 2nd percentile, when compared to her same-age peers. *Id.*

73.    Dr. Battin also conducted the Behavior Assessment System for Children – 3rd Edition (BASC-3) and Behavior Rating Inventory of Executive Functioning (BRIEF) profile. PC8pp23-26. Ms. Sparks noted as part of the BASC rating of the Student that she can get frustrated in reading and written language due to dyslexia not always allowing her to show her understanding and knowledge. PC5p2; 496-497. The Student's BRIEF profile was similar to individuals clinically diagnosed with Attention Deficit/Hyperactivity Disorder-Combined Type (ADHD). PC8p24.

74.    Dr. Battin diagnosed the Student with ADHD; SLD in Reading and Written Expression; Generalized Anxiety Disorder; and Other Specified Depressive Disorder. PC8p28

75.    Dr. Battin recommended that the findings from her evaluation be integrated into the Student's IEP with the following specific elements:

- SDI in Reading: Dr. Battin recommended that the Student receive individualized and specialized instruction via a phonologically based curriculum that has a specified scope and sequence targeting her reading rate/fluency/comprehension skills. *Id.* She recommended that this service be delivered at a rate of 5x45 minutes, totaling 225 minutes, per week, in Basic Reading. *Id.* Dr. Battin recommended these services be provided to the Student only by a certified special education teacher (not special education classroom staff) with expertise in remediating these areas of difficulty. *Id.*

- SDI in Written Expression: Due to the severity of the Student's disability in written expression, Dr. Battin recommended this instruction be provided by a special education teacher on a 1:1 basis at a frequency of 5 times weekly for 45 minutes, totaling 225 minutes per week. PC8p30. Dr. Battin recommended these services be provided to the Student by a teacher with expertise in remediating writing challenges, with the aim of teaching her strategies and efficient approaches for producing and integrating written material. *Id.* Dr. Battin further recommended the Student be given assistance with all aspects of the writing process, including the independent generation of ideas, use of thinking maps, writing mechanics, sentence structure, paragraph/essay formulation, and editing. *Id.* She stated the Student needed to be directly taught organizational strategies to learn information more effectively and to express written knowledge in an organized fashion and provided examples of writing support software and conceptual maps (graphics organizers.) *Id.*

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 20

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

- <u>Learning Environment:</u> Dr. Battin recommended including an accommodation in the Student's IEP, that she be taught by a teacher with experience working with students with difficulties in reading and written language who can provide a very structured yet highly supportive and nurturing classroom environment. PC8p31.

## October 2020 Team Meetings

76.     On October 15, 2020, a meeting was held because the Parents provided Dr. Battin's evaluation to the IEP team. D9p2. Based on review and consideration of the private evaluation, the team decided to reevaluate the Student. D9p2; Test. of Haynes, 92:1. Assessment areas recommended were academics, motor, and behavior. *Id.* Ms. Haynes conducted the reevaluation. Test. of Haynes, 91:11.

77.     On October 29, 2020, the Student's IEP team met. D7p1; Test of Cottrill, 763:23. The Student's IEP team determined that based on current assessments and slow rate of progress towards IEP reading goals, an IEP amendment was needed. *Id.* The Student's IEP reading instruction was increased from 140 minutes per week to 230 minutes of SDI in the special education classroom per week beginning November 5, 2020. D7p15; Test. of Cottrill, 763:23. The team decided the Student would no longer receive her SDI in math during her one-on-one services with Ms. Cottrill but would instead receive this SDI during Zoom break-out groups within the general education classroom. PD7p18. The team declined to make further changes to her special education services until after reviewing her revaluation. *Id.*

78.      On November 5, 2020, as the Student was no longer receiving SDI in math during her one-on-one services, she was provided an estimated 75 minutes per week in SDI in both reading and written language, evenly divided among the total 150 minutes per week that Ms. Cottrill delivered. Test. of Cottrill 716:9. Based on the District calendar this adjustment occurred approximately 9 weeks into the 2020-2021 school year. D22p2.

## First Quarter 5th Grade IEP Progress Report

79.     On November 20, 2020, the District reported on the Student's progress toward her basic reading goal that she read a 5th grade passage with 91 percent accuracy. D8p1. Test. of Cottrill, 782:12. Regarding the Student's fluency goal, the Student read a 5th grade passage with 71 correct words per minute. D8p2; Test. of Cottrill, 783.3. Regarding the Student's written language goals in spelling – long vowels, she spelled words with one syllable long vowel spellings with 50 percent accuracy. *Id.* Regarding the Student's written language spelling – variant vowels goal, she spelled one syllable vowels with 60 percent accuracy. D8p2; D10p15.

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 21

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

80.    On December 1, 2020, regarding her written language goal in paragraph writing, when given a template for opinion writing, the Student demonstrated her ability to verbally dictate content for three body paragraphs. D10p16; Test. of Cottrill, 766:17. She needed teacher support to separate her ideas into individual paragraphs and to edit her work. D10p16. She was unable to independently plan and organize her writing into three developed paragraphs. D10p16; Test. of Cottrill, 718:8.

## December 2020 Reevaluation

81.    On December 1, 2020, an evaluation team meeting was held. D9p1. The team reviewed the Student's WISC-V cognitive scores obtain by Ms. Haynes in February 2018, WRAML-2 testing conducted by Dr. Jenkins, WISC-V testing conducted by Dr. Battin, and WRAML-2 testing conducted by Dr. Battin. D9pp17-18. As part of the school-based reevaluation, Ms. Haynes administered the Children's Organization Skills Scales (COSS) assessment regarding study organizational skills. D9p15. The Student scored in the average range on the COSS scales. D9p16. Ms. Haynes interpreted the testing completed by Dr. Jenkins and Dr. Battin to consistently indicate the Student was in the average range, around the 50th percentile. Test. of Haynes, 97:21. The report considered BASC-3 and BRIEF behavioral testing conducted by Dr. Battin in addition to behavioral observations conducted by Ms. Haynes. D9pp13-14. The reevaluation team reviewed the Student's iReady and other District assessments and input from the Parent and general education teacher. D9pp7-12.

82.    The December 2020 reevaluation included a review of existing data, pertinent health/medical information, input from general education, and one observation of the Student via Zoom. D9p1; Test. of Hayes, 103:25.

83.    The reevaluation team determined the Student had low self-esteem and needed lots of reassurance due to frustration from functioning below her peers. PC22p13. The Student's self-esteem contributed to the Student having anxiety over not doing things well in school. *Id.* The reevaluation team determined the Student would blurt out or interrupt when feeling insecure of anxious. *Id.*

84.    Based on their review of Dr. Battin's report, scores from the WIAT-III, CTOPP-2, and GORT-5, and review of IEP goals and progress data, the reevaluation team recommended that the Student continue to qualify for SDI in basic reading, reading comprehension, math calculation, math reasoning, math fluency, and written expression. D9p22. The reevaluation team recommended that reading fluency be added as a specific area of eligibility. *Id.* The team also recommended that the Student no longer be eligible for OT services based on recent testing indicating that the Student scored in the average range in motor coordination, visual perception, and visual motor integration. D9pp22-

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 22

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

23. The reevaluation team recommended the IEP team consider accommodations for the Student with respect to behavior. Test. of Haynes, 108:4.

### December 2020 Student Performance Assessments

85.　On December 8, 2020, the Student read a 5th grade passage with 94 percent accuracy. D10p13. She also read a 5th grade level passage with 52 correct words per minute. *Id.*

86.　On December 11, 2020, the Student spelled one syllable long vowel words with 90 percent accuracy and one syllable variant vowel words with 80 percent accuracy. D10p15. The Student completed this assessment with the use of her Phono-Graphix sound picture chart. *Id.* The Student wrote the words on a large white board and was prompted to write at least three versions of the word using the scratch sheet spelling strategy. *Id*

87.　On December 15, 2020, the Student was spelling two syllable long vowel words with 30 percent accuracy. D10p15.

### December 18, 2020, IEP Meeting

88.　On December 18, 2020, the Student's IEP team met to consider the results of the District's December 2020, triannual reevaluation and to develop the Student's annual IEP. D10p1; Test. of Ms. Cottrill, 766:6. Attendees at this IEP meeting were the Parent, Ms. Cottrill, Ms. Fellows, Ms. Davy, Principal Joel Fagundes[17], Mr. Chavez, the District's attorney, and Mr. Ford, the Parents' attorney. D10p3.

89.　The December 18, 2020, IEP team identified the Student's present level of performance in reading by reviewing Ms. Fellows' reports, District assessments (including IRR and iReady reading diagnostics), quarterly IEP progress reports, and the Student's performance on 5th grade level passage reading. D10, pp8-10, 13. When the IEP team met, the Student had not mastered her previous basic reading and reading fluency IEP goals. Test. of Cottrill, 783:3.

90.　The IEP team identified the following new IEP goals in reading:
- Basic Reading: by December 22, 2021, the Student will improve basic reading from reading a 6th grade passage with 81 percent accuracy to reading a 6th grade passage with at least 95 percent accuracy as measured by teacher observations and data. D10p14.

---

[17] Mr. Fagundes was Principal of Kokanee Elementary School. Test. of Cottrill, 305:8.

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

- Reading Fluency: by December 22, 2021, when given a 6th grade passage, the Student will improve reading accuracy from 41 correct words per minute to 80 correct words per minute as measured by teacher observations and data. *Id.*
- Reading High Frequency Words: by December 22, 2021, when given 5th grade Dolch high frequency words, the Student will read the words improving accuracy from 73 percent to 95 percent as measured by teacher observations and data. *Id.*
- Reading Comprehension: by December 22, 2021, when given 6th grade passage the Student will answer comprehension questions improving comprehension from 33 percent accuracy to 80 percent accuracy as measured by teacher observations and data. *Id.*

91.    The IEP team identified the Student's present level of performance in written language by reviewing Ms. Fellows reports, quarterly IEP progress reports, and the Student's performance on spelling resource sheets and paragraph writing. D10, pp8-10, 15-16. The team identified the following IEP goals in written language:

- Written Language Spelling – Long Vowels: by December 22, 2021, when given 2 syllable words including long vowel spellings (a_e, ey, oe, ai, ee, ea, oa, ie, ay, ow) and a spelling reference sheet slowly faded over time, the Student will sound out and write words improving spelling from 30 percent accuracy to 80 percent accuracy as measured by teacher observations and data. D10p15.
- Written Language Paragraph Writing: by December 22, 2021, when given a written draft (handwritten, scribed, typed with or without assistive technology) the Student will independently organize her writing into separate body paragraphs and individual sentences improving writing skills from 0 out of 3 opportunities to 2 out of 3 opportunities as measured by teacher observations and data. D10p16.

92.    The Student's IEP team added accommodations in written language but did not explain why it did not adopt Dr. Battin's recommendation regarding an increase in SDI minutes in written language. D10pp15-17. The IEP team continued the Student's placement and provided she would receive her SDI in reading and written language in a special education classroom. D10p21.

93.    On December 19, 2020, the District issued a prior written notice (PWN) indicating the IEP revisions would be initiated beginning December 23, 2020. D10p25.

**5th Grade First Quarter Report Card and IEP Progress Report**

94.    On January 8, 2021, the Student obtained an iReady reading assessment scaled score of 540 which was one point less than her September 2020 score of 541. PC61p1;

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 24

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

Test. of Fellows, 232:25. The Student's iReady assessment scores indicated she needed improvement in decoding. D16p1; PC20p1; Test. of Fellows, 181:3.

95.      The Student's first quarter report card for the 2020-2021 school year indicated that in written language, the Student sometimes had difficulty focusing her ideas, and it could be a challenge for her to refocus her thoughts. D16p1; PC20p1; Text. of Fellows, 182:4. Ms. Fellows noticed a pattern in the Student's approach to writing where she would get very enthusiastic about learning different ideas and go off on tangents. Test. of Fellows, 182:4, 202:12.

96.      On January 28, 2021, the District issued a report on the Student's IEP goals. PC25p1. The report stated:
- Basic reading goal: The Student demonstrated skills to read a 6th grade passage with 81 percent accuracy. *Id.*
- Reading fluency goal: The Student demonstrated skills to read 66 correct words per minute at the 6th grade level. PC25p2.
- High frequency words goal: The Student read 5th grade high frequency words with 94 percent accuracy (31/33 words) after drawing a picture clue to help her remember the words and self-correcting three words. *Id.*
- Reading comprehension goal: The Student demonstrated skills to answer comprehension questions with 50 percent accuracy at the 6th grade level. *Id.*
- Written language goal of spelling – long vowels: The Student demonstrated skills to spell two syllable long vowel words with 40 percent accuracy. *Id.*
- Written language paragraph writing goal: The Student was unable to separate her writing into 5 paragraphs without support. PC25p3.

### February and March 2021 Reading Assessments

97.      On February 4, 2021, the Student read a beginner 4th grade reading passage with 94 percent accuracy. PC80p15, Test. of Cottrill, 308:9, 316:15. On the same passage, the Student read 63 correct words per minute. PC80pp15, 16, Test. of Cottrill, 308:15. On this passage the Student had 12 errors which, combined with her accuracy rate, was so many mistakes that she reached her frustration level. PC80p18; Test. of Cottrill, 308:25.

98.      On February 9, 2021, the Student read a 5th grade passage with 91 percent accuracy. PC80p22, PC74p3; 3 Test. of Cottrill, 309:14, 317:3. On the same passage, the Student read 54 correct words per minute. *Id*. On this passage, the Student had 19

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 25

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3125
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

mistakes, which, when combined with her 91 percent accuracy rate, was so many mistakes that she reached her frustration level. PC80, p24; Test. of Cottrill, 308:25.

99.    On March 8, 2021, the Student read a beginning 5th grade passage with 89 percent accuracy. PC70p10; PC80p32; Test. of Cottrill, 313:10 314:6, 324:5. On the same passage the Student read 68 correct words per minute. PC80p32; Test. of Cottrill, 314:6.

100.    On March 25, 2021, the Student read a 5th grade passage with 86 percent accuracy. PC80p46; Test. of Cottrill, 315:6, 325:15. On the same passage the Student read 66 correct words per minute. *Id.*

## March 2021 IEP Meeting

101.    On March 11, 2021, the Student's IEP team met. D12p24; Test. of Cottrill, 767:1. The team added the use of the Phono-Graphix sound picture chart or other similar tool as a writing accommodation. *Id.*

## Hybrid Learning

102.    On April 5, 2021, the Student began hybrid learning, which involved a combination of in-person classes and remote learning. PC57pp1-2; Test. of Fellows, 544:10. For the remote learning portion, the Student's schedule included an optional morning chat by Zoom in the learning center 4 days per week for 10 minutes; SDI in written language 35 minutes, 4 times per week; and SDI in reading 30 minutes, 3 days per week, and 35 minutes, 2 days per week. Test. of Fellows, 544:5. The Student's in-person classroom instruction occurred on Thursdays and Fridays. Test. of Fellows, 545:4. The Student had reading twice weekly for 35 minutes each in the general education classroom. Test. of Fellows, 544:23. Ms. Cottrill also met individually with the Student via Zoom on Wednesdays for 15 minutes of one-on-one reading instruction. Test. of Cottrill, PC57p2; 784:7. Based on the District calendar hybrid learning began approximately 14 weeks the Student's schedule was adjusted on November 5, 2020. D22p2.

## April 24, 2021, IEP Progress Reporting

103.    On April 24, 2021, the District issued a progress report on the Student's IEP goals. D13p1. The report detailed the results of reading passages including:
- The Student read a 6th grade passage with 77 percent accuracy. *Id.*
- The Student read a 6th grade passage with 41 correct words per minute. D13p2.

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

- On her written language spelling – long vowels goal with access to her Phono-Graphix sound picture chart, the Student wrote two syllable long vowel words with 60 percent accuracy. D13p3.
- On her written language paragraph writing goal when given a graphic organizer to separate her writing into paragraphs, the Student completed writing in individual paragraphs. If she was completing writing without a graphic organizer, she completed writing in one large piece of text. D13p3.

104.    On April 30, 2021, the Student read a 5th grade passage with 82 percent accuracy. PC80p55; Test. of Cottrill, 315:20, 325:15. On the same passage the Student read 75 correct words per minute. Test. of Cottrill, 315:25.

## June 2021 IEP Meeting

105.    On June 14, 2021, the Student's IEP team met to amend the Student's IEP in anticipation of her transition from Kokanee Elementary School to Leota Middle School. D14p24, Test. of Myers, 928:10. The meeting was held remotely via Zoom and the following team members attended: the Parent, Ms. Fellows, Ms. Cottrill, Mr. Fagundes, Ms. Davy, Mr. Chavez, and Mr. Ford. D14p24. The meeting also included Leota Middle School Staff Audee Gregor (Leota principal), Jeffery Keller,[18] and Daniel Myers.[19] D14p24, PC44p26. The Leota Middle School team and Ms. Davy did not have direct experience with the Student before the June 14, 2021, IEP meeting. Test. of Myers, 939:16, Test. of Davy, T1149:13, T1156:23. During the meeting, the Parents requested the Student be placed at Brock's Academy for SDI in reading and written language. D14p24; PC44p26; Test. of Cottrill, 305:8. The IEP team rejected the Parents request and determined the Student should be placed in Leota Middle School. *Id.* The IEP team changed the Student's SDI minutes in reading and written language and decided those minutes would be delivered in a general education classroom. *Id.* The reason for the adjustments to her SDI minutes was to fit the Leota Middle School service model. Test. of Myers, 928:25.

106.    The description of services in the June 2021 IEP amendment stated that from July 1, 2021, through December 22, 2021, the Student's services would be at Leota Middle School. The IEP amendment stated the minutes of services for the Student within the general

---

[18] In 2018, Mr. Keller graduated from the University of Washington, Bothell, with a credential in secondary history and K-12 special education. Test. of Keller, 946-T947. Mr. Keller then began working as a special education teacher for the District at Leota Middle School. *Id.*

[19] In 2011, Mr. Myers graduated from the University of Akron and received a bachelor's degree in English. Test. of Meyers, 918. In 2013, Mr. Myers received a master's degree in special education from Muskingum College. Test. of Myers, 919. Mr. Myers previously taught at private schools including specialty schools for students with disabilities where he served as an intervention specialist. Test. of Myers, 920.

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

education classroom would be delivered within the Combined Co-teach classroom. D14p21. The Combined Co-teach classroom was taught by one general education curriculum teacher and one special education teacher. Test. of Myers, 929:19. The Academic Lab was a catchall special education classroom that taught reading, and written language, in addition to math. D14p21: Test. of Myers, 923:1. Test. of Myers, 924:21. Because the meeting was to amend the Student's IEP, her progress after December 2020 was not documented. Test. of Cottrill, 303:21

107.  The Student's June 2021 IEP team made the following changes effective July 1, 2021:
- Reduced the Student's SDI minutes in reading in the special education classroom (identified as the Academic Lab) from 230 minutes per week to 160 minutes per week. D14p24; PC44p23.
- Added 80 minutes of SDI in reading per week in a general education classroom (identified as the Combined Co-Teach Classroom). *Id.*
- Reduced the Student's SDI in written language in a special education classroom (identified as the Academic Lab) from 140 minutes per week to 60 minutes per week. *Id.*
- Added 80 minutes of SDI in written language per week in a general education classroom (identified as the Combine Co-teach classroom). *Id.*
- Increased the Student's time in the general education setting from 70.18 percent per day to 86.17 percent per day. *Id.*

108.  On June 11, 2021, the District issued a PWN that rejected the Parents' request for the Student's placement at Brock's Academy to receive special education services in reading and written language. D14p24, PC44p26; Test. of Cottrill 305:8. 707:6. The District's PWN indicated that the one-to-one instructional setting of Brock's Academy was not the Student's Least Restrictive Environment (LRE). *Id.* The PWN detailed that the Leota Middle School model was chosen as the District believed the Student was making appropriate progress. *Id.*

109.  Ms. Cottrill agreed with the June 2021, IEP team's decision to place the Student in the Leota Middle School model as the Student would continue to receive some of her services in the special education setting coupled with push-in support through the Combined Co-teach classroom that the District had found was highly effective for student. Test. of Cottrill, 334:15. Ms. Cottrill's opinion was based on her observation of the program, conversation with the Leota Middle School special education staff. Test. of Cottrill, T709:9.

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 28

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

**June 2021 iReady assessment, end of 2020-2021 Report Card, and IEP Progress Report**

110.  In June 2021, the Student obtained a scaled score of 558 on the iReady assessment, which was three points below the midpoint of the 4th grade range. PC76p11; Test. of Fellows, 233:23.

111.  The Student's report card at the end of the 2020-2021 school year indicated decoding in fluency was still a challenge, and she was performing below grade level. D16pp2-3; Test. of Fellows, 187:16. In the Student's writing, Ms. Fellows saw growth in the Student's ability to work independently within boundaries set by learning center teachers. Test. of Fellows, 195:23. The Student continued to exhibit the pattern of losing focus in writing and required coaching from a teacher to return to the task at hand. Test. of Fellows, 195:10.

112.  On June 14, 2021, the District issued the Student's second semester IEP report. D15pp1-5; Test. of Cottrill, 768:5. The report indicated:

- Basic reading goal: The Student read a 6th grade passage with 84 percent accuracy on an initial reading. D15p1. She read a 5th grade passage with 86 percent accuracy. D15p1.
- **Reading fluency goal: The Student** read a 6th grade passage with 58 correct words per minute. D15p2. She read a 5th grade passage with 67 correct words per minute. *Id.*
- High frequency words goal: The Student read 5th grade high frequency words with 100 percent accuracy. D15p2. On this 5th grade assessment, the Student corrected herself one time. *Id.* The Student read 4th grade high frequency words with 96 percent accuracy. *Id.* On the 4th grade assessment, the Student corrected herself three times. *Id.*
- Reading comprehension goal: the Student read a 6th grade passage with 44 percent accuracy. D15p3. When given a 5th grade passage, the Student answered comprehension questions with 67 percent accuracy. *Id.*
- Written language spelling – long vowel goal: The Student wrote two syllable words including long vowel spellings with 40 percent accuracy without the use of a Phono-Graphix sound picture chart. D15p3.
- Written language paragraph writing goal: On her most recent assignment, the Student needed significant teacher support to help her research the topic, organize the information, and put the information into three paragraphs, despite being very excited about the project. D15p3.

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 29

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

**Dr. Christine Clancy Evaluation**

113.    In August 2021, Dr. Christine Clancy, Ph.D., ABPP[20], completed an evaluation of the Student at the request of the Parent. PC39p12. The Parent was concerned about the discrepancy between the Student's progress reported by the District and the lack of progress she observed. PC39p12; D23p16; Test. of Parent, 1116:4. Dr. Clancy reviewed the testing and diagnoses provided by Dr. Jenkins and Dr. Battin. PC39pp16-18; Test. of Clancy, 347:18. She reviewed the Student's performance on Smarter Balanced, Star Enterprise, iReady, and IRR assessments. PC39pp16-17. She also reviewed the Students services through IEPs up to December 23, 2020. *Id.* Dr. Clancy conducted an interview of the Parent and an observation of the Student during testing. PC39pp18-19; Test. of Clancy, 347:12.

114.    Dr. Clancy did not conduct new cognitive testing of the Student because Dr. Battin had recently administered the WISC-5. Test. of Clancy, 349:8. She did not have any concerns over the validity of Dr. Battin's cognitive testing. Test. of Clancy, 348:20. Dr. Clancy reviewed Dr. Battin's testing protocols. Test. of Clancy, 397:4. Dr. Clancy found the prior cognitive testing conducted in 2018 2020 was consistent over time. Test. of Clancy, 352:15. The Student's overall cognitive ability was in the average range, with some variability in the composite scores. Test. of Clancy, 353:8.

115.    Dr. Clancy defined statistically significant progress as one standard deviation of improvement that would indicate that a student had made clinically significant and statistically significant gains. Test. of Clancy, 383:22. Dr. Clancy explained the confidence interval around the Student's pattern of scores reflected consistent scoring in the band range of the below-average range, despite outlier scores. PC39p10. The confidence interval is ascertained by doing repeated measures to get a true score with variability around it. Test. of Clancy, 355:6.

116.    Dr. Clancy explained the Student had challenges with working memory, which is the ability to listen to and/or look at information and hold onto it for a short time to execute a task. Test. of Clancy, 350:17. If a student has difficulty holding information due to working memory challenges, it means they can only manage a certain amount of

---

[20] Dr. Clancy received a Bachelor of Science, Psychology Specialist and English Major, from the University of Toronto in 1989, a master's degree in Applied Psychology with Early Childhood Studies Specialization from the University of Toronto in 1992, a Post-Professional Diploma, Child Life Studies, from McMaster University in 1993, and a Doctor of Philosophy, School and Child Clinical Psychology from the University of Toronto in 2003. PC41p1. She is board certified in Clinical Neuropsychology and Pediatric Clinical Psychology through the American Board of Professional Psychology (ABPP) and licensed Psychologist in the State of Washington. *Id.* Dr. Clancy has conducted an estimated 1300 neuropsychological evaluations of students ages 5 through 18. Test. of Clancy, 345:7. She has been contracted to conduct evaluations by school districts as well as private evaluations for parents. Test. of Clancy, 346:17.

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 30

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

information before they cannot take in any more information. Test. of Clancy, 350:11. Once a student reaches this point, they are unable to process additional information. Test. of Clancy, 351:6.

117.  Dr. Clancy administered the WIAT-4, GORT-5, and the TOWRE-2.[21] PC39p8; Test. of Clancy, 398:5. In the area of reading, the Student was given a score of 76 on the WIAT-4 which is 5th percentile. PC39p9. Dr. Clancy compared this scoring to those obtained on the WIAT-III in basic reading by Dr. Jenkins in 2018 and by Dr. Battin in 2020. PC39p9; Test. of Clancy, 348:20. She found the result of the WIAT-4 to be statistically unchanged from the previous assessments. PC39p9. Dr. Clancy determined that the Student scored 72 on the Dyslexia Index score, which is in the very low range of the 3rd percentile. PC39pp9, 30.

## Dr. Clancy's Analysis of the Student's Performance

118.  Dr. Clancy's report analyzed the Student's performance in the components of phonemic awareness/phonics; phonological processing; oral reading fluency; reading comprehension; spelling; and written expression. PC39pp10-11.

### Phonemic Awareness

119.  On the component of phonologic awareness, Dr. Clancy noted that on the WIAT-III conducted in 2018 and 2020 Student's score on the subsets of single word reading skills and nonsense word/decoding skills of the were consistent and as in the very low range. PC39p10. This score was also consistent with the results she obtained in 2021 on the WIAT-IV. *Id.* Test. of Clancy, 359:15. The Student's TOWRE-2 scores obtained by Dr. Jenkins, 73, were consistent with those obtained by Dr. Clancy, 70, both falling in the poor to very poor range and below the 5th percentile. PC39p16. In some areas the Student had declined, and there were no statistically significant changes between the TOWRE testing. Test. of Clancy, 356:13. The Student also obtained a score in the extremely low range score of 69, on the WIAT-4 orthographic fluency subtest, which measured the Student's sight vocabulary with scoring in the second percentile. *Id.* These results confirmed that despite the Student's abilities she was not developing skills in this area. PC39p10.

---

[21] Dr. Clancy's report stated that she administered the Test of Written Language, Second Edition. At hearing she clarified that she had administered the TOWRE-2. Test. of Clancy, 398

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

<u>Phonics / Phonological Processing</u>

120.    On the component of phonological processing, Dr. Clancy examined the Student's CTOPP-2 scores, which is a test presented to the Student aurally. PC39p10. Dr. Clancy noted decline between 2018 and 2020 on the Student's index scores of phonological awareness, phonological memory, and rapid symbolic naming. PC39p10, 16. Dr. Clancy also noted the Student's WIAT-4 phonological processing score of 77 was in the 6th percentile, which is in the very low range. PC39p10, 15.

<u>Oral Reading Fluency</u>

121.    Dr. Clancy identified that the Student's oral reading fluency measured in the low average range on the WIAT-4 with a score of 84 which was the 14th percentile and 3rd grade level equivalent. PC39p10. The Student was in the below average range in 2018 on the WIAT-III with a score of 80 in the 9th percentile. *Id.* The Student's performance on the GORT-5 oral reading index as tested by Dr. Clancy was in the below average range with a score of 81, which was in the 10th percentile. *Id.* In September 2020, it was assessed to be in the Very Poor range at a score of 70, which was the 2nd percentile. *Id.* Dr. Clancy concluded the Student's oral reading rate and oral reading accuracy scores have not progressed past the below average to poor range, indicating no appreciable gains in her oral reading skills despite being provided with increasing reading intervention support. PC39p10, Test. of Clancy, 354:20. She explained that, taken together, these results fail to document appreciable and statistically significant growth in the Student's oral reading skills since special education services were initiated because the Student remained in the below average range when comparing standard scores on the reading rate, reading accuracy, and reading fluency subtests. PC39p11.

<u>Reading Comprehension</u>

122.    Dr. Clancy analyzed and compared the Student's skills in reading comprehension on the GORT-5 administered by Dr. Battin in 2020 and by Dr. Clancy in 2021. In 2020, the Student was in the 2nd percentile at a grade equivalent of 1.4, whereas in 2021, she was in the 16th percentile, at grade equivalent 3.0. PC39pp11, 15; Test. of Clancy, 380:1. Dr. Clancy concluded that the Student appeared to have made some progress in reading comprehension skills, but those skills remain very insecure and variable. PC39p11. Dr. Clancy stressed that the Student's performance on the GORT-5 testing was particularly indicative of her reading comprehension skills, in contrast to the WIAT-III and WIAT-4, because the GORT-5 does not permit the Student to go back and look at the passage. Test. of Clancy, 380:6. Dr. Clancy also noted that the Student's higher reading comprehension scores were not statistically meaningful compared to earlier scoring and that there was a possibility it could have resulted from test familiarity and the Student's strong verbal memory. Test. of Clancy, 358:8, 407:8.

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

Dr. Clancy noted a similar pattern in the Student's WIAT-III and WIAT-4 subsets of pseudo-word decoding scaled scores and determined that, generally, she was not advancing. Test. of Clancy, 359:15.

### Spelling and Written Comprehension

123.    The Student obtained a score of 79 in the very low range on the WIAT-4 spelling subtest in the 8th percentile. PC39pp11, 15. Dr. Clancy determined this scoring to be consistent and statistically unchanged from her performance on the WIAT-III Spelling subtest scoring 80 in 9th percentile in 2018, and a score of 75 in the 5th percentile in 2020. *Id.*

124.    During administration of the WIAT-4 sentence composition and essay composition subtests, the Student made many severe phonemic spelling errors that impacted readability. PC39p11. The Student's performance on the WIAT-4 essay composition subtest was notable in that she indented each line a bit further to the right such that her paragraph width got narrower as she progressed, with the last few lines starting in the middle of the page. *Id.* This indicated a problem with her planning and organization. Test. of Clancy, 363:13. The Student wrote 7 sentences and utilized correct capitalization and punctuation throughout. PC39p11. She crossed out many words and scribbled overtop, squeezed information into the far-right side of the page, and made numerous spelling errors (e.g., "whith" for "with"; "echuthe r" for "each other"), which made the content of her essay difficult to comprehend. *Id.* Her ideas were disjointed and had poor flow. *Id.* The effort was immature and representative of someone who struggles with reading and written language. Test. of Clancy, 363:13. Her score of 78 on the WIAT-4 essay composition subtest was in the very low range, 7th percentile, relative to her same-aged peers. Pc39p11; Test. of Clancy, 362:3. Dr. Clancy concluded that the Student's performance was consistent with and statistically unchanged from her performance on the WIAT-III essay composition subtests in 2018 and 2020 and indicated a lack of progress. PC39p11; Test. of Clancy, 365:20

### Dr. Clancy's Recommendations

125.    Dr. Clancy opined that with a structured reading program that involves the 5 components of reading, with explicit instruction by a very highly trained teacher, the Student should make significant gains, and that many of her scores should be within the average limits, whether it's low-average to mid-high average. Test. of Clancy, 368:14. She further opined that if she received appropriate instruction, the Student would not have scores in the below-average to severely below average range. *Id.*

126.    With respect to written language instruction, Dr. Clancy opined that if the Student were receiving appropriate instruction based on her average sentence composition skills, she

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

would be an average writer and could make substantial gains in her ability to write lengthier and more complex compositions. Test. of Clancy; 370:18.

127.    As a part of the Student's IEP, Dr. Clancy recommended she receive a minimum of 60 minutes, 5 times per week of specialized instruction in reading from an experienced interventionist with 1 year or more of training and experience implementing a structured reading program. PC39p12. Dr. Clancy opined that this increase was necessary because the Student was previously receiving 45 minutes, 5 times per week, and was not making appropriate progress. Test. of Clancy, 371:13. Dr. Clancy emphasized that the interventionist needs to be skilled at conducting diagnostic teaching sessions and interventions to track the Student's progress. PC39p12; Test. of Clancy, 371:19. She recommended the Student receive a structured literacy program that addresses phonological awareness and phonics, reading fluency, and reading comprehension skills. *Id.*

128.    Additionally, as part of her IEP, Dr. Clancy recommended the Student receive 60 minutes, 5 times per week, of specialized instruction in written language from an experienced interventionist with training and expertise in remediating writing challenges with the aim of teaching the Student strategies and efficient approaches for producing and integrating written materials. PC39p13, Test. of Clancy, 373:15.

129.    Dr. Clancy opined that the placement in the general education setting would not be sufficient to address the Student's significant deficits. Test. of Clancy, 377:16

130.    The total cost of Dr. Clancy's evaluation of the Student was $4,500.00. PC42p1. Dr. Clancy's cost for preparation and attending an IEP meeting was $250.00 per hour for three hours, totaling $750.00. *Id.*

131.    Dr. Clancy's testimony is found credible and given significant weight because her evaluation was based on school records, observation of the Student, and previous and current formal testing. Also, the previous cognitive testing relied upon was done within a year of Dr. Clancy's evaluation and Dr. Clancy reviewed Dr. Battin's protocols and determined her prior testing was valid. As explained below, Dr. Clancy's test results were adopted and unchallenged by the District in its October 2021 assessment revision.

## Sixth Grade year 2021-2022

132.    On August 6, 2021, the Parents provided written notice to the District that the Student would enroll at Brock's Academy for the 2021-2002 school year to receive SDI in reading and written language and would remain enrolled with the District to receive the rest of her public education. PD2p2. The letter noted that the Parents hoped to work collaboratively with the

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 34

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

District to provide for the Student's special education, and that the Student would remain unilaterally enrolled in Brock's Academy's English Language Arts (ELA) class until then. PDp6. The Parents sought reimbursement for Brock's Academy tuition from the District. *Id.*

133.    On August 23, 2021, the District sent the Parent a PWN rejecting the Parent's request for placement at Brock's Academy and for tuition reimbursement and continuing to offer the IEP developed in June 2021. D17p1.

### October 2021 Assessment Revision

134.    On September 2, 2021, the District convened a meeting to consider whether to conduct another reevaluation of the Student considering the private evaluation conducted by Dr. Clancy. PD3p22. Heather Fletcher[22] was the assigned District school psychologist. Test. of Fletcher, 901:10. The District decided to conduct an assessment revision of the October 2020 reevaluation with new data from Dr. Clancy's evaluation, review of existing data, information from the Student's general education teacher, Student observation, and District assessment in the areas of cognitive, medical-physical, and academic. PD3p3; Test. of Fletcher, 901:13.

135.    On October 19, 2021, an evaluation team meeting was held to review the assessment revision. PD3p20; Test. of Fletcher, 902:19. The following team members were in attendance: the Parent, Ms. Fletcher, Mr. Myers, Ms. Palmer, Ms. Davy, Principal Gregor, Mr. Chavez, Mr. Ford, Dr. Clancy, Anne Davidson, general education teacher, Linda Nelson,[23] general education teacher, and Kyle Jolly, a representative from Brock's Academy. PD3p20. As part of the revision, the District considered information from the Parent, the Student's report card, the Student's achievements in IRR Levels, iReady reading diagnostic results, reports from the Student's teachers, Dr. Clancy's evaluation, District assessments, and the Student's progress toward her IEP goals. PD3pp8-12; Test. Of Fletcher, 903:6. Ms. Fletcher also conducted 3 classroom observations of the Student at Leota Middle School. PD3pp12-13; Test. Of Fletcher, 903:13. The assessment revision determined the Student continued to qualify for special education services under the category of SLD in the areas of basic reading, reading

---

[22] Ms. Fletcher graduated from Allegheny College with a bachelor's degree in psychology in 1987. Test. of Fletcher, 899:2. She received a master's degree in school psychology from the State University of New York in Oswego in 1992. Test. of Fletcher, 899:6. Ms. Fletcher was employed as a school psychologist from 1992 to 1997 for the Rochester City School District. Test. of Fletcher, 899:14. In 1995, she moved to Washington and was a school psychologist for Monroe School District until 2000. *Id.* Ms. Fletcher took time off from employment from 2000 to 2008 to raise her children. T900. Beginning in 2008, Ms. Fletcher join the District as a school psychologist. 899.

[23] In 1986, Ms. Nelson graduated from the Washington State University with a hotel and restaurant administration degree Test. of Nelson, 967:21. In 1995 Ms. Nelson received a master's in education from Washington State University Test. of Nelson, 968:5. Ms. Nelson began working for the District in either 2001 or 2002. Test. of Nelson, 968:12.

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

fluency, reading comprehension, written expression skills, and math calculation, reasoning, and fluency. PD3p13.

136.    The revision report adopted the testing scores Dr. Clancy obtained, and previous testing completed by Dr. Jenkins and Dr. Battin. PD3pp10-11. Ms. Fletcher believed the purpose of the assessment revision was to determine the Student's eligibility rather than to assess the Student's progress. Test. of Fletcher, 911:17.

## December 15, 2021, IEP

137.    On December 15, 2021, the District convened an IEP meeting for the Student. PD7p21, Test of Myers, 935:4. The meeting was attended by the Parent, Ms. Davy, Bryan McNeil (District representative), Mr. Myers, Mr. Chavez, Mr. Ford, Ms. Nelson, and Ms. Davidson. PD7pp18. The IEP team made the following changes to the Student's IEP effective December 20, 2021:

•    Reduced the Student's SDI reading minutes in the special education classroom from 160 minutes per week to 60 minutes per week. PD7p15.

•    Reduced the Student's SDI reading minutes in the general education classroom from 80 minutes per week to 30 minutes per week. *Id.*

•    Reduced the Student's SDI written language minutes in the general education classroom from 80 minutes per week to 30 minutes per week. *Id.*

•    Added 80 SDI written language minutes per week in the general education classroom. *Id.*

138.    The change in minutes was made to reflect a change in the Combined Co-teach classroom at Leota Middle School. Test. of Myers, 935:23. The IEP team did not consider the Student's current performance levels in the areas of reading or written language before making this change in the Student's reading and written language special education service minutes. Test. of Myers, 935:23

139.    The December 15, 2021, IEP team did not draft IEP goals in reading and written language. PD7pp10-11, 18. Ms. Davy explained this was because the team did not have any data for the Student in those areas. Test. of Davy, 1193:12. The PWN indicated that if the Student returned to Leota Middle School for reading and written language, goals in those areas would be written. PD7p18.

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 36

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

**David Breiger**

140.    Dr. David Breiger[24] is a neuropsychologist and is employed as a clinical professor by the University of Washington. D21p1. Test. of Breiger, 424:12. Dr. Breiger has never met or evaluated the Student. Test. of Breiger, 447:16. Prior to his testimony Dr. Beiger reviewed the Student's IEP, Dr. Clancy's report, and a couple of other assessments identified in Dr. Clancy's report. Test. of Breiger, 448:12. This review took a couple hours. Test. of Breiger, 448:19.

141.    Based on the Student's WISC and WIAT scores, Dr. Breiger testified that he could intuit that the Student could understand what is said in a classroom and, if given potentially adequate time, could read and understand material in front on her. Test. of Breiger, 445:13. He noted that he did not have all the standard scores. Test. of Breiger, 445:10. Dr. Breiger opined that in a general education setting with accommodations for speed and other aspects of writing, the Student's profile suggested she could access a fair amount of the curriculum. Test. of Breiger, 445:19.

142.    Dr. Breiger did not meet with the Student and reviewed limited Student information over a short period of time. Therefore, his opinion regarding the Student's needs is accorded little weight.

**Brock's Academy**

_Non-public Agency_

143.    Rachel Kier[25] is the Director of Education at Brock's Academy and has been employed in this position since 2012. PD11p1; PD11p1; Test. of Kier, 580:24. She oversees all academic programs and student placements at Brock's Academy. _Id._ Her responsibilities include working with school districts to put together programs for students, teacher hiring, overseeing tutoring services, and daily operations of the school. Test. of Kier, 581:13.

---

[24] Dr. Breiger obtained a bachelor's degree in psychology from the University of California, Berkely, in 1979. D21p1. He received a master's degree in 1982 and a Ph.D. in psychology in 1986 from the University of Houston. Test. of Breiger, 424:12. He also directs neuropsychological consultation services at Seattle Children's Hospital. _Id._ For at least 15 years, he has taught the assessment class at the University of Washington to graduate level students. Test. of Breiger, 424:24.  Dr. Breiger is not board certified as a neuropsychologist. Test. of Breiger, 446:19.

[25] Ms. Kier obtained a Bachelor of Arts degree in Liberal Studies from California State University, Stanislaus (CSUS). PD11p2. She received a Master of Science in Special Education from CSUS. _Id._ In 2005, she received her Washington State teacher certificate endorsement in special education and continues to be certified. PD11p2, Test. of Keir, 580:20. From 2001-2004 Ms. Kier was a special education teacher at the junior high and high school level at William S. Hart School District in Santa Clarita, California. PD11p2. From 2005-2008 Ms. Kier was a substituted special education teacher for Issaquah School District. _Id._ From 2008-2012 Ms. Kier was the Brock's Academy, Administrative Director. PD11p1.

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 37

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

144.    Brock's Academy is a designated non-public agency (NPA), which is a private school that partners with school districts to provide specialty programs and SDI for students with IEPs. Test. of Kier, 587:13. At the time of the hearing, Brock's Academy had between 70 and 80 students. Test. of Kier, 603:22. Brock's Academy employees approximately 43 teachers and 7 administrative staff, including 2 case managers. Test. of Kier, 604:16. Case managers help teachers collect data for IEP forms and come up with curriculum ideas. Test. of Kier, 605:2. Brock's Academy maintains a list of resources for its teachers to pick from that is driven by grade level learning targets. Test. of Kier, 614:9.

### Development of the Student's Program at Brock's Academy

145.    The Student's reading program at Brock's Academy is a blend of reading and written language. Test. of Kier, 594:10. The program does not use any particular methodology and has components that include novel reading, computer-based assessments, journaling, and various types of writing and reading. Test. of Williamson, 837:3. The Student's reading and written language instruction is delivered through one-on-one instruction via an English Language Arts (ELA) class consisting of the Student and Ms. Williamson. Test. of Kier, 594:10. Brock's Academy initially used the reading and written language goals in the Student's June 2021 IEP as a basis for her instruction. Test. Of Kier, 612:22. The ELA class taught reading and written language instruction together so that the fluency of how the skills work together, the grammar mechanics, use of reference materials, and vocabulary were taught together in an experiential manner. Test. of Williamson, 827:18; 836:13.

146.    Brock's Academy obtained and reported data on the Student's progress. Test. of Kier, 590:5. The data was intended to give insight into the Student's current level of progress in the areas of reading and written language based on her IEP goals. PD4p2Test. of Kier, 607:15.

147.    The Student's teacher at Brock's Academy was Rachel Williamson.[26] Test. of Kier, 585:14. The Student's case manager was Kyle Jolly. Test. of Kier, 586:1. Ms. Kier worked with Ms. Williamson and Mr. Jolly to identify real time assessments to conduct with the Student to develop the Student's initial program. Test. of Kier, 585:1. Ms. Kier did not provide any direct teaching to the Student. Test. of Kier, 615:9.

---

[26] Ms. Williamson graduated from the University of Washington, Tacoma with a double bachelor's degree in psychology and arts media and culture in 2016. PD17p3. She obtained a Master of Arts and Interdisciplinary Studies in 2018. D17p3; Test. of Williamson, 799:6. Ms. Williamson was a behavior therapist for children on the autistic spectrum for three years before becoming a private teacher. PD17p2; Test. of Williamson, 798:21. From September 2019 through 2020, Ms. Williamson was a teacher with Gersh Academy-Cougar Mountain in Issaquah, Washington and taught Art and Drama to middle school students on the autism spectrum PD7pp1, 2. She began as a teacher with Brock's Academy in 2020. Id. Ms. Williamson does not have a teaching certification and has no experience teaching in a public school. Test. of Williamson, 834:20.

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

148.    Ms. Williamson was responsible for selecting teaching materials and collecting and reporting data for the Student. Test. of Williamson, 841:21. Ms. Williamson had no formal training in literacy and was unfamiliar with the 5 components of reading. Test. of Williamson, 835:3. Ms. Williamson had no experience implementing a structured literacy program. Test. of Williamson, 835:9. Additionally, Ms. Williamson does not have training or expertise in remediating writing challenges. Test. of Williamson, 850:13.

149.    The Student's performance at Brock's Academy was summarized in a monthly narrative in the areas of Basic Reading, Reading Fluency, Reading High Frequency Words, Reading Comprehension, Written Language Spelling Long Vowels, and Written Language Paragraph Writing, which was intended to track her IEP goals from September 2021 through February 2022. PD4pp7-12; Test. of Kier, 612.7. Brock's Academy collected data in these areas on a weekly basis. PD4pp14-18; Test. of Kier, 613:4.

Student's Services Delivered at Brock's Academy

150.    The Student started at Brock's Academy in September 2021. Test. of Kier, 610:19. Instruction was provided one-on-one by Ms. Williamson at the Brock's Academy physical site. Test. of Kier, 615:18. The Student attended Brock's Academy two times per week. PD14p4; Test. of 1052:9. The Student attended Brock's Academy approximately 6.5 hours per week through November 2021 and then began attending 7 hours per week. Test. of Williamson, 801:5, 837:10, Test. of Parent, 1136:24.

151.    Ms. Williamson taught spelling to the Student using high frequency sixth grade level sight words. PD15pp2-5; Test. of Williamson, 790:1. Ms. Williamson conducted timed reading assessments of the Student. PD5p1; Test. of Williamson, 797:24. It was her practice to time a cold reading and count correct words per minute and mistakes. Test. of Williamson, 797:8. Ms. Williams then conducted a second hot read, counted correct words per minute and mistakes. Test. of Williamson, 797:24. Ms. Williamson then averaged the Student's score between cold and hot reads over multiple tests. Test. of Williamson, 798:3.

152.    Ms. Williamson compiled and reported data in a narrative and course-tracking form added to an IEP tracking form. Test. of Williamson, 837:19. She completed session notes after every class. Id.

The Student's Performance at Brock's Academy

153.    In April 2022, regarding her reading fluency goal, the Student scored an average of 142 correct words per minute on three tests at the 6th grade level based on cold and hot reads. PD4p25; PD5p1; Test. of Williamson, 798:3; 804:21. The cold reads on these three tests comprised of 104 correct words per minutes with 4 mistakes, 154 correct words per

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 39

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

minutes with 2 mistakes, and 132 correct words per minutes with 4 mistakes. PD5p1; Test. of Williamson, 798:3.

154.    In April 2022, regarding her written language goal of paragraph writing, the Student regularly created multiple paragraph texts and used headers, page numbers, and references. PD4p29; Test. of Williamson, 809:1; 859:10. The Student was able to create a rough draft independently, check her spelling, grammar, and punctuation, and edit as she went along with little to no support. *Id.* Ms. Williamson used a 20-point paragraph writing rubric with the Student to assess her progress. PD10p1; Test. of Williamson, 820:9. Ms. Williamson obtained the rubric from a teacher sourcing website. Test. of Williamson, 845:9. The Student could independently create a draft with 87 percent accuracy. PD4p29. The Student usually scored between 14-16 points on the rubric. Test. of Williamson, 820:9.

155.    In April 2022, regarding the Student's high frequency words reading goal the Student could read 87 percent of 6th grade sight/high frequency words. PD4p26. Ms. Williamson based her scoring on a list of words entitled "2,000 Words Every Student Should Know" that she obtained from another district. Test. of Williamson, 841:16. In March 2022, the Student scored 241 out of 258 sight words resulting in 93 percent using the same list of words. PD4pp20, 26. Test. of Williamson, 869:17.

156.    Brock's Academy does not have criteria for how long a student should remain in its one-on-one setting. Test. of Kier, 635:1. The decision as to when a student is ready to leave Brock's Academy, and the plan for return to a public-school setting is a team decision. Test. of Kier, 635:5. Factors to consider include student progress, ability to participate in a group setting, and the steps involved in a plan to return. Test. of Kier, 635:15 636:9.

157.    The Parents have paid invoices to Brock's Academy on a bi-weekly or monthly basis. PD14pp1-2; 1052:24. The hourly rate for the Student's attendance at Brock's Academy was $150.00 per hour. PD14pp1-4; Test. of Parent 628:24. The Parents planned to have the Student continue at Brock's Academy in June 2022. Test. of Parent, 1053:12. The total of the invoices paid by the Parents through May 2022, was $32,880.00. PD14pp1, 2. Based on the Student's schedule, there were approximately three weeks through the end of the 2021-2022 school year, which at the rate of $150.00 would cost the Parents $3,150.00 (21 hours x $150.00 per hour). D22p3. Therefore, the total cost to the Parents for Brock's Academy during the 2021-2022 school year was $36,030.00 ($32,880.00 + $3,150.00).[27]

158.    The Parents also incurred travel costs in transporting the Student to Brock's Academy twice a week at 19.4 miles per day totaling 1,164 miles through April 2022. PD14p4;

---

[27] Brock's Academy was closed during Winter break for two weeks. Test. of Williamson, 827:1.

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 40

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

T0154:13. The Student attended 14 sessions in May and June 2022, at 19.4 miles per day, which is 271.6 miles, for a total of 1,435.6 miles (1,164 + 271.6) during the 2021-2022 school year. PD14pp1, 4, D22p3.

## CONCLUSIONS OF LAW

### Jurisdiction and Burden of Proof

1. The Office of Administrative Hearings (OAH) has jurisdiction over the parties and subject matter of this action for the Superintendent of Public Instruction as authorized by 20 United States Code (USC) §1400 *et seq.*, the Individuals with Disabilities Education Act (IDEA), Chapter 28A.155 Revised Code of Washington (RCW), Chapter 34.05 RCW, Chapter 34.12 RCW, and the regulations promulgated pursuant to these federal and state statutes, including 34 Code of Federal Regulations (CFR) Part 300, and Chapter 392-172A Washington Administrative Code (WAC).

2. The burden of proof in an administrative hearing under the IDEA is on the party seeking relief. *Schaffer v. Weast*, 546 U.S. 49, 62 (2005). The Parents are seeking relief and bear the burden of proof in this case. The U.S. Supreme Court and Washington courts have generally held that the burden of proof in an administrative proceeding is a preponderance of the evidence. *Steadman v. SEC*, 450 U.S. 91, 98-102 (1981); *Thompson v. Department of Licensing*, 138 Wn.2d 783, 797 (1999); *Hardee v. Department of Social & Health Services*, 172 Wn.2d 1, 4 (2011*)*. Therefore, the Parents' burden of proof in this matter is preponderance of the evidence.

### The IDEA and FAPE

3. Under the IDEA, a school district must provide "a free and appropriate public education" (FAPE) to all eligible children. In doing so, a school district is not required to provide a "potential-maximizing" education, but rather a "basic floor of opportunity." *Bd. Of Educ. Of Hendrick Hudson Central Sch. Dist. V. Rowley*, 458 U.S. 176, 200-201 (1982).

4. In *Rowley*, the United States Supreme Court established both a procedural and a substantive test to evaluate a state's compliance with the IDEA. The first question is whether the state has complied with the procedures set forth in the IDEA. The second question is whether the individualized educational program developed under these procedures is reasonably calculated to enable the child to receive educational benefits. "If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more." *Rowley*, 458 U.S. at 206-07.

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 41

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

5.      Procedural safeguards are essential under the IDEA, particularly those that protect the parent's right to be involved in the development of their child's educational plan. *Amanda J. v. Clark County Sch. Dist.*, 267 F.3d 877, 882 (9th Cir. 2001). Procedural violations of the IDEA amount to a denial of FAPE and warrant a remedy only if they:

> (U) impeded the child's right to a free appropriate public education.
> (II) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a free appropriate public education to the parents' child; or
> (III) caused a deprivation of educational benefits.

 20 USC §1415(f)(3)(ii); see WAC 392-172A-05105(2); 34 CFR §300.513(a)(2).

6.      The next question is whether the District has violated the substantive requirements of the IDEA. "To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. v. Douglas County Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017). Additionally, the Student's "educational program must be appropriately ambitious in light of his circumstances . . .." *Id.* at 1000.

7.      The Ninth Circuit has explained that the *Endrew F.* standard requires a school to "implement an IEP that is reasonably calculated to remediate and, if appropriate, accommodate the child's disabilities so that the child can make progress in the general education curriculum...taking into account the progress of his non-disabled peers, and the child's potential." *M.C. v. Antelope Valley Union High Sch. Dist.,* 858 F.3d 1189, 1201 (9th Cir.), *cert. denied*, 138 S. Ct. 556 (2017) (internal quotation marks and citations omitted).

8.       The determination of reasonableness is made as of the time the IEP was developed. *Adams v. Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999). An IEP is "a snapshot, not a retrospective." *Id.*

Issues

A. **The Parents Did Not Establish Violations of the IDEA in Reading or Written Language Beginning November 24, 2019, Through March 31, 2020.**

9.      The Parents allege that dating back two years from the filing of the original complaint the Student's progress in reading and written language stagnated since the initiation of special education services and the District denied the Student a FAPE by not correcting course in her written language instruction. Two years prior to the filing of the complaint on November

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 42

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

24, 2021, was November 24, 2019. The amended IEP in effect on November 24, 2019, was developed in October 2019, more than two years prior to the date the complaint was initially filed and outside the statute of limitation period of two years provided under WAC 392-172A-05080(2). The Parents did not allege any exceptions to the Statute of Limitations. Therefore, the undersigned ALJ does not have jurisdiction to consider whether the Student's October 2019 Amended IEP and the goals therein was appropriate.

10.    The Parents' closing brief argued that the Student failed to progress toward her October 2019 IEP Amendment reading and written language goals and the District was required to address this lack of progress by developing an IEP reasonably calculated to meet the Student's needs. Lack of progress alone is insufficient to conclude that the Student's IEP was inappropriate. *See, e.g., Adams*, 195 F.3d at 1149-50; *Lessard v. Wilton-Lyndeborough Coop. Sch. Dist.*, 518 F.3d 18, 29 (1st Cir. 2008). As such, the Parents have not proven that the District violated the IDEA or denied the Student FAPE in Reading or Written Language from November 24, 2019, to March 31, 2020.

### A. The Student's April 2020 IEP Was Not Reasonably Calculated to Offer FAPE in Reading and Written Language.

11.    The determination as to whether an IEP is reasonably calculated to offer a student FAPE is a fact-specific inquiry that must focus on the unique needs of the student at issue.  As the U.S. Supreme Court has made clear, "A focus on the particular child is at the core of the IDEA," and an IEP must meet a child's "*unique* needs."  *Endrew F.,* 137 S.Ct. at 999 (emphasis in original).  "An IEP is not a form document," and the "essential function of an IEP is to set out a plan for pursuing academic and functional advancement."  *Id.*  "Above all, an IEP team is charged with developing a 'comprehensive plan' that is 'tailored to the unique needs of a particular child.'"  *L.C. on behalf of A.S. v. Issaquah Sch. Dist,* 2019 WL 2023567 at *21, 119 LRP 18751 (W.D. Wash. 2019) (quoting *Endrew F.*, 137 S.Ct. 't 994), *aff'd sub nom. Crofts v. Issaquah Sch. Dist.* No. 411, 22 F.4th 1048 (9th Cir. 2022).

12.    An IEP must contain a statement of measurable annual goals, including academic and functional goals designed to meet the student's needs that result from his disability to enable him to be involved in and make progress in the general education curriculum and meet each of a student's other educational needs that result from the student's disability.  WAC 392-172A-03090(1)(b)(i); 34 § CFR 300.320(a)(2). There must be a relationship between the present levels of performance and the goals and objectives. *Seattle Sch. Dist.,* 34 IDELR 196, 34 LRP 226 (SEA WA 2001).

13.    The Student's April 17, 2020, IEP did not include measurable IEP goals in basic reading, reading fluency, reading comprehension and written language spelling – variant vowel as the goals

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 43

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

provided for a zero-level 5th grade baseline. Ms. Cottrill testified that a zero-level baseline was chosen due to lack of data due to the COVID-19 pandemic. It was undisputed that the zero-level did not represent the Student's present level of academic and functional performance when the goals were developed on April 17, 2020, meaning there was no relationship between the present levels of performance and the goals and objectives. Additionally, the failure to provide a baseline undermined the ability of the Student's team to measure the Student's progress toward her goals. This did not set the Student up for success because the team's ability to adjust her instruction as she progressed was hinged on having an accurate base level. It is understandable that the District's IEP team was not able to obtain 5th grade level data at the beginning the COVID-19 pandemic. However, the District did not amend the Student's basic reading, reading fluency goals, reading comprehension, and written language spelling – variant vowel to add a baseline in performance until December 2020. Given that the April 17, 2020, IEP was the Student's annual IEP, the lack of baseline data in the Student's goals was impactful.

14.     All the evidence and testimony indicated that in April 2020, the Student required a structured literacy program consistent with the components recommended by the National Reading Panel that were implemented with fidelity. An essential element of the Student's reading and written instruction was monitoring the increased trajectory of Student's progress toward her IEP goals in reading and written language based on District assessments. Without an accurate base level for her basic reading, reading fluency, reading comprehension and written language spelling – variant vowel goals, the Student's April 17, 2020, IEP was fatally flawed because her IEP team would be unable to compare her successes to previous benchmarks to design future goals. The IEP team incorporated all the Student's reading and written language instruction so that each were integral to the other. The Student's progress in each reading component impacted her development on other components, including having ancillary benefits from written language instruction. Because essential reading and written language goals were inappropriate, the Student's entire IEP in April 2020 was not reasonably calculated in reading and written language to enable the Student to make appropriate progress in light of her circumstances and unique needs. *See, e.g., Karl v. Bd. Of Educ. Of Geneseo Cent Sch. Dist.,* 736 F.2d 873, 877 (2nd Cir 1984); *Palo Alto Unified Sch. Dist.,* 118 LRP 21969 (CA SEA 2018) (citing *J.M. v. New York City Dep't of Education,* 171 F. Supp. 3d 236, 247-48 (S.D.N.Y. 2016) ("An IEP must be considered as a whole; its individual parts cannot be judged in isolation.").

### B.  The Student's December 22, 2020, IEP Was Not Reasonably Calculated to Provide the Student a FAPE.

15.     The Student's December 2020 reevaluation report included inaccurate statements of the Student's assessments on reading fluency passages in June 2020 and assessments of reading fluency during ESY in July of 2020. The report misstated that the Student was assessed reading 5th

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

grade materials when she was reading 3rd grade materials. The December 22, 2020, IEP team relied on this incorrect information to indicate her present level of academic and functional performance in the December 2020 IEP. The Student's December 22, 2020, IEP team may have identified a different baseline and annual goal if it had been aware that the Student was assessed using 3rd grade level materials instead of 5th grade level materials in reading fluency in June and July of 2020. The Student's December 2020 IEP team had inaccurate information regarding the Student's current level of academic and functional performance in reading fluency and, therefore, the team was unable to develop an appropriate reading fluency goal for the Student.

16.     Reading fluency was added as an area in which the Student was eligible for services through the December 2020 revaluation. The District's failure to develop an appropriate IEP goal in fluency impacted her ability to progress toward her other reading and written language goals when delivered through a structured literacy program as the Student required, because as discussed above, the Student's reading and written language instruction were each integral of the other.

17.     Additionally, the Student's IEP team decided not to increase the Student's SDI in written language when it developed the December 18, 2020, IEP, despite evidence indicating the Student required additional SDI in written language for the IEP to be reasonably calculated to enable her to make progress appropriate in light of her circumstances. The Student's reevaluation incorporated the results of testing conducted by Dr. Battin which were consistent with the results obtained by Dr. Jenkins. Dr. Battin determined the Student severely needed help with all aspects of the writing process in addition to receiving accommodations as she was not performing consistent with her cognitive abilities. She recommended an increase in the Student's SDI in written language to 225 minutes per week. The Student's December 2020 IEP team did not indicate why it did not adopt the increase in special education services in written language as Dr. Battin recommended although it added other accommodations in written language.

18.     Dr. Battin's finding with respect to sentence writing demonstrated that she struggled to integrate her ideas into her writing. This was consistent with the Student's performance toward her paragraph writing goal as of December 1, 2020, as she continued to need teacher support to separate her ideas into written paragraphs and had not evidenced written progress toward this goal since April 2020 (although the Student could verbalize paragraphs). Ms. Haynes testified that for students with slower processing speeds who are not progressing toward specific skills sets over a period of 12 weeks more intensity may be appropriate. As the student had not progressed toward her independent paragraph writing goal for over a period more than 12 weeks, there was reason for the IEP team to increase the Student's SDI service minutes in written instruction consistent with Dr. Battin's recommendation. Therefore, it was not reasonable for the December 2020, IEP team to decline to increase the Student SDI minutes per week in written language consistent with the Dr. Battin's recommendations.

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 45

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

19.     Because the December 22, 2020, IEP was not based on an accurate statement of the Student's performance in reading fluency and did not offer sufficient minutes per week of SDI in written language that she required, the IEP was not reasonably calculated offer the Student a FAPE in reading and written language.

### C. The District's June 15, 2021, IEP Was Not Reasonably Calculated to Enable the Student to Make Progress Appropriate Considering Her Circumstances in Reading and Written Language.

20.     The Parents argue the programming in reading and written language offered by the District for the 2021-2022 school year was not reasonably calculated to provide the Student a FAPE as they believed she required a greater amount of SDI delivered in a one-to-one setting, and request she be placed in the ELA class at Brock's Academy. During the June 2021 IEP meeting, the IEP team identified the Student's placement as Leota Middle School model and rejected the Parent's request of Brock's Academy, as it determined a one-to-one setting was not the Student's LRE. Therefore, the question is whether the placement proposed by the District for reading and written language was the Student's LRE.

21.     School districts must ensure that students who receive special education are served in the "least restrictive environment (LRE)." WAC 392-172A-02050. This means students should be served "(1) to the maximum extent appropriate in the general education environment with students who are nondisabled; and (2) special classes, separate schooling, or other removal of students eligible for special education from the general educational environment occurs only if the nature or severity of the disability is such that education in general education classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id*.

22.     WAC 392-17A-02060(1) and (2) requires that an IEP team, including the parents, decide about the educational placement of a student after formulating the IEP and based on the following criteria:

> (a) the Student's IEP.
> (b) the least restrictive environment requirements contained in WAC 392-172A-02050 through 392-172A-02070 . . .
> (c) the placement option(s) that provide a reasonably high probability of assisting the student to attain his or her annual goals; and
> (d) a consideration of any potential harmful effect on the student or on the quality of services which he or she needs.

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

*See* 34 CFR 300.116(b)(2).

23.     The Ninth Circuit has developed a four-part test to determine whether a student's placement represents the least restrictive environment, as first set out in *Sacramento City Unified Sch. Dist. V. Rachel H*., 14 F.3d 1398, 1404 (9th Cir. 1994).

> We consider: (1) the academic benefits of placement in a mainstream setting, with any supplementary aides and services that might be appropriate; (2) the non-academic benefits of mainstream placement, such as language and behavior models provided by non-disabled students; (3) the negative effects the student's presence may have on the teacher and other students; and (4) the cost of educating the student in a mainstream environment. . .. The first factor requires us to analyze the educational benefits available to the child in a regular classroom, supplemented with appropriate aids and services, as compared to the educational benefits of a special education classroom.

*Ms. S. ex rel. G v. Vashon Island Sch. Dist.*, 337 F.3d 1115, 1137 (9th Cir. 2003) (Internal quotation marks omitted; citations omitted). "While every effort is to be made to place a student in the least restrictive environment, it must be the least restrictive environment which also meets the child's IEP goals." *City of San Diego v. California Special Educ. Hearing Office*, 93 F.3d 1458, 1468 (9thCir. 1996).

24.     In the Student's case, there were no indications that the Student was unduly disruptive to the students or teachers when in the general education setting or concerns about the cost of mainstreaming. Therefore, the two considerations with respect to the Student's LRE under the *Rachel H* test, are the academic benefits and non-academic benefits of a mainstream setting.

### Academic Benefits of Placement in a Mainstream Setting

25.     When the Student began 5th grade her IEP required a placement for reading and written language that was full-time in a special education classroom. However, because of the COVID-19 pandemic the District began implementing her SDI in reading and written language through a push-in model that provided for special education support in general education Zoom classes.

26.     District reading assessments at the 4th grade level in February 2021 and the 5th grade level in March, April, and June 2021, evidenced that the Student was struggling in general education classes with special education support. For example, on February 4, 2021, the Student read 4th grade level passages at 94 percent accuracy with 63 correct words per minute, with 12 errors

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 47

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

and on February 9, 2021, the Student read 4th grade level passages with 91 percent accuracy, at 54 correct words per minute, with 19 errors. These performances did not exceed the baseline for the Student's basic reading goal of 94 percent at 4th grade level and the reading fluency base line of 81 correct words per minute that was established in her October 24, 2019, IEP Amendment. The Student's significant error rate on these performances also exceeded her frustration level.

27.     Additionally on September 29, 2020, the Student read a 5th grade level passages at 71 correct words per minute and on October 1, 2020, she Student read another 5th grade passaged with 91 percent accuracy. However, on March 8, 2021, the Student read a 5th grade level passage at 89 percent accuracy, with 68 correct words per minute, on March 25, 2021, the Student read a 5th grade level passage at 86 percent accuracy, at 66 correct words per minute, on April 20, 2021, the Student read a 5th grade passage with 82 percent accuracy at 75 correct words per minute, and in June 2021, the Student read a 5th grade passages with 86 percent accuracy. The overall scores demonstrate a pattern of decreased accuracy on the Student's basic reading skill and reading fluency skills in the months leading up to the June 2021 IEP meeting.

28.     When the IEP team convened in June 2021 Ms. Fellows had observed that the Student continued to exhibit the pattern of losing focus in writing and required coaching from a teacher to return to the task at hand. There was no evidence at that time that the Student could write paragraphs independently or that she had moved past the original base line for this goal established in her April 2020, IEP.

29.     The Combined Co-teach classroom was taught by both a special education teacher and general education teacher. Dr. Battin stressed that the Student required teaching from only a special education teacher with expertise at meeting the Student's needs and went as far as to say for written language that instruction should be one-to-one. Placement of the Student in the Combined Co-teach classroom which was a general education classroom was not consistent with her recommendation.

30.     The District argued in its closing brief that expert opinion should be provided less weight than those of IEP members who worked with the Student. Dr. Battin's testing was adopted by the District through the December 2020 reevaluation team and her recommendations regarding the Student's learning needs in reading and written language required significant consideration by the June 2021 IEP team. Given that the reevaluation team relied on her testing, coupled with her extensive education, training and experience in evaluating students, the consistency of her findings with previous evaluations, and that Dr. Clancy reviewed her testing and protocols found them valid, Dr. Battin's recommendations and opinion are given significant weight. Additionally, because the June 2021 IEP Amendment did not update the Student's present levels of academic and functional performance, it was not evident what progress the June 2021 IEP team relied upon when determining her placement. Based on Mr. Myers'

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

testimony, the Leota Middle School team did not have experience with the Student and their only input to the June 2021 team was to ensure that if the Student transitioned to their school that her service minutes fit the school's model. The opinions of Ms. Cottrill and Ms. Fellows would be deserving of significant weight, however, their opinion that the Combined Co-teach classroom would benefit the Student was based on speculation that the Combined Co-teach classroom was generally an effective program. This opinion is given less weight with respect to the Student's LRE because the most recent data in June 2021 was that the Student's performance struggled academically in a general education setting even when provided push-in special education support. Even though the Student's general education experience in reading and written language occurred through on-line Zoom classes there was reason to believe that this was reflective of what to expect of the Student performance in the Combined Co-teach Classroom from the Student as the team had almost a full school year of performance data. Additionally, the decision to place Student in the Combined Co-teach classroom resulted in a significant reduction of SDI minutes in reading and written language in the special education classroom, which was insufficient to provide the Student a FAPE.

31.    The testimony and evidence in the record supports the conclusion that in June 2021 placement of the Student in a general education classroom for her SDI in reading and written language did not have more academic benefit than a special education classroom.

    Non-academic Benefits of Mainstream Placement.

32.    In 4th grade, Ms. Sparks noted that when the Student returned to the general education classroom from the learning center her anxiety increased, and she requested in-school counseling to support her emotional needs. She further noted the Student would get frustrated in her general education classes when she felt her Dyslexia would not allow her to show she fully understood what she was reading. When the Student was unable to keep up in her general education Zoom classes during 4th grade her attendance was impacted. The Student's survey indicated that keeping up with her peers and dealing with anxiety was the thing that worried her most about 5th grade and the Parent noted the Student would get embarrassed over her learning challenges. The December 2020 reevaluation team noted that the Student had low self-esteem and anxiety due to falling behind her peers. Dr. Battin concluded the Student was at-risk for significant deterioration of function without supportive services in school. The evidence supports the conclusion that at the time the June 2021 IEP team met, the Student's emotional concerns and its impact on her anxiety, esteem and engagement supported placement in the special education setting for reading and written language. Therefore, on June 15, 2021, the Student would have received more non-academic benefits from a special education classroom for reading and written language.

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

LRE

33.    The *Rachel H* considerations weighed in favor of the Student's LRE for reading and written language in June 2021 being full-time placement in a special education classroom and not a general education classroom.

Insufficient SDI minutes in Reading and Written Language in the Special Education classroom

34.    Mr. Myers testified that the June 2021 IEP team adjusted the Student's service minutes in reading and written language to fit the Leota Middle School model, which would indicate those minutes were not individually tailored to meet her unique needs. To accomplish fitting the Student's minutes to the model, the June 2021 IEP team reduce the Student's SDI reading minutes in a special education classroom from 230 minutes per week to 160 minutes per week and her SDI minutes in the special education classroom in written language from 140 minutes per week to 60 minutes to week. The IEP team's decision to add 80 SDI reading and written language minutes each in the Combined Co-teach classroom did not alleviate the overall reduction of those minutes in the special education classroom because the Student still required a great deal of support in reading and written language in the special education classroom based on her academic testing and recent performance in reading and written language assessments and when her IEP was implemented in general education Zoom classes.

35.    Dr. Battin recommended that the Student receive her special education services in written expression provided at a frequency of 45 minutes, 5 times per week, totaling 225 minutes, per week in a special education classroom. The IEP team's decision to reduce the Student's reading and written language SDI minutes in the special education classroom per week was not consistent with the Dr. Battin's recommendation and was not sufficient to meet her needs.

36.    Because the June 2021, IEP team did not offer sufficient SDI minutes in the special education classroom in both reading and written language and did not offer a placement in reading and written language in her LRE, the June IEP was not reasonably calculated to provide the Student a FAPE.

### D.    The District's December 2021 IEP Was Not Reasonably Calculated to Provide the Student an Opportunity to Receive a FAPE in Reading and Written Language

IEP Goals in Reading and Written Language

37.    The IDEA does not specify the number of annual goals that must be included in an IEP, but there should typically be at least one goal for each area of need.  *See, e.g., Bellflower Unified Sch. Dist.*, 54 IDELR 66 (SEA CA 2010) (IEP deficient because it did not contain goals to address student's deficits in attending to group instruction); *Flagstaff Arts and Leadership*

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

*Academy*, 113 LRP 27180 (SEA AZ 2013) (IEP deficient because it failed to provide goals to properly address basic reading, reading fluency, life skills, and other areas of need).

38.    When the Student's IEP team met on December 15, 2021, the IEP team did not develop annual IEP goals in reading and written language as the Student was attending the Brock's Academy and the District believed it did not have data to develop those goals. School districts are obligated to offer FAPE, including an updated IEP, to resident students with a disability even when the student has unilaterally enrolled in a private school. *Bellflower Unified School District v. Fernando*, 832 F. App'x 493. 495-96 (9th Cir 2020) (unpublished). In *Capistrano United School District v. S.W.*, 21 F.4th 1125, 1129 (9th Cir. 2021), the Ninth Circuit recognized an exception to this rule when the parents explicitly told the district that they intended to keep the student in private school the following year. *Capistrano* distinguished *Bellflower* by noting that, in *Bellflower*, the parent made "multiple requests" to convene an IEP meeting. *Capistrano*, 21 F.4th at 1139, n.6. The situation in *Bellflower* differed from the situation in *Capistrano*, in which the parents "explicitly told Capistrano that they intended to keep [the first-grade student] in private school for second grade." 21 F.4th at 1140. *Capistrano* holds that "the school district must develop an IEP when the parents request one, even if the child is in private school, because such a request shows that the parents are at least nominally seeking a public education for their child." 21 F.4th at 1137. So, all that needs to be shown to trigger the duty for a district to develop an IEP for an unenrolled student is that a request demonstrate that the parent is "at least nominally seeking a public education for the student." *See,* 21 F.4th at 1137. This is a low bar. What decided the issue in favor of the district in *Capistrano* was that the parents had told the district unequivocally that they were not even nominally interested in a public education for their student for second grade. *See Capistrano* at 1137 (Parents placed student in private school and said that they intended to keep her there.). That is a far cry from what happened in the Student's case, as the Parents indicated in their August 6, 2021, letter to the District that they were enrolling the Student in Brock's Academy for the 2021-2022 school year that they hoped to work collaboratively with the District to resolve the Student's educational needs. Nothing in the record indicated that at the time of December 2021 IEP meeting, the Parents had explicitly stated that they would not return the Student to the District for reading and written language instruction for the 2022-2023 school year. The Parents followed up on their expressed hope to work with the District by attempting to obtain an IEP that met the Student's needs in reading and written language, including providing the District with Dr. Clancy's evaluation, and participating in the October 2021 revision meeting and the December 2021 IEP meeting. The Student's case differs from *Capistrano* as the Parents were "at least nominally" seeking a public education for Student. Therefore, the December 2021, IEP team was required to develop an IEP for the Student that included annual IEP goals in reading and written language. By failing to develop goals in those areas, the December 2021 IEP was not reasonably calculated to enable the Student to make progress appropriate in light of her circumstances.

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

39.     The explanation that the IEP team did not have data to develop annual goals for the Student in reading and written language does not excuse the District's failure to developed annual IEP goals in those areas in December 2021. The District conducted a revision in October 2021 and the Student attended Leota Middle School during that process. The District could have gathered current performance data either at school or from Mr. Jolly, the Student's cases manager from Brock's Academy, or Parent, who participated in the revision meeting.

40.     The failure to develop annual IEP goals for the Student in reading and written language deprived the Student of a FAPE as Brock's Academy was attempting to implement instruction in reading and written language consistent with those goals. Additionally, the Parents were less able to determine if the Student could obtain a FAPE from the District without IEP goals in reading and written language.

### SDI Minutes in Reading and Written Language

41.     The December 15, 2021, IEP reduced the Student's SDI minutes in reading in the special education classroom to 60 minutes per week, reduced the Student's SDI minutes in reading in the general education setting to 30 minutes per week, reduced the Student's SDI minutes in written language to 30 minutes per week, and increased the Student's SDI minutes in written language to 80 minutes per week. Based on the testimony of Mr. Meyers, these adjustments were made to reflect a change in the District's Leota Middle School service model and adjustments to the Combined Co-teach classroom, and not to meet the Student's independent needs. He also stated the IEP team did not determine the Student's current abilities in the areas of reading and written language before making the changes to the Student's service minutes. As such, the special education services in reading and written language offered to the Student through the District's December 2021 IEP were not individually tailored to the unique needs of the Student as required by the IDEA. *Endrew F.,* 137 S.Ct. at 999.

42.     Additionally, the District had incorporated Dr. Clancy's testing results in the October 2021 revision and had her recommendations available during the December 2021, IEP meeting. The information obtained through the October 2021 revision was the most current information available to the District and, therefore, her recommendations should have been considered when deciding about the Student's needs. Dr. Clancy recommended 60 minutes of SDI in reading 5 times per week, totaling 300 minutes per week, from an experienced interventionist with 1 year or more of training and experience implementing a structured reading program with fidelity. Dr. Clancy also recommended the Student receive 60 minutes, 5 times per week, totaling 300 minutes of specialized instruction in written expression, from an experienced interventionist. Dr. Clancy made her recommendations because the Student was not progressing consistent with her abilities. Given that the reevaluation team relied on her testing, coupled with her extensive education, training and experience in evaluating students, Dr. Clancy's recommendations for

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 52

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

special education service minutes in reading and written language are given significant weight. The testimony and evidence support the conclusion that the special education service minutes in reading and written language were insufficient for the Student to receive a FAPE in December 2021.

43.     For the above reasons the Student's December 15, 2021, IEP was not reasonably calculated to provide her FAPE.

### E. The District Deprived the Student a FAPE in Reading and Written Language During the COVID-19 Closure Beginning March 2020 Through June 2020 by Failing to Implement Her IEP.

44.     The District argued in its closing brief, that the impact of COVID-19 disruptions was not at issue during the hearing. Issues (a) and (b) in the January 26, 2022, prehearing order clearly stated the issues of whether the District violated the IDEA and denied the Student a FAPE in the areas of reading and written language dating back from two years of the filing of the complaint. The Parents amended complaint raised issues of IEP implementation with respect to reading, at page 5, and written language, at page 8, without specifically referencing COVID-19 disruptions. The District had the opportunity to clarify whether COVID-19 disruptions were included among the issues in the January 24, 2022, prehearing conference. Extensive evidence including witness testimony addressed the implementation of the Student's IEPs during the COVID-19 pandemic and the Parents did not waive this issue. Therefore, considering the clear and broadly stated language of issues (a) and (b) encompassing the denial of FAPE for the Student in reading and written language going back to November 24, 2019, issues of implementation of the Student's IEPs in reading and written language due to the COVID-19 disruptions were clearly encompassed in the Parents' claims and must be addressed in this decision. *See, M.C. v. Antelope Valley Union High Sch. Dist.*, 858 F3d at 1196.

45.     Due to the COVID-19 pandemic the District was ordered to stop all in-person educational programs on March 12, 2020, by proclamation from the Governor of Washington State. Governor Proclamation 20-08, 20-09.1. The U.S. Department of Education (DOE) issued guidance that same day stating,

> If an LEA closes its schools to slow or stop the spread of COVID-19 and does not provide any educational services to the general student population, than an LEA would not be required to provide services to students with disabilities during that same period. Once school resumes, the LEA must make every effort to provide special education and related services to the child in accordance with the child's individualized education program (IEP) ....

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 53

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

U.S. Dep't of Education, Questions and Answers on Providing Services to Children with Disabilities During the Coronavirus Disease 2019 Outbreak (March 2020) at p. 2.

46.    OSPI also issued guidance stating, "there remains an expectation that individualized education program (IEP) services will be delivered to the maximum extent possible during the pandemic while adjusting delivery methods to comply with state and local health/safety restrictions." OSPI, Questions and Answers: Provision of Services to Students with Disabilities During COVID-19 in Summer and Fall 2020 (released 3/24/20, last updated 4/12/21). This guidance further recognized that there have been no changes made to the IDEA or its implementing regulations, thus, school districts are not relieved of their obligation to comply with said laws. *Id.*

47.    It is clear from the DOE guidance that the District was required to provide special education services to the Student even after the COVID-19 school closure. The question is whether the services provided satisfied the District's obligation to implement the Student's IEP. Only material failures to implement an IEP violate the IDEA. On the other hand, minor discrepancies between the services a school provides, and the services required by the IEP do not violate the IDEA. See *Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811 (9th Cir. 2007).

> "[S]pecial education and related services" need only be provided "*in conformity with*" the IEP. [20 USC §1401(9)] There is no statutory requirement of perfect adherence to the IEP, nor any reason rooted in the statutory text to view minor implementation failures as denials of a free appropriate public education.
> . . .
> We hold that a *material* failure to implement an IEP violates the IDEA. A material failure occurs when there is more than a minor discrepancy between the services a school provides to a disabled child and the services required by the child's IEP.

*Van Duyn,* 502 F.3d at 821 and 822 (italics in original).

<u>Failure to Implement Student's IEP in Reading During the 2019-2020 School Year</u>

48.    On March 31, 2020, the IEP in effect for the Student was the October 2019 IEP amendment, which required 140 minutes per week of SDI in reading in a special education classroom. Once the District began providing on-line learning the Student received small group reading instruction in the learning center on Tuesdays and Thursdays for 30 minutes per session. She also received small group learning center check-ins to address math, reading, and written language on Tuesdays for 15 minutes. Dividing the learning center check in time evenly among math, reading, and written language, the Student received 5 minutes of SDI in reading as part of these check-ins. In total, the Student received 65 minutes per week of on-line special education services in reading when online learning resumed on March 31, 2020, through the end of the school year in June 2020. The Student

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

received 75 fewer minutes of reading SDI per week during this period that her IEP required. This failure to implement the Student's IEP was material and denied the Student FAPE because a conservative estimate of the number of SDI minutes in reading required by her IEP that were not provided during this approximate 11-week period is 825 minutes (75 minutes per week times 11 weeks).

<u>Failure to Implement Student's IEP in Written Language During the 2019-2020 School Year</u>

49.    The Student's IEP on March 31, 2020, required 140 minutes per week of SDI in written language in a special education classroom. Beginning with the implementation of online learning on March 31, 2020, the Student received small group written language instruction in the learning center on Thursdays for 30 minutes per session. She also received small group learning center check-ins on Tuesdays for 15 minutes. Dividing the learning center check-in time evenly among math, reading, and written language is 5 minutes each. In total the Student was offered 35 minutes per week of online SDI in written language, which is 105 minutes less than her IEP required. Such a significant reduction in the Student's SDI minutes in written language clearly amounted to a material failure to implement the Student's IEP and denied the Student FAPE. A conservative estimate of the amount of SDI minutes in written language the Student should have received and did not was 1,155 minutes (105 minutes per week times 11 weeks).

**F.    During the 2020-2021 School Year, the District Failed To Implement the Student's IEP in Reading and Written Language Which Was a Material Violation that Denied FAPE.**

<u>Failure to Implement the Student's IEP in Reading during the 2020-2021 School Year</u>

50.    At the start of the 2020-2021 school year, the District provided the Student approximately 50 minutes per week of one-on-one special education services in reading (150 minutes of one-on-one special education services total divided among reading, written language, and math). She also received some push-in support from the learning center during her general education reading classes. This differed from her IEP, which called for 140 minutes per week of SDI in reading delivered in the special education classroom. The IEP did not provide for any push-in support. Therefore, the District was not implementing the Student's IEP as she was not receiving the full amount of SDI minutes in reading in the special education classroom that she required. This was a material failure to implement the Student's IEP as she was receiving approximately 90 minutes per week less than the total amount of SDI minutes, she required in reading in the special education classroom. The additional push-in support in her general education reading classes does not alleviate this material failure as the amount of support varied and was not delivered in the placement provided for in her IEP. The one-to-one minutes the Student received were likely more intensive than the services

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 55

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

generally provided in the learning center, however, this did make up for overall reduction of SDI minutes in reading in the special education classroom. Therefore, the Student was not offered approximately 810 minutes (90 minutes per week times 9 weeks) of SDI as required by her IEP throughout the 9-week period from the beginning of the 2020-2021 school year through November 5, 2021.

51.    Beginning November 5, 2020, the District increased the total amount of SDI in the Student's IEP to 230 minutes per week in the special education classroom. The District changed its delivery of SDI services in reading and written language to approximately 75 minutes each as it began implementing her math services in the general education setting and continued to offer the Student 150 one-to-one minutes per week from Ms. Cottrill. Therefore, from November 5, 2020, through April 4, 2021, the District failed to implement the Student's IEP in reading by providing only 75 minutes per week of SDI in reading in a special education classroom, when her IEP required 230 minutes per week in of SDI in reading delivered in a special education classroom. This was a material failure to implement her IEP as the Student did not receive 155 minutes per week for the approximate 17-week period beginning November 5, 2020, through April 4, 2021. In total, the Student did not receive, 2,635 minutes (155 minutes per week times 17 weeks) of SDI in reading that should have been provided beginning November 5, 2020, through April 4, 2021.

52.    The significant number of SDI minutes in reading that were not provided in the special education classroom, supports the conclusion the Student was deprived of a FAPE in reading from the beginning of the 2020-2021 school year through April 4, 2021. The amount of SDI minutes of reading that were not implemented in this period totaled approximately 3,445 (810 minutes + 2,635 minutes).

<u>Failure to Implement the Student's IEP in Written Language During the 2020-2021 School Year</u>

53.    At the start of the 2020-2021 school year the District provided the Student approximately 50 minutes per week of one-on-one special education services in written language (150 minutes of one-on-one special education services total divided among reading, written language, and math). She also received some push-in support from the learning center during her general education classes in written language. This differed from what was in her IEP which required 140 minutes per week of SDI in written language delivered in the special education classroom. Her IEP did not provide for any push-in support. Therefore, the District was not implementing the Student's IEP as she was not receiving the full amount of SDI minutes in written language in the special education classroom. This was a material failure to implement the Student's IEP as she was receiving approximately 90 minutes per week less than her IEP required. From the start of the 2020-2021 school year through November 5, 2020, the District's failure to provide 90 minutes per week of SDI in written language that the

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

Student should have received and did not, deprived the Student of an approximate total of 810 minutes (9 weeks times 90 minutes per week).

54.    On November 5, 2020, the amount of SDI minutes in written language the Student received increased to approximately 75 minutes per week. This continued to be a material violation to implement the IEP as the Student continued to receive approximately 65 minutes per week of SDI in written language less than her IEP required in the special education classroom. As discussed above the one-to one support she received would not make up for the total amount of SDI she was denied and the push-in support provided in general education varied and could not make up for the significant amount of SDI in written language that was not delivered, therefore, the Student was denied a FAPE. In total the Student was denied 1,105 minutes of SDI in written language due to the failure to implement her IEP beginning November 5, 2020, through April 4, 2021. Therefore, from the beginning of the 2020-2021 school year through April 4, 2021, the District failed to implement 1,915 minutes of SDI in written language (1,105 minutes + 810 minutes).

### G. The Parents Are Entitled to Compensatory Education Encompassing Placement at the Brock's Academy ELA Class For 21 weeks during the 2022-2023 school year, Reimbursement of Prior Tuition Expenses, and Other Remedies.

**Summary of Violations**

55.    The District violated the IDEA and denied the Student FAPE as follows:

a.    Dating back two years from the filing of the original complaint in Reading by failing to develop an IEP reasonably calculated to meet the Student's needs in April 2020, and December 2020. The District also failed to implement the Student's IEPs in reading beginning March 31, 2020, through June 2020, and from the beginning of the 2020-2021 school year through April 4, 2021, resulting in a deprivation of approximately 4,270 SDI minutes (825 SDI minutes + 3,445 SDI minutes) + 1,050 SDI minutes in reading and 1,475 SDI minutes in written language. (Conclusions of Law 14, 19, 48, 49, 52, and 54).

b.    Dating back two years from the filing of the original complaint in Written Language by failing to develop an IEP reasonably calculated to meet the Student's needs in April 2020, and December 2020. The District also failed to implement the Student's IEPs in written language beginning March 31, 2020, through June 2020, and from the beginning of the 2020-2021 school year through April 4, 2021, resulting in a deprivation of approximately 3,070 SDI minutes (1,155 SDI minutes + 1,915 SDI minutes). (Conclusions of Law 14, 19, 48, 49, 52, and 54).

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 57

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

c.  The special education programming offered by the District for the 2021-22 school year was the June 2021, and December 2021 IEPs were not reasonably calculated to provide the Student a FAPE. (Conclusions of Law 36, 43).

## Compensatory Education Regarding Brock's Academy

56.    The primary remedies the Parents request for these violations of FAPE is prospective placement in Brock's Academy and compensatory education in the form of reimbursement for past tuition. Compensatory education is a remedy designed "to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." *Reid v. District of Columbia*, 401 F.3d 516, 524 (D.C. Cir. 2005), *cited with approval in R.P. v. Prescott Unif'd Sch. Dist.*, 631 F.3d 1117, 1125 (9th Cir. 2011). Compensatory education is not a contractual remedy, but an equitable one. "There is no obligation to provide a day-for-day compensation for time missed. Appropriate relief is relief designed to ensure that the student is appropriately educated within the meaning of the IDEA." *Parents of Student W. v. Puyallup Sch. Dist.*, 31 F.3d 1489, 1497 (9th Cir. 1994). Flexibility rather than rigidity is called for. *Reid v. District of Columbia,* 401 F.3d at 523-524. Compensatory education is an equitable remedy, meaning the tribunal must consider the equities existing on both sides of the case. *Id.* at 524. A hearing officer may fashion individualized relief for students seeking compensatory education. As noted in *R.P. v. Prescott:*

> Courts have been creative in fashioning the amount and type of compensatory education services to award. *See, e.g., Ferren C. v. Sch. Dist. of Phila.,* 612 F.3d 712, 718-19 (3d Cir. 2010) (court can order school to provide annual IEPs to student who had aged out of a statutory right to a FAPE); *M.S. ex rel. Simchick v. Fairfax Cnty. Sch. Bd.,* 553 F.3d 315, 324-26 (4th Cir. 2009) (court can order that private school tuition be reimbursed); *Park, ex rel. Park v. Anaheim Union High Sch. Dist.,* 464 F.3d 1025, 1034 (9th Cir. 2006) (court can order additional training for a child's teachers).

631 F.3d at 1126.

57.    In April 2022, regarding her reading fluency goal, the Student made significant progress at the 6th and 5th grade levels at Brock's Academy, on cold reads, when compared to her performance on June 14, 2021.

58.    In April 2022, regarding the Student's high frequency words reading goal the Student read 87 percent. In March 2022, the Student read 93 percent of 6th grade sight/high frequency words. This demonstrated significant improvement from the June 14, 2021.

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 58

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

59.    In April 2022, regarding the Student's written language paragraph writing goal, on a regular basis the Student independently created multiple paragraph texts and with headers, page numbers, and references with little to no support. This performance was significantly improved from the Student's performance reported June 14, 2021, regarding paragraph writing when she needed significant teacher support to help her research, organize the information, and put the information into paragraphs.

60.    The Parents established the services at Brock's Academy provided the Student with some educational benefit that was specially designed to meet her needs. It is, therefore, appropriate to order placement at Brock's Academy during the 2022-2023 school year for a period of 21-weeks during the 2022-2023 school year as compensatory education funded by the District. The 21-week placement during the 2022-2023 school year shall be two sessions per week totaling 7 hours per week. The District shall reimburse the Parents for transportation costs during the 21-week placement at the federal milage rate for up to 20 miles per day. It is also appropriate to order the District reimburse the Parents for the tuition paid for the Student's placement at Brock's Academy during the 2021-2022 school year in the amount of $36,030.00 to reimburse the Parents for travel in the amount of 1,435.6 miles at the federal milage rate in effect as of the date of this order.

61.    The order for the District to provide 21-weeks placement at Brock's Academy for SDI in reading and written language and to reimburse the Parents for the tuition paid and travel for the Student's placement is appropriate in light of the District's failure to develop appropriate IEPs that were reasonably calculated to meet the Student's needs in reading and written language, beginning with the April 2020 IEP and continuing during the entire 2020-2021 and 2021-2022 school years as detailed in the conclusions of law and summarized above. As this period covers more than two school years, it is reasonable to award the Parents reimbursement for their tuition at Brock's Academy for the 2021-2022 school year and the additional 21-weeks during the 2022-2023 school year. The 21-week compensatory education during the 2022-2023 school year compensates the Student with an additional half school year of services in the Brock's Academy ELA class and allows the Student continuity in her education while an IEE is obtained, and the District gathers data as to her reading and written language needs to develop an IEP as outlined below.

62.    As the 21-week placement during the 2022-2023 school year is a compensatory education award, rather than an open ended prospective educational placement, it will not be the Student's stay-put placement. However, nothing in this order prevents the IEP team from placing the Student at Brock's Academy in addition to the 21-weeks compensatory education.

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 59

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

63.    In the event the Parents reenroll the Student in the District during the 2022-2023 school year for SDI in reading and written language prior to completion of the 21-week placement, the District remains obligated to provide those compensatory education services.

64.    The District's failure to develop IEPs reasonably calculated to meet the Student's needs in reading and written language is significant enough on its own to support the award of the compensatory education and other remedies identified in this order. The District's failure to implement the Student's IEPs as detailed in this decision further supports these orders.

### Independent Educational Evaluation

65.    Independent Educational Evaluation (IEE): By December 9, 2020, the District shall obtain an IEE at District expense from a qualified private evaluator, selected by the Parents. The purpose of the IEE is to obtain and relay information sufficient to assist the Student's IEP team to identify the Student's present levels of functional and academic performance and LRE in reading and written language. The IEE shall make recommendations as to the annual goals and amount, frequency, location, and type of services the Student requires in reading and written language. The IEE shall also recommend data collection and progress monitoring required to track the Student's development in reading and written language, including a process for informing and obtaining information from the Parents. The IEE provider shall observe the Student at Brock's Academy and Leota Middle School. At District expenses, the IEE provider shall attend the IEP meeting discussed below and any necessary reevaluation or revision meeting connected to the IEE. The Parents shall have full access to the IEE provider. The Student's IEP team shall review the IEE report and strongly consider the information and recommendations provided through the IEE provider at the IEP meeting.

### IEP Meeting

66.    By December 20, 2022, the District shall develop an IEP for the Student that includes annual IEP goals in reading and written language. In developing the Student's IEP, the District shall obtain present levels of academic and functional performance through a process that includes the following steps:

- **Data Collection in Reading and Written Language:** The District shall coordinate with Brock's Academy, the Parents, and the IEE provider, to assess the Student's performance in reading and written language through reliable measures consistent with a structured literacy program based on the 5 components of a core reading program, conducted on multiple occasions over a period necessary to obtain a reliable baseline of the Student's performance in each reading and written language goal.

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 60

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

Through this process, and in consultation and coordination with the IEE provider, the District shall begin collecting data no later than October 15, 2022. When the data is collected it shall be shared with the Parents and IEE provider.

- **Progress Reported to Parents:** The District shall ensure the IEP required by this order provides that progress toward the Student's annual goals in reading and written language is reported and reviewed with the Parents through a process that considers the information provided through the IEE and may include the sharing of detailed information with the Parents occurring more frequent than quarterly.

- **Plan for Student's Return:** The District shall ensure that the IEP required by this order shall include a plan for support of the Student if she returns to a District school for reading and written instruction. The plan should address her academic, functional, and social/emotional needs. The plan shall be based on consultation with Brock's Academy, the Parents, the Student, the IEE provider, and other members of the IEP team.

67.    All arguments made by the parties have been considered.  Arguments not specifically addressed herein have been considered but are found not to be persuasive or not to substantially affect a party's rights. All other claims for relief not specifically addressed in this order are denied.

<u>ORDER</u>

1.    The Northshore School District violated the IDEA and denied the Student FAPE as summarized in Conclusion of Law 1-54:

2.    The Parents are awarded the remedies at Conclusions of Law 55-66.

3.    All other remedies requested by the Parents are denied.

Served on the date of mailing.

_____
Paul Alig
Administrative Law Judge
Office of Administrative Hearings

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 61

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

## <u>Right To Bring A Civil Action Under The IDEA</u>

Pursuant to 20 U.S.C. 1415(i)(2), any party aggrieved by this final decision may appeal by filing a civil action in a state superior court or federal district court of the United States. The civil action must be brought within ninety days after the ALJ has mailed this final decision to the parties. The civil action must be filed and served upon all parties of record in the manner prescribed by the applicable local state or federal rules of civil procedure. A copy of the civil action must be provided to OSPI, Administrative Resource Services.

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 62

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135

DECLARATION OF SERVICE

I declare under penalty of perjury under the laws of the State of Washington that today I served this document on each of the parties listed below. I emailed via secure email or mailed a copy to the parties at their addresses of record using Consolidated Mail Services or U.S. Mail.

Parents



Obadiah Dunham
Adra Davy
Northshore School District
3330 Monte Villa Parkway
Bothell, WA  98021

Ryan Ford
Ford Law Firm, PLLC
6141 NE Bothell Way
Suite 203
Kenmore, WA  98028

Carlos Chavez
Pacifica Law Group LLP
1191 Second Avenue, Suite 2000
Seattle, WA  98101

Dated August 14, 2022, at Seattle, Washington.

*Lan Le*

_____
Representative
Office of Administrative Hearings
600 University Street, Suite 1500
Seattle, WA 98101

cc:    Administrative Resource Services, OSPI

Findings of Fact, Conclusions of Law, and Final Order
OSPI Cause No. 2021-SE-0155
OAH Docket No.11-2021-OSPI-01463

Page | 63

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400 1-800-845-8830
FAX (206) 587-5135