1

2

3                          UNITED STATES DISTRICT COURT
                          WESTERN DISTRICT OF WASHINGTON
4                                    AT SEATTLE

5     NORTHSHORE SCHOOL DISTRICT,

6                          Plaintiff,

7              v.                                          C22-1630 TSZ

      A.J. and N.J. on behalf of their minor              ORDER
8     child, P.J.,

9                          Defendants.

10          THIS MATTER comes before the Court on Northshore School District's appeal

11   from the Corrected Findings of Fact, Conclusions of Law, and Final Order issued by

12   Administrative Law Judge ("ALJ") Paul Alig, AR 1846–1906 (docket no. 16-8 at 220 –

13   docket no. 16-9 at 30).  In August 2022, the ALJ concluded that Northshore School

14   District ("District") violated the Individuals with Disabilities Education Act ("IDEA"),

15   20 U.S.C. §§ 1400–1482, by failing to provide a free appropriate public education

16   ("FAPE"), as defined in 20 U.S.C. § 1401(9), to its student P.J., during the period from

17   March 12, 2020, through the 2021-22 school year, which ended on June 17, 2022.  *See*

18   AR 1888–1906 (docket no. 16-9 at 12–30); *see also* AR 2143 (docket no. 16-10 at 237).

19   The District challenges the ALJ's findings of liability and his award of monetary relief.

20   Having reviewed the ALJ's decision, the parties' briefs, the relevant portions of the

21   administrative record, and the supplemental materials submitted pursuant to the Order

22   dated March 29, 2024, docket no. 48, the Court enters the following Order.

23

**Background**

Like many children in our community, P.J. was adversely affected by the school closures caused by the coronavirus disease ("COVID") pandemic.  Just prior to the state-wide shutdown in March 2020, and pursuant to an individualized education program ("IEP"), within the meaning of 20 U.S.C. § 1401(14), which had been crafted in October 2019, P.J. was receiving from the District 140 minutes per week of special education in reading and 140 minutes per week of special education in written language.[1]  *See* AR 1930 (docket no. 16-10 at 24); *see also* 20 U.S.C. § 1401(29) (defining "special education" as "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability, including . . . instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings").  Before the COVID crisis, P.J.'s special education or specially designed instruction ("SDI") in reading and written language[2] occurred in person, in a special education setting, separate from the general education classroom.  *See* AR 1930 (docket no. 16-10 at 24).  When the pandemic began, P.J. was in the fourth grade at Kokanee Elementary School in Woodinville, Washington ("Kokanee").  AR 1914 (docket no. 16-10 at 8).

---

[1] P.J. was also receiving from the District special education in mathematics, but those services are not at issue in this case.

[2] The parties have used the term "writing" interchangeably with the phrase "written language," which appears in the October 2019 IEP (and subsequent IEPs).  The Court will also occasionally do so.

A.    **April 2020 IEP (Fourth and Fifth Grades)**

P.J.'s October 2019 IEP expired on March 22, 2020, *see id.*, amidst the chaos of the COVID-related shuttering of schools and businesses.  After a brief delay caused by the closures, in mid-April 2020, an IEP meeting was convened via virtual means, and the resulting IEP indicated that the number of hours of special education P.J. was scheduled to receive in reading and written language would remain the same, *i.e.*, 140 minutes per week in each subject.  *See* AR 1956 (docket no. 16-10 at 50).  In a notice relating to the April 2020 IEP, however, the District quoted materials it had received from Washington's Office of Superintendent of Public Instruction ("OSPI") in which OSPI observed that, during the then-existing "national emergency," IEP services could not be expected to "be delivered exactly as the IEP states."  AR 1960 (docket no. 16-10 at 54).

On May 29, 2020, as a result of OSPI's guidance, the District issued a notice setting forth a continuous learning plan for P.J. that offered services via Zoom from the "Learning Center" as follows:  (i) 60 minutes per week of one-on-one instruction in reading; (ii) 30 minutes per week of one-on-one instruction in writing; and (iii) a small group check-in for 15 minutes each week.  AR 1963 (docket no. 16-10 at 57); *see also* AR 2444 (docket no. 16-13 at 31).  When P.J. entered the fifth grade in the fall of 2020, the April 2020 IEP remained in effect, and she remotely received 120 minutes per week of SDI in reading and 120 minutes per week of SDI in written language.  *See* AR 3691 (docket no. 16-20 at 28) (reflecting that P.J. received Learning Center services via Zoom for two 30-minute blocks of time, four days a week, in the morning for reading and in the afternoon for writing).

**B.**  **September 2020 Evaluation (Fifth Grade)**

In September 2020, Michelle Battin, Ph.D., a clinical psychologist, examined P.J. (at her parents' expense), and on October 6, 2020, Dr. Battin issued a 28-page report.  *See* AR 2858–85 (docket no. 16-14 at 195–222).  Dr. Battin administered a battery of tests, including the Wechsler Individual Achievement Test – Third Edition ("WIAT-III"), Gray Oral Reading Test – Fifth Edition ("GORT-5"), and Comprehensive Test of Phonological Processing – Second Edition ("CTOPP-2").  *See* AR 2858–59 & AR 2865–68 (docket no. 16-14 at 195–96 & 202–05).  Based on her evaluation, Dr. Battin made numerous recommendations, including:  (i) with respect to reading, P.J. should receive 225 minutes per week of specialized instruction delivered by a certified special education teacher; and (ii) with respect to writing, P.J. should receive 225 minutes per week of one-on-one instruction by a special education teacher.  AR 2875–76 (docket no. 16-14 at 212–13).

**C.**  **October 2020 IEP (Fifth Grade)**

In late October 2020, based in part on Dr. Battin's suggestions, P.J.'s IEP was revised to increase the amount of SDI she received in reading to 230 minutes per week. AR 1988 (docket no. 16-10 at 82).  The amount of special education for written language remained at 140 minutes per week.  *Id.*  Beginning on November 5, 2020, P.J. began receiving on a weekly basis 160 minutes of one-on-one SDI in reading, 70 minutes of small group reading instruction, and 140 minutes of writing services delivered jointly to P.J. and one other student.  *Id.*; *see* AR 3692 (docket no. 16-20 at 29); *see also* AR 1160–61 (docket no. 16-5 at 156–57).

**D.      December 2020 Reevaluation and IEP (Fifth Grade)**

In December 2020, the District completed an early triennial reevaluation of P.J. *See* AR 2022 (docket no. 16-10 at 116) ("The team . . . determined that initiating [P.J.'s] triennial reevaluation a few months early was appropriate."); *see also* 20 U.S.C. § 1414(a)(2)(B)(ii) (the IDEA requires that a reevaluation of a child with a disability be conducted "at least once every 3 years, unless the parent and the local educational agency agree that a reevaluation is unnecessary.").  In conjunction with the triennial reevaluation, an IEP was prepared; the December 2020 IEP specified that P.J. would continue to receive SDI in reading and writing for, respectively, 230 minutes and 140 minutes per week.  AR 2047 (docket no. 16-10 at 141).  At the time, because of the ongoing COVID pandemic, the District was offering only remote instruction (through the Zoom platform). *See* AR 2051 (docket no. 16-10 at 145).

**E.      March 2021 IEP (Fifth Grade)**

An IEP that took effect on March 16, 2021, maintained the previous levels of special education in reading and written language, *i.e.*, 230 and 140 minutes per week, respectively.  AR 2057 & 2077 (docket no. 16-10 at 151 & 171).  The March 2021 IEP also outlined measurable annual goals in basic reading, reading fluency, reading of high-frequency words, reading comprehension, writing two-syllable words with long vowels, and writing paragraphs.  AR 2069–70 & AR 2071–72 (docket no. 16-10 at 163–64 & 165–66).  Importantly, the ALJ did not find any flaw in this IEP, mentioning only that it contemplated P.J.'s use of a Phono-Graphix® sound picture chart or other similar tool as an accommodation.  *See* AR 1871 (docket no. 16-8 at 245); *see also* AR 2074 (docket

no. 16-10 at 168).  In this action, P.J.'s parents have not challenged the March 2021 IEP

or the ALJ's related analysis, and thus, the Court concludes that, in this matter, with

respect to subsequent IEPs with equivalent amounts of special education, the quantum of

SDI in reading and writing (as opposed to the setting in which it would be provided) is

not at issue.

**F.    April 2021 Hybrid Schedule (Fifth Grade)**

In April 2021, in response to reductions in COVID-based restrictions, the District

allowed students to opt for a hybrid schedule; P.J. began attending in-person classes two

days per week, and she received virtual services three days per week.  *See* AR 862–63

(docket no. 16-4 at 81–82) ("[S]tudents were divided into an A cohort and a B cohort.

[P.J.] was in the B cohort. . . .  [O]n Mondays and Tuesdays, she attended school virtually

on Zoom.  On Wednesdays, I met individually with her for some reading instruction. . . .

On Thursdays and Fridays, [P.J.] was in person for instruction.").

**G.    June 2021 IEP (Sixth Grade)**

In June 2021, in preparation for P.J.'s transition to sixth grade at Leota Middle

School in Woodinville ("Leota"), her IEP was amended to reflect an increase in the total

amount of special education in reading (from 230 to 240 minutes per week), but a

decrease in the time spent in a special education setting for reading (from 230 minutes to

160 minutes per week).  *See* AR 2107 (docket no. 16-10 at 201).  The June 2021 IEP

proposed that, at Leota, the balance of P.J.'s SDI in reading (80 minutes per week) would

be offered via a "co-teach model" within the general education classroom.  *Id.*  Special

education in writing (with the total time remaining 140 minutes per week) would likewise

be split; 60 minutes per week would be provided in a special education setting (*i.e.*, the "Academic Lab course"), and 80 minutes per week would be delivered as part of the "co-teach model."  *Id.*

In drafting this IEP, the District rejected P.J.'s parents' request that P.J. be placed at Brock's Academy (at the District's expense) to receive one-on-one special education services in English Language Arts ("ELA") and mathematics.  *See* AR 2110 (docket no. 16-10 at 204).  The reasons stated for this decision were as follows:  (i) P.J. was making appropriate progress within the current instructional approach; (ii) Leota would provide P.J. appropriate instruction within the "co-teach" and Academic Lab models; (iii) P.J. would benefit from "the opportunity to share her ideas and engage with her peers" in both general education and Academic Lab settings; (iv) segregating P.J. from her peers for substantial portions of the school day might "be detrimental and negatively impact [P.J.'s] social, emotional, and academic development"; and (v) Brock's Academy did not constitute P.J.'s least restrictive environment, as defined by the IDEA.[3]  *See id.*

**H.    August 2021 Evaluation**

In August 2021, at P.J.'s parents' expense, Christine Clancy, Ph.D., a board-certified clinical and pediatric neuropsychologist, provided a 14-page report that was

---

[3] The IDEA requires that, "[t]o the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily."  20 U.S.C. § 1412(a)(5)(A).

based *inter alia* on testing conducted in May 2021.  AR 3427–40 (docket no. 16-18 at 14–27).  Dr. Clancy administered the Wechsler Individual Achievement Test – Fourth Edition ("WIAT-IV") and GORT-5, and compared the results against P.J.'s scores from Dr. Battin's evaluation in September 2020.  *See* AR 3438–39 (docket no. 16-18 at 25–26).  Dr. Clancy concluded that, despite the District's "best efforts" at providing intensive intervention and special education support, P.J. had "not made any clear and statistically significant documented gains in her literacy skills."  AR 3435 (docket no. 16-18 at 22).

According to Dr. Clancy, for the 2021-22 school year, P.J. required 300 minutes per week of SDI in reading, to be provided by "an experienced interventionist with 1 year or more of training and experience implementing a chosen Structured Literacy Program with fidelity."  AR 3435 (docket no. 16-18 at 22).  In addition, Dr. Clancy opined that P.J. should receive another 300 minutes per week of specialized instruction in writing delivered by "an experienced interventionist with training and expertise in remediating writing challenges."  AR 3436 (docket no. 16-18 at 23).  Dr. Clancy further indicated that P.J. "will need to work privately with a skilled interventionist," outside of the school setting, and she listed five possible providers, including Brock's Academy.  *Id.*  She also suggested that, if the District was "unable to remediate [P.J.'s] global learning delays," then it "should pay for [P.J.'s] educational needs at a Non-Public Agency."  AR 3437 (docket no. 16-18 at 24).

## I.    2021–22 School Year – Dual Enrollment (Sixth Grade)

On August 4, 2021, P.J.'s parents, through counsel of record, informed the District via a three-page letter that they intended to place P.J. at Brock's Academy for ELA (*i.e.*,

1  reading and writing) instruction.  AR 4390–92 (docket no. 16-25 at 123–25).  P.J.'s

2  parents would, however, continue to entrust the District with schooling P.J. in all other

3  areas, including mathematics, for which P.J. received special education services.  *See*

4  AR 4392 (docket no. 16-25 at 125).  On August 23, 2021, the District provided notice

5  concerning a schedule for dual enrollment at Leota and Brock's Academy that would

6  minimize the impact to P.J.'s school day.  AR 2121 (docket no. 16-10 at 215).  Pursuant

7  to this plan, P.J. would attend half of the fifth period (the Academic Lab course) at Leota,

8  but would miss all of the sixth period (the "co-taught" ELA class), as well as all other

9  SDI in reading and writing that was being offered by the District.  *Id.*

10  **J.    December 2021 IEP (Sixth Grade)**

11        P.J.'s June 2021 IEP was set to expire on December 22, 2021.  *See* AR 2107

12  (docket no. 16-10 at 201).  An IEP meeting was held on December 15, 2021, and the

13  resulting IEP contained no progress reports or annual goals for reading or writing because

14  P.J.'s parents had chosen to enroll P.J. at Brock's Academy for ELA instruction and SDI

15  in reading and writing.  *See* AR 4500–01 & 4508 (docket no. 16-26 at 87–88 & 95).

16  Nevertheless, the December 2021 IEP specified the amounts of special education for

17  reading and written language that would be provided to P.J., namely 180 minutes per

18  week (with 90 minutes per week devoted to each subject), to be split two-thirds (⅔) in the

19  Academic Lab and one-third (⅓) in a "co-taught" class; this IEP also noted that P.J. was

20  receiving SDI in reading and writing at a private school, and that she was not attending

21  the offered Academic Lab and "co-taught" sessions.  AR 4505 & 4508 (docket no. 16-26

22  at 92 & 95).  The IEP further indicated that, if P.J. were to return to Leota for ELA, the

23

1    amount of special education would need to be adjusted, and "an IEP amendment would

2    happen at that time."  AR 4508 (docket no. 16-26 at 95).

3    **K.**    **Administrative Hearing (May 16 – May 25, 2022)**

4          On November 24, 2021, Ryan Ford (P.J.'s parents' attorney) served a "Due

5    Process Complaint" on OSPI and the District's Superintendent.  AR 1378–85 (docket

6    no. 16-7 at 2–9).  On P.J.'s parents' behalf, Mr. Ford asserted that the District had denied

7    P.J. a FAPE in the areas of reading and writing for the period "dating back two years[4]

8    from the date of submission" of the Due Process Complaint, and more specifically,

9    during the school years 2019-20, 2020-21, and 2021-22.  AR 1378 & 1384–85 (docket

10   no. 16-7 at 2 & 8–9); _see also_ AR 1450–51 (docket no. 16-7 at 74–75) (amended

11   complaint).  The matter was eventually assigned to ALJ Alig, AR 1470–71 (docket

12   no. 16-7 at 94–95), who conducted the hearing entirely via videoconference, _see_ AR 1474

13   (docket no. 16-7 at 98).  Post-hearing briefs were filed in mid-July 2022, and the ALJ's

14   decision issued in August 2022.  _See_ AR 1674–75, 1681– 777, & 1846 (docket no. 16-8

15   at 48–49, 55–151, & 220).

16

17

18   _____

19   [4] The IDEA requires that a party be given an opportunity to present a complaint setting forth "an
20   alleged violation that occurred not more than 2 years before the date the parent or public agency
     knew or should have known about the alleged action that forms the basis of the complaint."  20
21   U.S.C. § 1415(b)(6)(B).  The ALJ limited his review to IDEA violations allegedly occurring on
     or after November 24, 2019, which was two years before the Due Process Complaint was filed,
22   _see_ AR 1887–88 (docket no. 16-9 at 11–12), and P.J.'s parents have not assigned any error to
     this decision.

23

ORDER - 10

The ALJ concluded that the District failed to provide P.J. a FAPE from March 12, 2020, through the end of the 2021-22 school year,[5] reasoning as follows:

(1)    The **April 2020 IEP** "was not reasonably calculated" to offer P.J. a FAPE in reading and writing because it incorporated "a zero-level baseline" as a result of COVID-related data gaps, _see_ AR 1888–89 (docket no. 16-9 at 12–13);

(2)    The **December 2020 IEP** "was not reasonably calculated" to offer P.J. a FAPE in reading and writing because (a) the underlying December 2020 triennial reevaluation contained inaccurate assessments of P.J.'s reading fluency, and (b) the IEP team did not provide a basis for not adopting Dr. Battin's recommendation regarding the amount of SDI in writing (225 minutes per week) that P.J. should receive, _see_ AR 1889–91 (docket no. 16-9 at 13–15);

(3)    The **June 2021 IEP** "was not reasonably calculated" to offer P.J. a FAPE in reading and writing because it did not offer sufficient SDI minutes in a special education, as opposed to general education, setting, _see_ AR 1891–95 (docket no. 16-9 at 15–19); and

(4)    The **December 2021 IEP** "was not reasonably calculated" to offer P.J. a FAPE in reading and writing because it did not specify any annual goals and did not provide enough special education time in those subjects, _see_ AR 1895–98 (docket no. 16-9 at 19–22).

The ALJ further found that the District denied P.J. a FAPE by failing to implement her April 2020 IEP during the following timeframes, which were during the period when school operations were negatively impacted by COVID-related protocols:

(1)    **from March 12, 2020**, when the Governor of the State of Washington issued a proclamation ceasing all in-person educational programs, **until June 22, 2020**, when the 2019-2020 school year ended, _see_ AR 1898–1900

---

[5] The District argues that the issue of whether it provided P.J. a FAPE after the date of the Due Process Complaint, _i.e._, after November 24, 2021, was not properly before the ALJ. The Court disagrees. The Due Process Complaint explicitly raised the question of whether "the special education programming offered by the District for the 2021-22 school year" was reasonably calculated to provide P.J. a FAPE. _See_ AR 1385 (docket no. 16-7 at 9).

(docket no. 16-9 at 22–24); *see also* AR 2141 (docket no. 16-10 at 235); and

(2)    **from September 2, 2020**, when the 2020-21 school year started, **until November 5, 2020**, when the District modified its delivery of SDI to P.J. pursuant to the October 2020 IEP, *see* AR 1900–02 (docket no. 16-9 at 24–26); *see also* AR 1988 & 2142 (docket no. 16-10 at 82 & 236).

Based on his determination that the District had violated the IDEA by denying P.J. a FAPE, the ALJ awarded to P.J.'s parents the following remedies:

(1)    reimbursement of tuition in the amount of $36,030.00, which had been paid to Brock's Academy for P.J.'s one-on-one tutoring in reading and writing during the 2021-22 school year, *see* AR 1904 (docket no. 16-9 at 28);

(2)    travel expenses for 1,435.6 miles at the applicable federal rate (58.5¢ per mile), or roughly $840, *see id.*;

(3)    an additional 21-week placement at Brock's Academy during the 2022-23 school year, with tuition and mileage to be paid by the District, *see id.*;

(4)    an independent educational evaluation to be obtained at the District's expense on or before December 9, 2022, *see* AR 1905 (docket no. 16-9 at 29); and

(5)    the development, by December 20, 2022, of an IEP that includes annual goals in reading and writing and a "plan for support" of P.J. if she returns to a District school for ELA instruction, *see* AR 1905–06 (docket no. 16-9 at 29–30).

The District has appealed all the above rulings, except for the requirement that the District pay for an independent educational evaluation. The ordered evaluation was completed on December 5, 2022, by Cindy Dupuy, Ph.D., who owns and operates a business (Explanations, Inc.) that specializes in the diagnostic testing of individuals who have or are suspected of having learning disabilities. *See* Dupuy Decl. at ¶¶ 2–3, 7, and 10 (docket no. 22). Thus, the issue of whether an independent educational evaluation must be conducted is moot.

ORDER - 12

1  **Discussion**

2  **A.    Applicable Standards**

3         Pursuant to the IDEA, schools that receive federal funding must ensure that

4  students with disabilities receive, in the "least restrictive environment" ("LRE"), "a free

5  appropriate public education that emphasizes special education and related services

6  designed to meet their unique needs and prepare them for further education, employment,

7  and independent living."  20 U.S.C. § 1400(d)(1)(A); _see_ _D.R. ex rel. R.R. v. Redondo_

8  _Beach Unified Sch. Dist._, 56 F.4th 636, 641 (9th Cir. 2022); _see also_ 20 U.S.C.

9  § 1412(a)(5)(A).  The LRE requirement seeks to prevent public schools from

10  unnecessarily segregating children with disabilities or excluding them from general

11  education classrooms.  _See_ _D.R._, 56 F.4th at 641 (citing 20 U.S.C. § 1400(c)

12  (enumerating Congress's findings)).  A FAPE is defined as "special education and related

13  services" that "(A) have been provided at public expense, under public supervision and

14  direction, and without charge; (B) meet the standards of the State educational agency;

15  (C) include an appropriate preschool, elementary school, or secondary school education

16  in the State involved; and (D) are provided in conformity with the individualized

17  education program required" by 20 U.S.C. § 1414(d).  _See_ 20 U.S.C. § 1401(9).

18         Among other things, an IEP must include (i) a statement of the student's present

19  levels of academic achievement and functional performance; (ii) a statement of

20  measurable annual goals; (iii) a description of how the child's progress toward meeting

21  the annual goals will be measured and when periodic progress reports will be provided;

22  (iv) a statement of the special education and related services (and supplementary aids and

23

1   services) that will be provided; and (v) an explanation concerning the extent, if any, to

2   which the student will not participate with nondisabled children in regular classes and

3   activities.  _See_ 20 U.S.C. §§ 1414(d)(1)(A)(i)(I)–(V).  In challenging P.J.'s various IEPs,

4   her parents bore the burden of proving that one or more IEPs violated the IDEA.  _See_

5   _D.R._, 56 F.4th at 643; _see also_ _Schaffer ex rel. Schaffer v. Weast_, 546 U.S. 49, 62 (2005)

6   ("The burden of proof in an administrative hearing challenging an IEP is properly placed

7   upon the party seeking relief.").

8        The IDEA directs a court (in which a civil action is brought to appeal the decision

9   of a due process hearing officer) to do the following:  (i) receive the records of the

10  administrative proceedings; (ii) hear additional evidence at the request of a party; and

11  (iii) grant "such relief as the court determines is appropriate" based on a preponderance

12  of the evidence.  20 U.S.C. § 1415(i)(2)(C).  This "preponderance of the evidence"

13  standard does not invite "courts to substitute their own notions of sound educational

14  policy for those of the school authorities which they review."  _Bd. of Educ. of Hendrick_

15  _Hudson Cent. Sch. Dist. v. Rowley_, 458 U.S. 176, 206 (1982).  Rather, a court must give

16  "due weight" to the administrative proceedings, and a court's inquiry is two-fold:

17  (i) has the State complied with the procedures set forth in the IDEA; and (ii) is the IEP

18  "reasonably calculated to enable the child to receive educational benefits."  _Id._ at 206–07.

19       In interpreting the Supreme Court's "due weight" guidance, the Ninth Circuit has

20  held that the quantum of deference to give to a hearing officer's decision constitutes a

21  matter of discretion for the courts.  _See_ _Capistrano Unified Sch. Dist. v. Wartenberg_, 59

22  F.3d 884, 891 (1995) (quoting _Gregory K. v. Longview Sch. Dist._, 811 F.2d 1307, 1311

23

1    (9th Cir. 1987)).  Courts should carefully consider an ALJ's decision and "endeavor to

2    respond to the hearing officer's resolution of each material issue," but they are "free to

3    accept or reject the findings in part or in whole."  _Id._  The Ninth Circuit has suggested

4    that the amount of deference accorded a hearing officer's rulings should increase when

5    they are "thorough and careful."  _Id._ (citing _Union Sch. Dist. v. Smith_, 15 F.3d 1519, 1524

6    (9th Cir. 1994)).  In sum, however, although "due deference" is owed, the district court's

7    independent judgment, which must be based on a preponderance of the evidence, "is not

8    controlled by the hearing officer's recommendations."  _Id._ at 892.  In seeking reversal of

9    the ALJ's decision in this matter, the District bears the burden of establishing error.  _See_

10    _J.B. v. Kyrene Elem. Sch. Dist. No. 28_, 112 F.4th 1156, 1161 (9th Cir. 2024).

11    **B.**    **No Liability Under the IDEA**

12          Although the ALJ and the parties have devoted substantial time and effort to the

13    question of whether the District's adoption of the April 2020, December 2020, June 2021,

14    and/or December 2021 IEPs and/or partial failure to implement the April 2020 IEP

15    violated the IDEA, the Court is not persuaded that it must emulate them.  Because the

16    ALJ found no flaw in the March 2021 IEP and it has not been challenged in this action,

17    the Court need not consider whether the earlier IEPs, _i.e._, the April and December 2020

18    IEPs, were technically deficient, particularly given that the March 2021 IEP offered the

19    same amount of SDI in reading and writing as the December 2020 IEP.  Moreover, none

20    of the remedies awarded by the ALJ were premised on (i) any IDEA violations related to

21    the April 2020 IEP or the December 2020 IEP, or (ii) any implementation failures during

22    the midst of the COVID pandemic.  The Court therefore DECLINES to further address

23

ORDER - 15

1    those issues.  The Court instead focuses on the ALJ's findings with respect to the

2    June 2021 IEP, which immediately preceded P.J.'s enrollment at Brock's Academy, and

3    the December 2021 IEP, which was prepared while P.J. was receiving private school

4    instruction in English Language Arts.

5        1.    **June 2021 IEP**

6        The crux of the dispute concerning the June 2021 IEP is whether, when P.J.

7    entered middle school, she should have continued to receive all her SDI in reading and

8    writing in a separate special education setting, as opposed to having a portion of the SDI

9    in a general education classroom.  This issue requires an inquiry into what constitutes

10   P.J.'s least restrictive environment.  *See* 20 U.S.C. § 1412(a)(5)(A).  The Ninth Circuit

11   has adopted a four-factor balancing test for determining whether the IDEA's LRE

12   mandate is satisfied.  *See* *Sacramento City Unified Sch. Dist. v. Rachel H.* 14 F.3d 1398,

13   1404 (9th Cir. 1994); *see also* *D.R.*, 56 F.4th at 643.  These *Rachel H.* factors are as

14   follows:  (i) the educational benefits of full-time placement in a regular class; (ii) the non-

15   academic benefits of placement in a regular class; (iii) the potentially negative effects that

16   a disabled student's presence in a regular classroom might have on the teacher and other

17   children; and (iv) the costs associated with the disabled student's placement in a regular

18   classroom.  *See* *Rachel H.*, 14 F.3d at 1404; *see also* *D.R.*, 56 F.4th at 643.  These four

19   considerations are consistent with the IDEA's "strong preference" for educating children

20   with disabilities in a regular classroom environment, or in other words, "mainstreaming"

21   them.  *See* *D.R.*, 56 F.4th at 643 (quoting *Poolaw v. Bishop*, 67 F.3d 830, 834 (9th

22   Cir. 1995)).

23

The ALJ was familiar with the _Rachel H._ standard and correctly recited it in his written decision.  _See_ AR 1892 (docket no. 16-9 at 16).  He failed, however, to properly apply the four-factor test.  Rather than balancing the four considerations, he concluded that the last two, which undisputedly favored the District's position, should simply be ignored.  _See id._ ("In the Student's case, there were no indications that the Student was unduly disruptive to the students or teachers when in the general education setting or concerns about the cost of mainstreaming.  Therefore, the two considerations with respect to the Student's LRE[,] under the _Rachel H_ test, are the academic benefits and non-academic benefits of a mainstream setting.").  In doing so, the ALJ erred.

_Rachel H._ itself illustrates how all four factors should be weighed in determining a student's LRE.  _See_ 14 F.3d at 1401–02 & 1404–05.  In _Rachel H._, the parents of the student at issue sought to increase the amount of time that the student spent in a regular classroom.  _Id._ at 1400.  The school district asserted that the student was too severely disabled to benefit from full-time placement in a general education setting.  _Id._  A hearing officer concluded that the school district "had failed to make adequate effort to educate [the student] in a regular class pursuant to the IDEA," and the district court affirmed.  _See id._  After summarizing the district court's analysis, the Ninth Circuit adopted the four-factor balancing test applied by the district court, and it refused to disturb the district court's findings.  _See id._ at 1401–05.

Notably, in _Rachel H._, with regard to the educational benefits of a regular classroom, the district court heard conflicting testimony from the parties' respective experts regarding the student's progress in a general education setting, and it found the

1  parents' experts more credible because they had more relevant experience and "a greater

2  opportunity to observe [the student] over an extended period of time in normal

3  circumstances." *See* *id.* at 1401.  The district court also gave "great weight" to the views

4  of the student's current teacher at a private school at which the student was attending

5  regular classes, and it concluded that (i) the student "received substantial benefits in

6  regular education," and (ii) "all of her IEP goals could be implemented in a regular

7  classroom with some modification to the curriculum and with the assistance of a part-

8  time aide." *Id.*

9  The current teacher's testimony also played a key role (along with the student's

10  mother's observations) in the district court's determination in *Rachel H.* that the student

11  experienced non-academic benefits as a result of placement in a general education

12  setting, including the development of social and communications skills, improved self-

13  confidence, and an enthusiasm about school, learning, and new friendships.  *See* *id.*

14  Similarly, in finding that the student followed directions, was well-behaved, was not a

15  distraction, and would not interfere with a teacher's ability to teach the other children in

16  the class, the district court considered evidence about the student's actual performance in

17  a regular classroom, including the testimony of her current teacher.  *See* *id.*  Finally, with

18  regard to costs, the district court concluded that the school district improperly inflated its

19  estimates and failed to make the appropriate comparisons, and neither the district court

20  nor the Ninth Circuit were persuaded by the school district's assertion that it would lose

21  significant state funding if the student was not enrolled in a special education class for at

22

23

least 51% of the day, reasoning that the school district had not sought an available waiver.  *See id.* at 1402 & 1404–05.

As in *Rachel H.*, in this matter, the last two factors, *i.e.*, potential disruption and any expense associated with the student's presence in the general education classroom, weigh in favor of mainstreaming P.J. for a portion of her ELA lessons.  The failure to balance these considerations along with the academic and non-academic benefits of the "co-teach" arrangement at Leota constituted a fatal flaw in the ALJ's analysis, and the Court accords no deference to the ALJ's conclusion that the June 2021 IEP "was not reasonably calculated" to provide P.J. a free appropriate public education because it "did not offer sufficient SDI minutes in the special education classroom," *see* AR 1895 (docket no. 16-9 at 19), as opposed to a "co-teach" setting.

Moreover, the first two *Rachel H.* factors, which the ALJ did take in account, do not support the ALJ's conclusion that the June 2021 IEP violated the IDEA.  With respect to the first consideration, namely whether Leota's "co-teach" model would have less academic benefit than a one-on-one or special education approach, the record in this matter, unlike in *Rachel H.*, does not contain any data about P.J.'s performance in a general education setting for ELA instruction, and thus, any comparison can be only speculative in nature.  In his analysis, the ALJ relied on a misimpression that P.J. was already participating in a mainstream program (or, in other words, receiving "push-in" special education services) at Kokanee, *see* AR 1892–93 (docket no. 16-9 at 16–17).  The record contradicts this premise; while at Kokanee, P.J. received all reading and writing SDI in one-on-one or segregated small group settings.  *See* AR 3692, 3764–65, 3770–72,

1    3778–81, 3789–91, & 3798–3800 (docket no. 16-20 at 29, 101–02, 107–09, 115–18,

2    126–28, & 135–137); *see also* AR 862–63 (docket no. 16-4 at 81–82); AR 1160–61

3    (docket no. 16-5 at 156–57).  Given the ALJ's mistake of fact, the Court disregards his

4    finding that the instructional approach proposed in the June 2021 IEP did not have as

5    much academic benefit as a totally separate, special education format.  Instead, the Court

6    concludes that reasonable minds differed in hypothesizing whether P.J. would experience

7    the same or more educational benefits in a "co-teach" system than in a special education

8    setting, with P.J.'s parents and their experts making negative predictions and the

9    District's employees and experts opining otherwise.  No rational basis exists for

10   assigning more weight to either side's theories, and thus, the first *Rachel H.* factor is

11   neutral with respect to whether the academic benefits of one approach outweighed those

12   of the other.

13          With regard to non-academic benefits, the ALJ seems to have ignored a relevant

14   portion of the testimony of Dr. Clancy, who evaluated P.J. in 2021 upon her parents'

15   request, as well as the principles underlying the second *Rachel H.* factor and the IDEA.

16   The ALJ noted that P.J. struggled with low self-esteem and anxiety relating to her reading

17   and writing skills.  *See* AR 1894 (docket no. 16-9 at 18).  Relying on the October 2020

18   opinion of Dr. Battin, who did not testify at the administrative hearing and was therefore

19   not subjected to cross-examination, the ALJ concluded that P.J. would receive more non-

20   academic benefits from a special education classroom for reading and writing than from a

21   general education "co-teach" scenario in which she might suffer embarrassment and

22   frustration in front of her peers.  *See id.*  Dr. Clancy, however, whose evaluation was

23

more current than Dr. Battin's, and who was a witness on the second day of the administrative hearing, explained to the ALJ that P.J. "is a very sociable child" and "being removed from her academic environment to go to Brock's Academy prevented her from having the same level of social-emotional interaction with her agemates."  AR 416–17 (docket no. 16-2 at 139–40); *see also* AR 407–08 (docket no. 16-2 at 130–31) (describing P.J. as "highly social and anxious" and as needing to "be embraced by her community as somebody who has these learning challenges but is making efforts to override them or overcome them").  Dr. Clancy expressed concern about the decision to place P.J. in one-on-one instruction at Brock's Academy, which essentially singled her out and could lead to increased anxiety, lower self-esteem, and mood-related issues.  *See* AR 417 (docket no. 16-2 at 140).

These same considerations operate to cast doubt on the ALJ's assessment that Leota's "co-teach" approach would have fewer non-academic benefits than a sequestered special education option.  In this regard, the Ninth Circuit's observations in *D.R.* are instructive.  In that matter, the disabled student "derived significant non-academic benefits from the time he spent in the regular classroom" in which he "became close friends with several of his non-disabled classmates," which in turn "helped [him] develop his interpersonal skills and build his self-confidence."  *D.R.*, 56 F.4th at 644.  In this case, by focusing on P.J.'s insecurities about her reading and writing skills, the ALJ foreclosed the possibility that P.J. might find the sense of community among her classmates that Dr. Clancy opined she needed.

1    In sum, the record does not support the relative academic and non-academic value

2 assigned by the ALJ to segregated SDI for reading and writing, and a proper balancing of

3 all four _Rachel H._ factors favors mainstreaming P.J. for a portion of her ELA studies.

4 Given the Congressional edict to include children with disabilities in general education

5 classrooms "[t]o the maximum extent appropriate," and to avoid removing disabled

6 students to special classes or separate schooling unless education in regular classes

7 "cannot be achieved satisfactorily" with the "use of supplementary aids and services,"

8 20 U.S.C. § 1412(a)(5)(A), the Court must conclude, by a preponderance of the evidence,

9 that the June 2021 IEP complied with the IDEA.

10    **2.    December 2021 IEP**

11    The dispositive question concerning the December 2021 IEP is whether the

12 District was obligated to set annual goals in reading and writing after P.J.'s parents

13 elected to place her at Brock's Academy for ELA instruction.  To be clear, the District is

14 not accused of failing to prepare an IEP or of declining to offer SDI in reading and

15 writing.  Rather, the District is faulted for not describing P.J.'s progress and not

16 establishing annual goals for these subjects, for which the District was not providing

17 instruction to P.J.  The District contends that, because P.J. was attending Brock's

18 Academy, the District was not required to even prepare an IEP incorporating SDI in

19 reading and writing, and thus, whether the December 2021 IEP was deficient in these

20 areas is irrelevant.  _See_ Pl.'s Br. at 35–38 (docket no. 50).  P.J.'s parents appear to agree

21 that the threshold issue is whether an IEP concerning reading and writing was statutorily

22 required, and that the answer to this question depends solely on whether P.J.'s parents

23

made the request necessary to trigger the District's responsibility to develop an IEP

concerning special education in ELA.  *See* Defs.' Resp. & Cross-Mot. at 43 (docket

no. 54).

In concluding that the District had such duty, the ALJ relied on *Capistrano*

*Unified School District v. S.W.*, 21 F.4th 1125 (9th Cir. 2021), and *Bellflower Unified*

*School District v. Lua*, 832 F. App'x 493 (9th Cir. 2020).  *See* AR 1896 (docket no. 16-9

at 20).  In *Capistrano*, the Ninth Circuit announced the following interpretation of the

IDEA:

> We hold that, if the student has been enrolled in private school by her parents,
> then the district need not prepare an IEP, even if a claim for reimbursement
> has been filed.  To be sure, when parents withdraw a student from public
> school and place her in private school, all they have to do is ask for an IEP,
> and then the district must prepare one.  But regardless of reimbursement,
> when a child has been enrolled in private school by her parents, the district
> only needs to prepare an IEP if the parents ask for one.

21 F.4th at 1138 (citing 20 U.S.C. § 1412(a)(10)).  Similarly, in *Bellflower*, the Ninth

Circuit observed that, pursuant to regulations implementing the IDEA, "*upon a parent's*

*request*, a school district must evaluate a child residing in its district for purposes of

making a FAPE available to her, even if she is enrolled in a private school in another

district."  832 F. App'x at 495–96 (emphasis added).  In *Capistrano*, the Ninth Circuit

concluded that, notwithstanding the parents' pending request for reimbursement of

private school tuition, the school district was *not* required to develop an IEP because the

parents had told the district that they would keep the student in private school.  *See* 21

F.4th at 1139–40.  In *Bellflower*, the Ninth Circuit held that the school district violated

the IDEA by refusing to convene an IEP meeting for a disabled child attending private

1  school in another district, "despite multiple requests from [the] parents."  832 F. App'x at

2  496.

3  In this matter, the ALJ found that P.J.'s parents put the District on notice that the

4  December 2021 IEP needed to include annual goals (and sufficient SDI) for reading and

5  writing, relying on three events:  (i) transmittal to the District and its counsel of a letter

6  dated August 4, 2021, from P.J.'s parents' attorney (Ryan Ford), *see* AR 1896 (docket

7  no. 16-9 at 20) (misidentifying the letter as dated August 6, 2021); (ii) transmittal of a

8  copy of Dr. Clancy's August 2021 report; and (iii) participation by P.J.'s parents in the

9  process of developing the December 2021 IEP.  Importantly, however, the ALJ did not

10  cite to any actual request made by P.J.'s parents or their lawyer while P.J. was attending

11  Brock's Academy that the District develop an IEP, include annual goals, and/or offer SDI

12  concerning reading and writing.  Rather, the ALJ drew unreasonable inferences from the

13  facts in the record.

14  Characterizing the required showing under *Capistrano* and *Bellflower* as a "low

15  bar," the ALJ misconstrued Mr. Ford's August 2021 letter as asking that the District

16  address, in the December 2021 IEP, P.J.'s special education needs in reading and writing.

17  *See* AR 1896 (docket no. 16-9 at 20).  Mr. Ford's letter made no such request, but rather

18  stated in relevant part as follows:

19      [T]his letter provides Northshore School District . . . with ten (10) or more
        business days notice of the Parents' intent to place the Student at Brock's
20      Academy . . . for her English Language Arts . . . instruction and reading and
        writing specially designed instruction *for the upcoming school year and*
21      *potentially beyond* and seek reimbursement from the District for the private
        placement of the Student. . . .  The Parents request that the District work with
22      them to identify an appropriate schedule for the Student that will allow the

23

1
2

       Student to dually enroll and attend at Leota and Brock's without disruption
to the Student's school day and class schedules.

3

AR 4390 (docket no. 16-25 at 123) (emphasis added).  In interpreting this letter as

4

imploring the District to include annual ELA goals in the December 2021 IEP, which was

5

not mentioned or even contemplated in the letter, the ALJ improperly ignored the context

6

in which the letter was written, *i.e.*, shortly after the development of the June 2021 IEP,

7

which offered 380 minutes per week of SDI, split between the Academic Lab and the

8

"co-teach" system at Leota, and which P.J.'s parents had (in relevant part) rejected.  As in

9

*Capistrano*, in this matter, the District reasonably interpreted the August 2021 letter as

10

"explicitly" indicating that P.J.'s parents "intended to keep" P.J. in private school for at

11

least the 2021-22 school year, *see Capistrano*, 21 F.4th at 1140, and the District

12

appropriately inferred from Mr. Ford's letter that any IEPs drafted during this timeframe,

13

including the December 2021 IEP, need not deal with ELA instruction.

14

       The ALJ's conclusion that P.J.'s parents satisfied the "low bar" by providing the

15

District with Dr. Clancy's August 2021 report, *see* AR 1896 (docket no. 16-9 at 20), is

16

likewise flawed.  The ALJ cited no evidence to suggest that an IEP request accompanied

17

Dr. Clancy's report, and given the timing (also on the heels of the June 2021 IEP), the

18

Court concludes that conveying Dr. Clancy's report did not constitute the type of request

19

envisioned in *Capistrano* or *Bellflower*.

20

       Finally, the ALJ's reliance on the IEP process itself, as evidence of the type of

21

demand required by *Capistrano* and *Bellflower*, was misplaced.  The ALJ reasoned that

22

P.J.'s parents' participation in the December 2021 IEP meeting demonstrated that they

23

1    "were 'at least nominally' seeking a public education" for P.J.  *See* AR 1896 (docket

2    no. 16-9 at 20) (quoting *Capistrano*, 21 F.4th at 1137).  P.J.'s parents make a similar

3    argument in response to the District's appeal.  *See* Defs.' Resp. & Cross-Mot. at 43

4    (docket no. 54) (citing AR 4508 & 4491–4510).  Neither the ALJ nor P.J.'s parents,

5    however, have identified any testimony concerning what was discussed during the IEP

6    meeting or showing the parents requested that reading and writing goals be included in

7    the December 2021 IEP.  Moreover, the contention that the parents' involvement in the

8    IEP process qualified as a *Bellflower*-style request disregards the circumstances in which

9    the December 2021 IEP was crafted.  At the time, P.J. was continuing to receive from the

10   District special education in mathematics.  The December 2021 IEP summarized P.J.'s

11   progress and set forth annual goals in math, and it outlined the SDI in math,[6] as well as

12   the related services and accommodations, that P.J. would receive from the District.  *See*

13   AR 4518–20 & 4523–27 (docket no. 16-26 at 105–07 & 110–14).  Against this backdrop,

14   P.J.'s parents' participation in the crafting of the December 2021 IEP can only be viewed,

15   at best, as "'at least nominally' seeking a public education" for P.J. *in mathematics*.

16        P.J.'s parents contend that the District "refused to draft goals for [P.J.] in the areas

17   of reading and writing until [she] returned to the District."  Defs.' Resp. & Cross-Mot.

18

19   _____

20   [6] Indeed, the December 2021 IEP described the following changes to P.J.'s schedule for special
     education in math:  "The team discussed and agreed that [P.J.] attend Leota Middle School for an

21   additional 60 minutes on Thursdays for math SDI in academic lab . . . .  Currently, [P.J.] is
     picked up by her parent at 11:20 on Thursdays.  The parent agreed to a new pickup time of 12:20

22   on Thursdays . . . ."  *See* AR 4529 (docket no. 16-26 at 116).

23

at 43 (docket no. 54). The record confirms the substance of this allegation, albeit not its

argumentative tone, as illustrated by these passages from the related Prior Written Notice:

> Parent is currently choosing to pull [P.J.] out of school for all reading and
> writing instruction. . . .
>
> . . . .
>
> There was also some discussion as to the reading, writing, and math SDI
> minutes in the special education setting. Should [P.J.] return to Leota for
> reading and writing SDI, and the team finds that the minutes need to be
> adjusted, an IEP amendment would happen at that time.
>
> The district continues to decline to fund the parent's placement as further
> explained in the prior notices . . . .
>
> Reading and Writing goals were not drafted for this IEP since the school
> team has not been providing SDI in these areas this school year. Should
> [P.J.] return to Leota for Reading and Writing SDI, goals in those areas will
> be written.

AR 4529 (docket no. 16-26 at 116). The above-quoted language indicates that the

IEP team, which included P.J.'s mother and the parents' attorney, *see* AR 4530 (docket

no. 16-26 at 117), talked about ELA instruction, but that a lack of data (and P.J.'s

parents' plans for her) curtailed the crafting of annual goals or SDI proposals in the areas

of reading and writing.

The ALJ was not persuaded that the absence of information about P.J.'s progress

excused the omission of reading and writing goals, and he chastised the District for not

gathering performance data from Brock's Academy and/or P.J.'s parents. AR 1897

(docket no. 16-9 at 21). The Court does not agree that the District had any record-

fetching obligation, given the lack of evidence that, in connection with the December

2021 IEP, P.J.'s parents made a *Capistrano/Bellflower* request or expressed any interest

in returning P.J. to Leota for SDI in reading and writing. The purposes of the IDEA are

1  not served by compelling public school districts to (i) guess whether parents of disabled

2  children who are attending private institutions want an IEP or components thereof, and/or

3  (ii) generate IEPs that such parents do not genuinely intend to consider, let alone

4  implement.  In this matter, P.J.'s parents were convinced months before the December

5  2021 IEP was prepared that they did not want P.J. to receive reading and writing SDI in a

6  "co-teach" model, and that P.J. would remain at Brock's Academy for the duration of her

7  sixth grade year.  They were certainly entitled to make these decisions, but they cannot

8  blame the District for simply acting accordingly.[7]  The ALJ's determination that the

9  December 2021 IEP violated the IDEA is reversed.

10  **C.    Compensatory Education Remedies**

11         The IDEA permits reimbursement for private instruction if (i) the IEP offered by

12  the public school district violated the IDEA, and (ii) the private placement was "proper"

13  under the IDEA.  _See_ _D.R._, 56 F.4th at 647; _see also_ _Florence Cnty. Sch. Dist. Four v._

14  _Carter ex rel. Carter_, 510 U.S. 7, 15 (1993).  Given the Court's ruling that neither the

15  June 2021 IEP nor the December 2021 IEP violated the IDEA, meaning that the first

16  element of the _Florence County_ standard has not been satisfied, the monetary relief

17  awarded by the ALJ must be vacated.

18

19

_____

20  [7] The Court notes that the ALJ set a deadline of December 20, 2022, for the District to develop
an IEP containing annual goals in reading and written language and a plan for P.J.'s support if
21  she returned to a District school for ELA instruction.  _See_ AR 1905–06 (docket no. 16-9 at 29–
30).  This due date has long since expired, and the record does not reflect whether the requisite
22  IEP was generated.  Regardless of whether the IEP was prepared, the issue of whether the relief
was appropriate is now moot.

23

1      As an independent, alternative basis for reversing the compensatory remedies at

2   issue, the Court concludes that the ALJ committed an error of law.  The District contends,

3   and P.J.'s parents concede, that the ALJ failed to perform the analysis required by the

4   second prong of the _Florence County_ test.  _See_ Pl.'s Mot. at 41–46 (docket no. 50); Defs.'

5   Resp. and Cross-Mot. at 45 (docket no. 54).  Indeed, the ALJ did not cite _Florence_

6   _County_ or even mention the long-established two-part standard.  _See_ AR 1903–04 (docket

7   no. 16-9 at 27–28).  Because the ALJ did not determine whether P.J.'s placement at

8   Brock's Academy was "proper" under the IDEA or, in other words, whether the private

9   school had provided "educational instruction specially designed to meet . . . [P.J.'s]

10  unique needs . . . , supported by such services as [were] necessary to permit . . . [her] to

11  benefit from instruction," _see_ _C.B. ex rel. Baquerizo v. Garden Grove Unified Sch. Dist._,

12  635 F.3d 1155, 1159–60 (9th Cir. 2011), the tuition and mileage reimbursements granted

13  by the ALJ cannot stand.[8]

14      P.J.'s parents assert, however, that, based on the record, the Court may affirm the

15  amounts awarded to them by the ALJ.  P.J.'s parents rely on certain after-acquired

16  evidence, namely the results of the independent educational evaluation required by the

17

18  _____

19  [8] In _C.B._, the Ninth Circuit made clear that a private school need not meet a state's educational
    standards or furnish "every special service necessary to maximize [a student's] potential" to
20  qualify as a "proper" placement for purposes of tuition reimbursement pursuant to the IDEA.
    635 F.3d 1159.  The District makes no argument and the Court does not rely on any finding that
21  Brock's Academy does not satisfy Washington's educational standards or was unable to provide
    P.J. "all" of the educational benefits she needed.  Rather, the Court's ruling rests on the ALJ's
22  failure to analyze whether Brock's Academy was a "proper" placement under the test set forth in
    _C.B._

23

1    ALJ, which was completed in December 2022 by Dr. Dupuy.  Upon the parties'

2    respective motions, docket nos. 21 and 34, Dr. Dupuy's report, docket no. 23, and her

3    related declaration, docket no. 22, were made part of the record, along with the following

4    materials:  (i) emails exchanged between Dr. Dupuy and P.J.'s parents' attorney, Exs. B

5    & C to Johnson Decl. (docket no. 37); and (ii) Paragraphs 7–25 of the rebuttal declaration

6    of David Breiger, Ph.D.[9]  _See_ Order (docket no. 48).

7          Having reviewed the relevant portions of the record, as supplemented on appeal,

8    the Court concludes that P.J.'s parents' argument lacks merit for the following reasons:

9    (i) they cite no authority for the proposition that the Court may post hoc perform the

10   analysis that the ALJ failed to conduct; (ii) even if the Court could retroactively cure the

11   ALJ's analytical mistake, the record before the ALJ did not support, but rather negated,

12   the appropriateness of P.J.'s placement at Brock's Academy; and (iii) to the extent after-

13   acquired evidence can be considered, the supplemental materials incorporated in the

14   record on appeal do not warrant ratification of the monetary relief granted by the ALJ.

15   The latter two points are further discussed below.

16

17

18   _____

19   [9] Dr. Breiger, a licensed neuropsychologist, AR 2133–34 (docket no. 16-10 at 227–28), testified

20   on behalf of the District during the underlying administrative hearing, _see_ AR 458–94 (docket
     no. 16-2 at 181–217).  When he appeared as a witness on May 17, 2022, he was employed as a
     clinical professor by the University of Washington, and he directed the neuropsychological

21   consultation service at Seattle Children's Hospital. _See_ AR 459 (docket no. 16-2 at 182).  He has
     since retired.  _See_ Breiger Decl. at ¶ 1 (docket no. 35).  The admitted portions of his rebuttal

22   declaration dated July 6, 2023, docket no. 35, criticize Dr. Dupuy's methodology and opinions.

23

1     **1.**    <u>**Record Before the ALJ**</u>

In his decision, the ALJ gave "significant weight" to the recommendations of Dr. Clancy, who evaluated P.J. in May 2021, and who testified at the administrative hearing in May 2022.  <u>See</u> AR 1897 (docket no. 16-9 at 21).  Despite Dr. Clancy's recommendation that P.J. receive (i) SDI in reading from "an experienced interventionist with 1 year or more of training and experience implementing a chosen Structured Literacy Program," and (ii) SDI in writing from "an experienced interventionist with training and expertise in remediating writing challenges," AR 3435–36 (docket no. 16-18 at 22–23), during P.J.'s placement at Brock's Academy for the 2021-22 school year, she received one-on-one instruction from a person with none of these qualifications.  P.J.'s tutor at Brock's Academy, Rachael Williamson, was not certificated as a teacher in the State of Washington (or apparently anywhere else), had no endorsement in special education or in literacy instruction, and had no formal training concerning literacy. AR 934–35 (docket no. 16-4 at 153–54).  She was not familiar with the five components of reading, and she had no experience implementing a Structured Literacy Program. AR 935 (docket no. 16-4 at 154).  Indeed, she admitted not even knowing the meaning of the term.  <u>Id.</u>

Ms. Williamson had never before worked with a student who has dyslexia, AR 901 (docket no. 16-4 at 120), and she had no training or expertise in remediating writing challenges, AR 950 (docket no. 16-4 at 169).  She did not have a set curriculum for P.J., but rather employed a "piecemeal approach," she did not use any particular methodology to assist P.J. with her reading skills, and she spent only two (2) hours per

week preparing for thirty-two (32) hours of instruction time with three (3) different

students, including P.J., or merely forty (40) minutes per student each week.  *See*

AR 935–37 (docket no. 16-4 at 154–56).  In addition, although Ms. Williamson's

supervisor apparently observed, at some point, her interactions with P.J., *see* AR 652–53

(docket no. 16-3 at 126–27), the supervisor did not testify during the administrative

hearing, and the only other witness from Brock's Academy, Director of Education

Rachel Kier, never personally checked on or monitored Ms. Williamson's performance,

*see* AR 686 (docket no. 16-3 at 160).

      The ALJ noted most of the deficiencies in Ms. Williamson's training, experience,

and credentials, *see* AR 1883 n.27 & 1884 (docket no. 16-9 at 7–8), but he offered no

analysis to justify overlooking Ms. Williamson's lack of qualifications to serve as the

person designated by Brock's Academy to provide P.J. with "specially designed

instruction" within the meaning of 20 U.S.C. § 1401(29).  Moreover, the ALJ failed to

explain how, in the absence of any established literacy program, teaching methodology,

or prior experience,[10] the brief period that Ms. Williamson devoted to lesson planning

---

[10] Ms. Williamson's ad hoc approach appears to have caused confusion concerning the rate and grade level at which P.J. was reading while at Brock's Academy.  Based on Ms. Williamson's reports, the ALJ found that, in April 2022, P.J. scored, on average, 142 correct words per minute on "cold" (first) and "hot" (second) reading of sixth-grade level materials.  AR 1884–85 (docket no. 16-9 at 8–9).  At the administrative hearing, Ms. Williamson testified that this average figure would place P.J. in the 25th or 50th percentile of sixth graders, but she acknowledged that she had never received training concerning the appropriateness of averaging "cold" and "hot" reading rates.  AR 957–58 (docket no. 16-4 at 176–77).  In contrast, Adra Davy, the District's Director of Special Education for the North Region Learning Community, explained that (i) a "cold" reading rate is a "true measure of fluency," (ii) a "hot" reading rate should not be used to assess fluency because the material has "already been practiced," and (iii) averaging "cold" and

1  could have possibly provided the requisite "educational instruction specially designed to

2  meet" P.J.'s "unique needs."  *See C.B.*, 635 F.3d at 1159.  The Court concludes that, had

3  the ALJ engaged in the inquiry expected by *Florence County*, the record before him

4  would not have supported a finding that placement at Brock's Academy was "proper"

5  pursuant to the IDEA.

6  **2.    After-Acquired Evidence**

7  Similarly, the supplemental materials offered on appeal do not show that the

8  second prong of the *Florence County* test can be satisfied.  Instead, the after-acquired

9  evidence establishes (i) Brock's Academy did not have a program that met P.J.'s needs;

10  and (ii) although P.J. progressed in a couple of ELA areas, she lost ground with respect to

11  many other reading and writing skills while attending Brock's Academy.

12  **a.    No Proper Program at Brock's Academy**

13  In attempting to persuade the Court to approve the ALJ's reimbursement award,

14  P.J.'s parents rely heavily on the opinions of Dr. Dupuy, but the views expressed in her

15  declaration to the Court should be considered in light of the derogatory comments she

16

17  "hot" reading rates was not recommended.  *See* AR 1302–04 & 1334–35 (docket no. 16-6 at 63–

18  65 & 95–96).  Moreover, Dr. Dupuy has since clarified that the passages for which P.J.'s average score was 142 correct words per minute were actually for mid-third-grade-level students.  *See*

19  Dupuy Decl. at ¶ 16 (docket no. 22); *see also* AR 4484, 4561–62, & 4573–74 (docket no. 16-26 at 71, 148–49, & 160–61).  This after-acquired information is consistent with Ms. Davy's

20  testimony before the ALJ, in which she expressed several concerns about P.J.'s placement at Brock's Academy, including the use of second, third, and fourth grade reading materials.

21  AR 1333 (docket no. 16-6 at 94).  Ms. Davy described Brock's Academy's curriculum as lacking in rigor, and she characterized P.J., who was then in the sixth grade, as being "kind of stuck"

22  there in the third-to-fourth-grade range in both reading and writing.  AR 1333–34 (docket no. 16-6 at 94–95).

23

1    made earlier, in a couple of emails to counsel.  In an email dated January 6, 2023,

2    Dr. Dupuy told Mr. Ford and his associate, as well as P.J.'s mother, that she had "several

3    concerns about Brocks [sic]" Academy, including that it was "not implementing

4    Structured Literacy."  Ex. B to Johnson Decl. (docket no. 37 at 16).  In discussing what

5    she believed P.J. needed, Dr. Dupuy summarized Brock's Academy's services as follows:

6    "smaller size is great, one on one is great – curriculum they are using is as bad as the

7    public school system."  _Id._  She further indicated that Brock's Academy needed "to

8    change what they are doing because what they are doing is not going to help [P.J.] really

9    learn to read and write."  _Id._  In a subsequent email to Mr. Ford's associate and P.J.'s

10   mother, Dr. Dupuy stated that she had "met with Kyle [Jolly][11] at Brocks [sic] and helped

11   him understand how to implement the goals."  Ex. C to Johnson Decl. (docket no. 37 at

12   18).  She also reported that she sent to Mr. Jolly recommendations for curriculum, and

13   "[h]e's got everything, except Wilson, that he needs to implement the goals."  _Id._

14   Dr. Dupuy further represented that, if Brock's Academy purchased "Wilson," presumably

15   meaning the Wilson Reading System, then she "can argue the placement with out [sic]

16   any difficulty."  _Id._

17         Notably, Dr. Dupuy derided Brock's Academy and attempted to advise its case

18   manager about reading and writing curriculum at least six (6) months after the end of the

19   2021-22 school year.  Given this timing, these emails must be viewed as reflecting

20   _____

21   [11] Kyle Jolly was a case manager at Brock's Academy, and he supervised the person assigned to
     work one-on-one with P.J., _i.e._, Rachael Williamson.  _See_ AR 652–53 & 672 (docket no. 16-3 at
22   126–27 & 146); AR 965 (docket no. 16-4 at 184).

23

ORDER - 34

1   Dr. Dupuy's belief that, during the initial period for which the ALJ awarded tuition and

2   mileage reimbursement, Brock's Academy was not situated to provide P.J. the special

3   education in ELA that she needed.  Dr. Dupuy has since acknowledged that Brock's

4   Academy does not qualify as a long-term solution[12] because it does not employ

5   a Structured Literacy Program, as had been recommended by Dr. Clancy.  *See* Dupuy

6   Decl. at ¶ 12 (docket no. 22); *see also* Clancy Report at 9, AR 3435 (docket no. 16-18 at

7   22).  In addition, although Brock's Academy might have benefitted from Dr. Dupuy's

8   January 2023 guidance to Mr. Jolly, including perhaps the purchase and use of the

9   Wilson Reading System, any improvement in its practices would have occurred after the

10  2021-22 school year, and would not support a finding that P.J.'s placement at Brock's

11  Academy for sixth grade ELA instruction was consistent with the IDEA.

12              **b.      P.J.'s Post-Attendance Performance**

13              Contrary to P.J.'s parents' and Dr. Dupuy's underlying premise, P.J.'s

14  standardized test scores do not establish that she made overall progress in her reading

15  and writing abilities while attending Brock's Academy.  As Dr. Breiger explained

16  while testifying at the administrative hearing, an assessment tool like the WIAT-III or

17  WIAT-IV provides standardized results, *i.e.*, scores that compare individual performance

18  with normative samples, which reflect data collected from a certain population when the

19

20  _____

21  [12] Even without the benefit of Dr. Dupuy's opinion, the ALJ contemplated that Brock's Academy
    would not be P.J.'s "stay-put" or "open ended prospective educational" placement, as requested

22  by P.J.'s parents.  *See* AR 1849–50 & 1904 (docket no. 16-8 at 223–24 & docket no. 16-9 at 28).

23

1    tests were developed.  _See_ AR 468 (docket no. 16-2 at 191).[13]  For example, P.J.'s scores

2    in basic reading on the WIAT-III were 74 in November 2018 and one point lower (_i.e._,

3    73) in September 2020, but these figures do not signify any decline in ability; rather, they

4    indicate that, in each instance, P.J. had the same relative standing with respect to her

5    peers.  _See_ AR 468–69 (docket no. 16-2 at 191–92).  In other words, in November 2018,

6    P.J.'s basic reading score (74) ranked in the fourth percentile (4%) of normative test

7    subjects in her same grade level (third grade), and in September 2020, P.J.'s basic reading

8    score (73) again placed in the fourth percentile (4%), but this time among normative test

9    subjects who, like P.J., were in the fifth grade.  _See id._  Thus, the WIAT-III showed that,

10   between the third grade and the beginning of the fifth grade, despite the interruptions

11   caused by the COVID pandemic, P.J. kept pace with her contemporaries, developing her

12   reading skills "at the same rate as other kids [her] age."  _See_ AR 469 (docket no. 16-2 at

13   192); _see also id._ (explaining that "to have a higher score, you would have to develop

14   faster; you would have to have acquired the skills faster").

15        In conducting the evaluation required by the ALJ, Dr. Dupuy administered a

16   multitude of tests during the period from October 26 through November 22, 2022,

17

18   _____

     [13] The ALJ accorded "little weight" to Dr. Breiger's testimony because he did not meet with P.J.

19   and "reviewed limited Student information over a short period of time."  AR 1882 (docket
     no. 16-9 at 6).  The Court gives no deference to this portion of the ALJ's ruling.  Dr. Breiger was

20   (and remains) well qualified to provide helpful insights regarding the proper interpretation of
     standardized-assessment results, and the ALJ's complete disregard of Dr. Breiger's views ran

21   contrary to nearly every doctrine related to expert testimony.  _See_, _e.g._, Fed. R. Evid. 702(a)
     (envisioning that, when an expert's opinion "will help the trier of fact to understand the evidence

22   or to determine a fact in issue," it will be admitted (and presumably considered) if it satisfies the
     other criteria of Rule 702).

23

including the CTOPP-2 and GORT-5, _see_ Dupuy Report at 20 & 26–28, Ex. C to Dupuy

Decl. (docket no. 23), which had also been used by Drs. Battin and/or Clancy.  Dr. Dupuy

also relied on the results of the Kaufman Test of Educational Achievement – Third

Edition ("KTEA-3"), _see id._ at 19–20, 22, 26–28, & 30–31, but she did not repeat the

WIAT-III or WIAT-IV, on which Drs. Battin and Clancy, respectively, based their

opinions.[14]

The results of the CTOPP-2 reflect a decline in abilities that coincided with P.J.'s

placement at Brock's Academy.  _See infra_ Table 1; _see also_ Breiger Decl. at ¶ 13 (docket

no. 35) (noting that P.J. performed worse on three of the CTOPP-2 subtests, namely,

blending words, phoneme isolation, and non-word repetition, after she had received ELA

instruction from Brock's Academy for over a year).  Furthermore, P.J.'s scores on the

GORT-5 indicated more improvement during the period when she received SDI from the

District than during the timeframe when she attended Brock's Academy.  _See_ Breiger

Decl. at ¶ 12 (docket no. 35).  Specifically, P.J.'s GORT-5 oral-reading-index ranking

improved eight percent (8%) between September 2020 (70:2%) and May 2021 (81:10%),

while she was receiving SDI from the District, but only four percent (4%) between

---

[14] Dr. Dupuy also employed at least fifteen (15) other standardized tests, _see_ Dupuy Report at 2 (docket no. 23), that neither Dr. Battin nor Dr. Clancy administered.  Given the absence of historical results or comparative data, and the fact that, in reaching his conclusions, the ALJ did not consider P.J.'s scores on these other tools, the Court gives no weight to Dr. Dupuy's findings or opinions based on these assessments.  The Court further notes that Dr. Breiger has indicated (i) many of these tests were unwarranted, and (ii) they were not performed in accordance with the applicable "strict protocols."  _See_ Breiger Decl. at ¶¶ 8–10 (docket no. 35).

May 2021 and November 2022 (84:14%), while she was attending Brock's Academy. *See infra* Table 1.

Similarly, to the extent that any comparison is appropriate among the results of the KTEA-3, WIAT-III, and WIAT-IV,[15] the data does not favor the placement at Brock's Academy. Although P.J.'s basic reading composite index was much higher in November 2022 (87:19%) than on previous tests (ranging from 73:4% to 76:5%), in written expression, spelling, decoding fluency, and reading comprehension, P.J.'s scores on the KTEA-3 administered by Dr. Dupuy were lower than on the WIAT-IV run by Dr. Clancy. *See infra* Table 1; *see also* Breiger Decl. at ¶¶ 19–24 (docket no. 35). The written expression and spelling results observed by Dr. Dupuy were also worse that those seen by school psychologist Jennifer Haynes, using the same test (KTEA-3) more than four years earlier, meaning that P.J. lost ground with respect to her peers while receiving ELA instruction at Brock's Academy. *See infra* Table 1. Likewise, the nonsense-word-decoding score recorded by Dr. Dupuy (71:3%) was lower than the earlier KTEA-3 result (79:8%), as well as the WIAT-III data from Drs. Jenkins and Battin (77:6% & 81:10%,

---

[15] During his testimony at the administrative hearing, and again in his declaration to the Court, Dr. Breiger cautioned against comparing scores from different tests or editions of the same tests. *See* AR 470–71 (docket no. 16-2 at 193–94); Breiger Decl. at ¶¶ 11 & 18 (docket no. 35). Each standardized assessment or version of a test is developed with a unique cohort, which will differ from other sets of individuals in terms of demographics and experiences. AR 470–71 (docket no. 16-2 at 193–94). For example, previous editions might have pre-dated smartphones, while later versions might have been normalized based on groups of kids who have always had access to smartphones. *See* AR 471 (docket no. 16-2 at 194). Dr. Dupuy has agreed that scores on the WIAT-III and WIAT-IV cannot be directly compared because the normative populations used in creating the two editions of the test were different. *See* Dupuy Report at 5 (docket no. 23).

respectively), and it showed no improvement over P.J.'s performance in May 2021 on the WIAT-IV (71:3%).

**Table 1**[16]

| Evaluator<br>Date of Testing | Haynes[17]<br>Mar. 2018 | | Jenkins[18]<br>Nov. 2018 | | Battin[19]<br>Sep. 2020 | | Clancy[20]<br>May 2021 | | Dupuy[21]<br>Nov. 2022 | |
|---|---|---|---|---|---|---|---|---|---|---|
| **TEST** | | | | | **GORT-5** | | **GORT-5** | | **GORT-5** | |
| oral reading index | | | | | 70 | 2% | 81 | 10% | 84 | 14% |
| • reading rate | | | | | 5 | 5% | 6 | 9% | 7 | 16% |
| • reading accuracy | | | | | 5 | 5% | 5 | 5% | 7 | 16% |
| • reading fluency | | | | | 5 | 5% | 6 | 9% | 7 | 16% |
| • comprehension | | | | | 4 | 2% | 7 | 16% | 7 | 16% |
| **TEST** | | | **CTOPP-2** | | **CTOPP-2** | | | | **CTOPP-2** | |
| phonological awareness | | | 90 | 25% | 88 | 21% | | | 96 | 40% |
| • Elision subtest | | | 6 | 9% | 4 | 2% | | | 11 | 63% |
| • blending words | | | 10 | 50% | 9 | 37% | | | 8 | 25% |
| • phoneme isolation | | | 9 | 37% | 11 | 63% | | | 9 | 37% |
| • non-word repetition | | | 6 | 9% | 7 | 16% | | | 6 | 9% |
| phonological memory | | | 82 | 12% | 76 | 5% | | | N/A | |
| rapid symbolic naming | | | 95 | 37% | 88 | 21% | | | N/A | |
| **TEST** | **KTEA-3** | | **WIAT-III** | | **WIAT-III** | | **WIAT-IV** | | **KTEA-3** | |
| written expression | 83 | 13% | 83 | 13% | 80 | 9% | 80 | 9% | 78 | 7% |
| • spelling subtest | 76 | 5% | 80 | 9% | 75 | 5% | 79 | 8% | 73 | 3% |
| basic reading | 76 | 5% | 74 | 4% | 73 | 4% | 76 | 5% | 87 | 19% |
| • nonsense word decoding | 79 | 8% | 77 | 6% | 81 | 10% | 71 | 3% | 71 | 3% |
| • decoding fluency | N/A | | N/A | | N/A | | 93 | 32% | 75 | 4% |
| • reading comprehension | 82 | 12% | 77 | 6% | 92 | 30% | 98 | 45% | 93 | 32% |

---

[16] In Table 1, the numbers in the left column under each test reflect P.J.'s scores, and the figures in the right column indicate the percentage ranking with respect to subjects in her age group.

[17] The results of tests administered by school psychologist Jennifer Haynes were summarized in Dr. Jenkins's Report.  *See* AR 2188–89 (docket no. 16-11 at 25–26).

[18] *See* Jenkins Report, AR 2186–2204 (docket no. 16-11 at 23–41).

[19] *See* Battin Report, AR 2858–85 (docket no. 16-14 at 195–222).

[20] *See* Clancy Report, AR 3427–40 (docket no. 16-18 at 14–27).

[21] *See* Dupuy Report, Ex. C to Dupuy Decl. (docket no. 23).

1      In sum, even if the Court were to accept Dr. Dupuy's premise that information

2  collected from these dissimilar tests (*i.e.*, the KTEA-3, WIAT-III, and WIAT-IV)

3  indicates either improvement or decline in P.J.'s reading and writing skills, *see* Dupuy

4  Decl. at ¶¶ 11(a) & 11(b) (docket no. 22), the figures do not support a conclusion that P.J.

5  was more successful at Brock's Academy (i) than she was when receiving special

6  education from the District, or (ii) than she might have been had she received SDI in

7  ELA at Leota during the 2021-22 school year.  Rather, the data indicates that, overall,

8  P.J.'s reading and writing abilities diminished during her time at Brock's Academy.

### 3.    Conclusion Regarding Reimbursement

10      As noted by the Supreme Court in *Florence County*, parents (like those of P.J.)

11  may "unilaterally change their child's placement . . . without the consent of state or local

12  school officials," but they "do so at their own financial risk."  510 U.S. at 15.  In trying to

13  relieve P.J.'s parents of the financial consequences of their decision to remove P.J. from

14  public school for ELA instruction, the ALJ completely disregarded the applicable

15  standards.  Contrary to P.J.'s parents' contention, the Court cannot now rectify the ALJ's

16  mistakes because the award of tuition and mileage reimbursement (i) was unsupported by

17  the record before the ALJ, and (ii) remains unjustified by the supplemental materials

18  submitted by the parties.  P.J.'s parents were entitled to choose a private one-on-one

19  teaching environment over the Academic Lab and "co-teach" models offered at Leota,

20  but to receive any compensation from the District, they were required to demonstrate to

21  the ALJ that Brock's Academy was a "proper" placement under the IDEA.  They did not

do so, and the ALJ drew no such conclusion.  On appeal, the District has established that the ALJ erred, and the ALJ's award of monetary relief must be reversed.

**<u>Conclusion</u>**

For the foregoing reasons, the Court ORDERS:

(1)    The ALJ's decision, AR 1846–1906, is REVERSED.

(2)    The Clerk is DIRECTED to enter judgment consistent with this Order in favor of the District and against P.J.'s parents, to send a copy of the Judgment and this Order to all counsel of record, and to CLOSE this case.

IT IS SO ORDERED.

Dated this 26th day of February, 2025.

Thomas S. Zilly
United States District Judge

ORDER - 41